**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| ZHEWEN HU, | C.A. NO. _____ |
| Plaintiff, | **COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| JUMP TRADING, LLC, JUMP CRYPTO HOLDINGS, LLC, TAI MO SHAN LTD., KANAV KARIYA, and WILLIAM DISOMMA, | |
| Defendants. | |

Plaintiff Zhewen Hu ("Plaintiff"), by and through undersigned counsel, brings this action against Defendants Jump Trading, LLC, Jump Crypto Holdings, LLC, Tai Mo Shan Ltd., Kanav Kariya, and William DiSomma (collectively, "Defendants" or "Jump") for violations arising from Defendants' fraudulent scheme to manipulate the market for Terraform Labs PTE Ltd.'s ("Terraform" or "TFL") stablecoin TerraUSD ("UST") and to deceive investors about the stability and functionality of UST and its companion token Luna ("LUNA").

## NATURE OF THE ACTION

1. Of all the instances that caused crypto investors to suffer losses, the collapse of UST in 2022 was singular. It ushered in a "crypto winter" that erased roughly $2 trillion in digital asset value and saw several once-venerated pillars of the cryptocurrency industry fall.

2. UST was an algorithmic stablecoin that maintained its $1 dollar peg not through asset backing, but through a supposedly automated arbitrage mechanism with its sister token, LUNA. Terraform and its principals promised industry participants and investors, including Plaintiff, that one UST would always be redeemable for $1.00 in LUNA, the native cryptocurrency

1

of the Terra blockchain. No traditional bank reserves or other assets were supposedly required to maintain the peg.

3. But this was all a mirage. In truth, UST was not stable at all. It depended upon the support and manipulation of other industry players, who artificially propped up and supported UST's peg to defend it when UST's price dropped. Ultimately, when UST's market grew too big to support, not even the support and manipulation could restore the peg. UST became worthless.

4. To preserve the illusion that UST was actually stable, Terraform and its founder, Do Kwon ("Kwon"), enlisted Defendants, pursuant to a "gentleman's agreement," to deploy tens of millions of dollars to secretly and artificially prop up UST, leading the market to falsely believe that UST was a functional algorithmic stablecoin. In exchange for their secret participation in propping up UST, Defendants received massive amounts of LUNA at a deep discount, which they later sold for a profit of over $1.28 billion—all while the rest of the market suffered.

5. In May 2021, UST depegged—it began trading below $1.00. At its low, UST traded at $0.85, meaning it was trading at a 15% discount to its "stable" value.

6. In May 2021, UST eventually repegged. As UST returned to $1.00, Kwon and Terraform publicly and repeatedly touted the restoration as a triumph of decentralization and the "automatically self-heal[ing]" UST/LUNA algorithm over the "decision-making of human agents in time of market volatility." By late May 2021, Terraform publicly boasted to the investing public that it had proven the reliability of the UST peg – the "lynchpin for the entire [Terraform] ecosystem" in a "black swan" event that was "as intense of stress test in live conditions as can ever be expected."[1]

---

[1] *SEC v. Terraform Labs Pte. Ltd.* ("SEC Action"), Trial Ex. P-57, https://www.sec.gov/files/terraform-trial-exhibit-p-57.pdf.

7.     This was false.  Between approximately May 23 and May 27, 2021, Jump, through its cryptocurrency arm Jump Crypto and its subsidiary Tai Mo Shan Ltd., purchased over 62 million UST tokens across multiple cryptocurrency trading platform venues to create phony demand for the crypto and buoy its faltering price.  Their efforts were successful.  By May 27, 2021, UST's peg was restored.  These secret coordinated purchases manipulated the market into believing that it was the algorithm that restored the $1.00 peg.  But it was secret intervention by Jump, to the tune of tens of millions of dollars, not the algorithm, that actually was responsible for restoring UST to its $1.00 peg.

8.     After the UST peg was restored in May 2021, investors, encouraged by the apparently successful stress test of UST's stability, poured additional billions of dollars into the Terraform ecosystem, mostly through investor purchases of LUNA and UST.  Plaintiff was one such investor.

9.     Defendants, together with Terraform, embarked on a campaign of falsely claiming that UST was a functional stablecoin capable of maintaining a $1.00 peg. As part of this scheme, Defendants injected false information into the market, publicly touting "Terra's stability mechanism" as effective to "balance safety," describing UST as "a highly scalable and more decentralized stablecoin," and lauding purported protections that "further strengthen[] confidence in the peg of the market's leading decentralized stablecoin."  Jump executives assured investors that even a "$450M contraction of the economy . . . should be manageable over a couple days and not impactful to prospects of the project," and represented that "UST is in high demand . . . and is generally trading at a premium."[2]

---

[2] Kanav Kariya (@KanavKariya), **X** (Mar. 8, 2022), https://x.com/kanavkariya/status/1501189252075429891.

10. One year later, however, in May 2022, under selling pressure from large UST holders, UST de-pegged again. Terraform reattempted its tried and true playbook and asked Defendants to intervene to secretly resuscitate UST. But Defendants' bailout strategy of purchasing UST on the open market this time could not be repeated. The price of UST and LUNA plummeted to nearly zero, bringing down the entire Terraform ecosystem, wiping out over $40 billion of total market value, and sending shockwaves throughout the entire crypto asset community.

11. A number of retail investors suffered due to Defendants' conduct. Plaintiff is one such investor. Plaintiff Hu's holdings, once worth more than $800 million, are now worth only a tiny fraction of that amount.

12. Terraform and Kwon have paid dearly for their fraudulent scheme. On February 16, 2023, the SEC charged Terraform and Kwon with orchestrating a "multi-billion dollar crypto asset securities fraud" by misleading users about the safety and stability of their algorithms. In June 2024, Terraform agreed to a massive $4.47 billion settlement to settle the allegations of fraud, one of the largest settlements in SEC history. In 2023, the Department of Justice charged Kwon with fraud arising from his misrepresentations concerning the stability of UST. After being arrested in Montenegro for using a fake passport, he was extradited to the United States in 2024. Kwon pled guilty to fraud and misleading investors and is currently serving a 15-year prison sentence.

13. But Terraform and Kwon did not act alone. Nor could they have. They worked together with the explicit agreement of Defendants, who made their scheme possible, played a lead role in UST's collapse, but have thus far escaped liability.

14. Plaintiff brings this action to hold Defendants responsible for their misconduct, and to recover his losses from the trading firm that enabled and participated in the fraud by falsely propping up the peg.

**PARTIES**

15. Plaintiff Zhewen Hu is a St. Kitts and Nevis citizen who, from May 2021 through May 2022, purchased UST and LUNA in reliance on public statements about the strength of the algorithmic peg. Plaintiff made his first purchase of LUNA on or about May 24, 2021, shortly after observing that UST had successfully repegged following the May 2021 depeg event. Altogether, Plaintiff invested approximately $80 million in LUNA and UST. As a result of Defendants' conduct, Plaintiff suffered losses of an amount to be proven at trial, but no less than $500 million, arising from Jump's conduct.

16. Plaintiff brings this action in his individual capacity, asserting direct claims arising from his own purchases of UST and LUNA and the injuries he personally sustained as a result of Defendants' fraudulent conduct. Plaintiff's claims are not derivative of, assigned to, or pursued on behalf of any bankruptcy estate or trust. Plaintiff did not assign or contribute any of his third-party claims to the Terraform Labs Wind Down Trust (the "Wind Down Trust") established pursuant to the Second Amended Plan of Reorganization confirmed by the United States Bankruptcy Court for the District of Delaware on September 20, 2024. The Plan Administrator appointed under that Plan does not represent Plaintiff and has no authority to assert, compromise, or release Plaintiff's claims. Plaintiff's claims are wholly independent of any claims that may be pursued by the Plan Administrator, the Wind Down Trust, or any other entity on behalf of Terraform's bankruptcy estate or its creditors. Plaintiff retained and never relinquished his individual right to seek recovery directly from Defendants for the harm caused by their misconduct.

17. Defendant Jump Trading, LLC ("Jump Trading") is a limited liability company organized under the laws of Delaware, with its headquarters located at 600 West Chicago Avenue, Suite 600, Chicago, Illinois 60654. Jump Trading is a registered broker-dealer with the SEC and a member of various exchanges. Jump Trading is one of the largest private trading firms in the world, focusing on algorithmic and high-frequency trading strategies. Jump Trading has been active in the digital assets sector since 2017. It is wholly owned by Jump Trading Holdings, LLC, which is wholly owned by Jump Financial, LLC, which is wholly owned by trusts associated with William J. DiSomma and Paul A. Gurinas, on information and belief, who are citizens of Illinois.

18. Defendant Jump Crypto Holdings, LLC ("Jump Crypto") is a limited liability company organized under the laws of Delaware, with its principal place of business in Chicago, Illinois. On information and belief, Jump Crypto is the alter ego of Jump Trading and operates as Jump Trading's crypto-related unit and division. According to Jump's annual report filed with the SEC for the year 2023, Jump Crypto is controlled by the same managing members as Jump Trading. Jump Crypto is wholly owned by DYSO TC, LLC and PXG, LLC, which are wholly owned by trusts associated with William J. DiSomma and Paul A. Gurinas, on information and belief, who are citizens of Illinois.

19. Defendant Tai Mo Shan Limited ("Tai Mo Shan") is a Cayman Islands corporation with its principal place of business in Grand Cayman, Cayman Islands. Tai Mo Shan is a subsidiary of Jump Crypto. On information and belief, Tai Mo Shan is the alter ego of Jump Crypto and Jump Trading, operating as a unit and division of Jump. Tai Mo Shan is wholly owned by TMS-HC Ltd., which is wholly owned by Jump Crypto Holdings LLC, which is wholly owned by DYSO TC, LLC and PXG, LLC, which are wholly owned by trusts associated with William J. DiSomma and Paul A. Gurinas, who, on information and belief, are citizens of Illinois.

6

20. Defendant Kanav Kariya ("Kariya") was the President of Jump Crypto from September 2021 through June 2024. Defendant Kariya was the public face of Jump Crypto and was in charge of managing the relationships between Jump and others in the crypto community. Defendant Kariya was personally involved in, and corresponded directly with, Kwon during the fraudulent re-peg of UST in May 2021. Kariya was also a member of the Governing Council of the LUNA Foundation Guard ("LFG"), which would purportedly serve as an asset reserve to defend UST's $1 peg. Six venture capital firms funded LFG, including Jump Crypto. On information and belief, Kariya is a citizen of Illinois.

21. Defendant William DiSomma ("DiSomma") is a founder and co-owner of Jump Trading. On information and belief, Defendant DiSomma ran the Jump Crypto team and personally directed the trading of UST to reestablish the peg in May 2021. On information and belief, DiSomma is a citizen of Illinois.

## JURISDICTION AND VENUE

22. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Racketeer Influenced and Corrupt Organizations Act under 18 U.S.C. § 1964.

23. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because there is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

24. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claims that they form part of the same case or controversy.

25.     Personal jurisdiction exists over Defendants because Defendants' principal places of business are in this District, Defendants transact business in this District, and the alleged misconduct occurred substantially in this District.  *See* 735 ILCS 5/2-209.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to these claims occurred in this judicial district.  Jump Trading, Jump Crypto, and related entities are headquartered in Chicago, Illinois.  The personnel, strategy decisions, and investment actions underlying the alleged misconduct substantially occurred within the State of Illinois.

## STATEMENT OF FACTS

### A.     Cryptocurrency and Stablecoin Background

27.     Cryptocurrency refers to a class of digital assets that use cryptography to secure transactions and verify ownership.  Unlike traditional currency issued and controlled by centralized authorities such as banks, cryptocurrencies typically operate on decentralized networks without any centralized control.

28.     Transferring cryptocurrency requires a private key and a public key: The sender must know the recipient's "public key," which functions like an account number.  To authorize the transaction, the sender uses a "private key," comparable to a PIN or password, that confirms the sender's authority to transfer the assets.  Once authorized, the transaction is permanently recorded on the blockchain, reflecting the change in ownership.

29.     Cryptocurrency markets are notoriously volatile and may fluctuate widely. This makes some cryptocurrencies less suitable as a medium of exchange for routine transactions.

30.     "Stablecoins," in contrast, refer to cryptocurrencies whose value is intended to remain stable as measured against a pegged asset. Many stablecoins are pegged to the U.S.  dollar,

where the price of the stablecoin is supposed to always remain at or near $1.00. This is designed to solve the volatility problem and improve the suitability of cryptocurrencies as a medium of exchange.

31.     There are two main types of stablecoins: reserve-backed stablecoins and algorithmic stablecoins. Reserve-backed stablecoins rely on reserves of cash or other assets (such as U.S. Treasury securities or other cryptocurrency) to back the stablecoin's value and ensure that holders can redeem their stablecoin for its established value.

32.     Algorithmic stablecoins do not maintain reserves to back the stablecoin's value. Instead, they purport to rely entirely on algorithms to keep the price pegged to $1.00. These algorithms attempt to control supply and demand automatically. For example, if the stablecoin's price falls below its $1.00 peg, such as to $0.95, the system may incentivize arbitrage by allowing users to "burn" (destroy) the stablecoin in exchange for $1.00 worth of a companion token. This creates an immediate $0.05 profit for the arbitrageur and reduces the supply of the stablecoin, pushing its price back toward $1.00.

33.     Conversely, if the stablecoin rises above $1.00, for example to $1.04, the system may mint additional stablecoins or encourage users to exchange their companion token for stablecoins below face value. This allows an arbitrageur to capture a $0.04 profit and increases the supply of the stablecoin until the price moves back toward the $1.00 target. In theory, this self-adjusting mechanism replaces the role of real-world reserves; in practice, it depends entirely on continued market confidence and can collapse rapidly once that confidence erodes.

34.     UST purported to be an algorithmic stablecoin, i.e., one that maintained its peg automatically by virtue of an arbitrage system against LUNA. But UST was not really a stablecoin,

and, in truth and in fact, required massive, secret intervention by Jump in order to maintain the peg and avoid a loss of confidence in the algorithm sparking a bank run.

**B.      The Terra Blockchain and UST Stablecoin**

35.      Do Kwon founded Terraform in 2018.  Terraform created and developed the Terra blockchain and various crypto assets associated with that blockchain, including UST and LUNA.

36.      On April 24, 2019, Terraform minted one billion LUNA, the primary cryptocurrency used for the Terra blockchain.[3]  Terraform later issued UST, a stablecoin that supposedly would always be equivalent to $1.00 in value.[4]  Under the Terra protocol (i.e., the operating rules for the software), it was possible to trade LUNA for UST and vice versa.[5]

37.      UST purportedly maintained its stable $1.00 value through an automated arbitrage mechanism linked to LUNA.[6] Because of the arbitrage algorithm, in theory, holders of LUNA could always swap $1.00 worth of LUNA for one UST.[7]  For example, if LUNA traded at $11.00, then a user could burn LUNA for eleven UST.  And holders of UST could likewise exchange one UST for $1.00 worth of LUNA.

38.      This created an arbitrage incentive, the net effect of which was supposed to be maintaining the price of UST at one dollar.  If, for example, UST dropped to $0.97, traders could buy UST at that price and exchange it for $1.00 worth of LUNA, "burning" UST and "minting" LUNA.  Doing so reduced the supply of UST and, in theory, would increase its price until it reached $1.00.

---

[3] *See SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-01346, Trial Tr. at 225 (S.D.N.Y. May 10, 2024), ECF No. 258.
[4] *See SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-01346, Trial Tr. at 98 (S.D.N.Y. May 10, 2024), ECF No. 248.
[5] *See SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-01346, Trial Tr. at 81 (S.D.N.Y. May 10, 2024), ECF No. 256.
[6] *Id.*
[7] *See SEC v. Terraform Labs*, Trial Tr. at 71, ECF No. 248.

39.     Likewise, if UST's price rose to $1.04, holders could burn $1.00 worth of LUNA to mint one UST (worth $1.04).  If the arbitrageur then sold that UST on the secondary market, it earned them an immediate $0.04 profit, increased the supply of UST, and thus helped stabilize its price back toward $1.00.

40.     This arbitrage mechanism was central to the marketing and sale of UST and LUNA. As explained below, investors were led to believe that UST would maintain its peg without the need for any human intervention or cash reserves.

41.     Unlike UST, LUNA did not purport to be a stablecoin.  Its value instead increased as more investors began transacting on Terra and using the Terra ecosystem.  The Terra ecosystem was especially promising in yield protocols, with one protocol, called Anchor, offering double-digit yield returns. This alone attracted thousands of retail investors into the Terra ecosystem. LUNA reached an all-time high in April 2022 when the price of LUNA exceeded $119.00.

42.     UST and LUNA were designed to be interdependent through the mint/burn swap mechanism, and confidence shocks in one could spill into the other.  When UST traded near its intended $1.00 value, confidence in the Terra ecosystem increased, which in turn supported demand for LUNA.  Increased demand for LUNA generally placed upward pressure on its price. Conversely, a sustained decline in LUNA's price undermined confidence in the Terra ecosystem and impaired confidence in UST.  Similarly, when UST de-pegged from its $1.00 value, losses of confidence in UST translated into reduced confidence in LUNA, creating the risk of rapid sell-offs of both tokens.

**C.      Jump's Relationship with Terraform**

43.      Jump is a Chicago-based proprietary trading firm whose investment strategies focus on algorithmic and high-frequency trading.  Jump has been active in the digital assets sector since 2017, being one of the first proprietary trading firms to begin trading Bitcoin and Ethereum.[8]

44.      Jump has been described as a "bigger risk taker than most traditional trading firms when it comes to crypto."[9]  In 2019, NYSE Chicago sanctioned Jump for failing to maintain sufficient risk-management controls designed to reduce the risk of erroneous orders.  Jump was fined $250,000 and had to certify to remediating the deficiencies the exchange had identified.[10]

45.      Jump's and Terraform's relationship began in 2019 after Tak Fujishima, a director at Jump Trading, met Kwon at a conference in Singapore.  Fujishima later reached out to Kwon and stated that Jump "might be interested in partnering with you on Terra."[11]  About a week later, he and Kwon arranged a call that included additional Jump personnel, including Kariya.

46.      Jump recognized that the Terra ecosystem needed additional liquidity to succeed, so it presented itself to Kwon as uniquely suited for supplying that liquidity and accelerating Terra's growth.

47.      In November 2019, Jump and Terraform entered into the first of several secret agreements for Jump to act as a market-maker providing liquidity for the Terra ecosystem.  In exchange for this service, Jump received a "loan" of 30 million LUNA with repayment prices

---

[8]      Insights4VC,      Inside      Jump      Crypto's      $1.3B      Terra      Trade,      Substack      (July      17,      2025), https://insights4vc.substack.com/p/inside-jump-crypto-13b-terra-trade.
[9] Bloomberg News, Jump Trading Prowls for Edge With Crypto Winter Hammering Peers, Crain's Chicago Business (June      17,      2022),      https://www.chicagobusiness.com/finance-banking/jump-trading-prowls-edge-cryptocurrency-winter-hammering-peers.
[10] NYSE Chi., Inc., Order Instituting Proceedings, Accepting Settlement, Making Findings, and Imposing Sanctions, Proceeding      No.      2018-11-00017      (Sep.      12,      2019),      https://www.nyse.com/publicdocs/nyse/markets/nyse-chicago/disciplinary-actions/2019/Jump%20Trading%20Order.pdf.
[11] Trial Tr. at 229, *SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-01346-JSR (S.D.N.Y. 2024), ECF No. 258.

ranging from $0.36 to $0.56 per token.[12]  In substance, the arrangement functioned like an option to purchase up to 30 million LUNA at an extremely low strike price.  These prices were significantly below LUNA's market value.

48.      By acting as a market-maker for the Terra ecosystem, Jump stood ready to buy and sell, thereby supporting broader adoption of UST and LUNA.  Jump agreed to provide Terraform with many of these conventional market-making services.  It committed to taking steps to increase liquidity in LUNA markets and to help "grow adoption of Terra stable coins.[13]

49.      But the relationship went far beyond standard market making. Typically, market makers keep a neutral position thereby remaining price-agnostic and instead earning a profit from trading volume and bid-ask spreads rather than taking a short or long position.  But Jump, in contrast, with access to millions of dollars' worth of discounted LUNA, essentially held a long position in LUNA, meaning Jump would profit significantly as the value of LUNA increased.

50.      Under a so-called "Gentleman's Agreement," Jump further agreed to "help maintain" UST's 1-to-1 peg with the U.S. dollar.  Specifically, Kariya agreed as follows in an August 26, 2020 email to Kwon:[14]

---

[12] *Sec. & Exch. Comm'n v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 458 (S.D.N.Y. 2023)
[13] U.S. Sec. & Exch. Comm'n, *Terraform Labs Trial Exhibit P-284*,
https://www.sec.gov/files/terraform-trial-exhibit-p-284.pdf (last visited Apr. 6, 2026).
[14] *Id.*

> Gentleman's agreement -
> 1. We will support trading on terra stable coin pairs on all exchanges we're connected to and help maintain the peg
> 2. We will thicken up LUNA markets further
> 3. We will tap our partners to help grow adoption of Terra stable coins (exchanges, DeFi partners, OTC, etc..)
> 4. Terraform labs will facilitate OTC creation/redemption of Terra stable coins on best efforts basis
>
> We have a number of exciting ideas on how we can work together to achieve both, these numbers and broader adoption in the DeFi ecosystem and we're ready to get going! I'm looking forward to hearing from you soon, open to any thoughts or feedback.
>
> Best,
> Kanav

51. This agreement imposed no constraints on how Jump would maintain the peg, only that it would do so, effectively granting Jump broad discretion to influence UST and LUNA markets in a manner fundamentally inconsistent with the limited, neutral function of a traditional market maker. Critically, Jump's commitment to "help maintain the peg" reflects Defendants' knowledge that UST was not a functional stablecoin.

52. Kwon wanted to make Jump's involvement public, believing that ties with a reputable trading firm like Jump Trading would give Terraform credibility and boost confidence in its stablecoin. But Jump refused.[15] Jump insisted on keeping its relationship with Terraform (and the Gentleman's Agreement) secret to avoid regulatory and public scrutiny. At the beginning of 2020, Kwon sent an email to a private group of Terra's lead investors, announcing "an important arrangement we've entered into with Jump Trading" but noting that "[a]t Jump's request, we are keeping this arrangement strictly confidential."[16]

---

[15] *See SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-01346, Trial Tr. at 67, 98, 111, 114–15, 212 (S.D.N.Y. May 10, 2024), ECF No. 258.
[16] SEC v. Terraform Labs Pte. Ltd., Trial Ex. P-282, https://www.sec.gov/files/terraform-trial-exhibit-p-282.pdf.

53.     They did just that and stayed silent.  Jump's role as the savior of the 2021 peg did not come to light until late 2023.[17]  Market participants, like Plaintiff, were thus unaware of Jump's involvement in supporting the Terra ecosystem.

54.     Jump's involvement in Terra only increased from there—and so did Jump's financial incentives. In September 2020, Terraform "loaned" Jump 65 million LUNA, again with highly discounted repayment prices.[18] The arrangement effectively granted Jump an option to purchase up to 65 million LUNA at a strike price of $0.40 per token, subject to different vesting periods.  If Jump achieved specified milestones, the LUNA would vest in 13 tranches of 5 million LUNA each.  This strike price was far below LUNA's market price.[19]

55.     Jump's agreements with Terraform thus created powerful financial incentives for Jump to protect the UST peg at all costs.  If the Terra ecosystem collapsed and LUNA became worthless, Jump's LUNA position could become worthless too.  But if LUNA's price rose, Jump stood to make billions of dollars.

56.     Throughout their relationship, Jump and Kwon kept their communications hidden. On February 10, 2021, Kariya asked Kwon to communicate exclusively through the disappearing message app Signal, explaining that Jump's "Compliance [team] feels much more comfortable here with [us on Signal using] the disappearing chats," and later reiterating that "Compliance [is] really stepping up the heat on moving over to Signal."[20]

---

[17] *SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450 (S.D.N.Y. 2023).
[18] Trial Tr. at 29, *SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-01346-JSR (S.D.N.Y. 2024), ECF No. 260.
[19] SEC v. Terraform Labs Pte. Ltd., Trial Ex. P-60, https://www.sec.gov/files/terraform-trial-exhibit-p-60.pdf.
[20] Alexander Osipovich (@aosipovich), X (Apr. 10, 2024), https://x.com/aosipovich/status/1778106293175107647.



57.     Kariya and Kwon's Signal messages to each other demonstrate just how closely Jump and Terraform were linked. Kariya messaged Kwon in early 2021 that "I think I'm going to have to get a dog named Terra by the end of this year[,]" and Kwon replied, "Name him LUNA. Then it matches mine." Kwon added, "Hope you get carry from this," which, upon information and belief, refers to Kariya making money from Jump's LUNA holdings. Kwon then followed up, stating "[b]etter than just making bill [DiSomma] slightly richer lol."[21]

**D.     The May 2021 De-Peg and Jump's Secret Bailout**

58.     Just months later, on May 19, 2021, UST suffered its first meaningful depeg. In the context of a stablecoin, a "depeg" occurs when the token's market price materially diverges from the value to which it is pegged. For UST, a depeg meant that one UST was no longer worth $1.00, undermining its defining feature as a "stable" coin. This, in turn, threatening a rapid further

---

[21] Leo Schwartz, *Jump Trading's Kanav Kariya and the Terra–Do Kwon Crypto Disaster*, Fortune (July 11, 2024), https://fortune.com/2024/07/11/jump-trading-kanav-kariya-crypto-terra-do-kwon-disaster/.

erosion of value, since the whole point of UST was to be worth a dollar, and those holding it would have an increasing incentive to dump it the longer the depeg persisted.

59. Thus, UST's ability to withstand this episode carried significant consequences not just for Terraform and investors, but especially for Jump. By that point, Jump had already invested substantial time and capital into the Terra ecosystem, was serving in secret as the primary market maker for Terra's UST and LUNA, and held large, highly profitable LUNA options that had not yet vested. As a result, Jump, unlike a typical market maker that would be agnostic to price direction, had a direct financial interest in ensuring that UST retained its peg, because continued confidence in UST directly supported the price of LUNA. That support was critical to the viability of the Terra ecosystem and to Jump's ability to profit once its LUNA options vested.

60. On May 19, 2021, UST began to dip below $1.00. The algorithm that was supposed to restore UST's peg on its own did not work.

61. When UST dipped below a dollar, the arbitrage mechanism led to mass redemptions of UST that minted new LUNA. This in turn increased the LUNA supply and put downward pressure on the price of LUNA, which made it increasingly difficult for UST to recover the peg.

62. At that time, UST's market capitalization exceeded $2 billion, and LUNA's market cap was roughly $6 billion. When the 2021 depeg began, Kariya called Kwon, and the two remained in near constant communication throughout the crisis, speaking on the phone multiple times over the next 48 hours.

63. The situation became increasingly urgent for Jump and Terraform as the price of UST fell even further below a dollar. By May 23, 2021, UST had sunk to around $0.90, falling

17

far short of its $1.00 peg. That day, Kariya spoke repeatedly with Kwon to formulate plans to secretly restore UST's peg, including engaging in five Signal calls.[22]

64. Internal Terraform communications reflected these efforts. Terraform's then-head of business development, Jeff Kuan, told Terraform's then-head of communications, Brian Curran, that Kwon had "just randomly called me" to relay that Terraform was "speaking to Jump about a solution" to the depeg.[23] Curran explained that Terraform itself was "going to deploy $250 million from stability reserve *through Jump* to stabilize the peg."[24]

65. Jump's contemporaneous internal communications further confirm the severity of the crisis. In one message sent during the 2021 depeg episode, DiSomma wrote that LUNA was "under massive selling pressure, LUNA down 40% – fear of a bank run given that UST is 'backed' by LUNA … Needed to support UST directly on [cryptocurrency exchange] KuCoin."[25]

66. Jump could not allow the Terra ecosystem to collapse. If Terra failed and LUNA became worthless, Jump's opportunity to reap enormous profits from its existing LUNA holdings and its deeply in-the-money LUNA options would disappear.

67. Kariya advanced several proposals to Terraform on Jump's behalf. He proposed that Kwon grant Jump access to Terraform's own funds so that Jump could trade on Terraform's behalf to stabilize UST. Kwon declined. After all, Jump had already committed under the "Gentleman's Agreement" to defend the UST peg, and Terraform was not prepared to relinquish direct control of its funds.

---

[22] U.S. Sec. & Exch. Comm'n, *Terraform Labs Trial Exhibit P-258A*, https://www.sec.gov/files/terraform-trial-exhibit-p-258a.pdf.
[23] *SEC v. Terraform Labs Pte. Ltd.*, 708 F. Supp. 3d 450, 479 (S.D.N.Y. 2023).
[24] *Id.* (emphasis added).
[25] U.S. Sec. & Exch. Comm'n, *Terraform Labs Trial Exhibit P-68*, https://www.sec.gov/files/terraform-trial-exhibit-p-68.pdf.

68.     Jump had the trading infrastructure to help repeg UST across all exchanges, so Jump had leverage. Jump capitalized, indicating that it would not defend the peg without Kwon agreeing to provide substantial additional consideration. Specifically, Kariya and Jump demanded that Terraform eliminate all vesting requirements in the parties' prior LUNA agreements, which would make Jump's LUNA options immediately exercisable. Kwon agreed. This meant that Jump could ultimately purchase millions of LUNA at prices substantially below market value, and with no performance requirements, for hundreds of millions of dollars in instant gains.

69.     Jump quickly celebrated the concessions it had extracted. During a May 23, 2021, company-wide "Always On" Zoom call, Kariya told DiSomma and other Jump employees that he had "spoke to Do [Kwon, and] he's going to vest us."[26] Other Jump personnel immediately understood the significance. As former Jump employee James Hunsaker, who filed an SEC whistleblower complaint against Jump Trading, later explained, "the previous vesting conditions no longer applied, and if Jump helped with the depeg, the deal would be fulfilled."[27]

70.     Having extracted these concessions, DiSomma, Kariya, and other Jump employees jumped to action. DiSomma began instructing Jump traders about how to trade UST. Their trading strategy was straightforward: Jump needed to purchase massive amounts of UST. This reduced redemptions and alleviated pressure on LUNA, thereby artificially propping UST's price back to $1.00. Far from algorithmic, this was an external actor making huge, secret purchases without disclosing them to the market.

71.     Between 9:30 and 10:00 a.m. CT on May 23, 2021, less than 30 minutes after a call between Kwon and a Jump executive, Jump purchased 10 million UST in an effort to artificially

---

[26] Trial Tr. at 84, *SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-01346-JSR (S.D.N.Y. 2024), ECF No. 256.
[27] *Id.* at 85.

restore the peg.[28] On one crypto exchange, KuCoin, during a half-hour period, Jump purchased more than twice as much UST as it typically purchased over an entire day.[29] Again, Jump was attempting to artificially restore the peg, when the algorithm was supposed to accomplish this automatically had failed to do so.

72.     These actions constituted a stark break from Jump's prior market-making practices. Before the depeg, Jump engaged in conventional market making for UST, using basic trading models designed to maintain a flat position by buying and selling roughly equal quantities of the asset, without taking on directional price risk. The conduct at issue bore no resemblance to those neutral, liquidity-providing activities.

73.     After Terraform eliminated all vesting conditions on May 23, 2021, DiSomma instructed Jump traders to fundamentally overhaul their trading approach. Abandoning its prior market-making strategy, Jump stopped balancing purchases and sales of UST and instead began buying and holding more and more UST.

74.     Between approximately May 23 and May 27, 2021, Jump made net purchases of more than 62 million UST tokens anonymously on multiple cryptocurrency exchanges to restore UST's $1.00 peg. As DiSomma wrote in an internal Jump Slack chat on May 24, 2021, Jump was "deploying $100 million to buyback UST."[30]

75.     By May 27, 2021, UST's $1.00 peg was restored, but only because of Jump's trading activity. The algorithm did not restore the peg. Without Jump's intervention, the underlying vulnerabilities of the so-called algorithmic stablecoin UST would have been exposed to the market in May 2021.

---

[28] U.S. Sec. & Exch. Comm'n, *Terraform Labs Trial Exhibit P-197*, https://www.sec.gov/files/terraform-trial-exhibit-p-197.pdf.

[29] *See SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-01346, Trial Tr. at 116 (S.D.N.Y. May 10, 2024), ECF No. 260.

[30] *SEC v. Terraform Labs Pte. Ltd.*, Trial Ex. P-72, https://www.sec.gov/files/terraform-trial-exhibit-p-72.pdf.

76.    Internal Jump communications demonstrated Jump's intervention and its immediate market impact.  Former Jump Chief Investment Officer Dave Olsen wrote to DiSomma, "seems like the prop to Do [Kwon] was well timed.  Lots of wood to chop still, but feels like a good start. That how you're seeing it?"[31]  DiSomma replied, "We [are] bracing for another sell storm.  It's a good start."[32]  These messages reflect a clear understanding within Jump that it had purchased substantial amounts of UST in an effort to push the price back to $1.00, that the intervention was only a temporary fix, and that further selling pressure, and another depeg, remained a real risk.

77.    At this time, Jump held large amounts of UST that it purchased over the prior days. Knowing full well that the algorithm could not maintain the peg on its own, DiSomma then instructed Jump to unwind Jump's UST positions slowly, to avoid triggering yet another collapse.

78.    The SEC's expert, Dr. Bruce Mizrach, testified at trial that "had it not been for Jump's trading, [] the peg would not have been restored, and [] UST's price would have come very close to zero [in May of 2021]."

79.    Later, in a chat reflecting on the de-peg, a Terra executive texted: "Do [Kwon] said if Jump hadn't stepped in we actually might've been fucked."  Another Terraform employee added that "[Jump] saved our ass."[33]  This sentiment was also echoed in an internal Terraform employee resource manual from 2021, which described Jump as "quietly one of the biggest players in crypto" and "the biggest on-chain market maker of UST and saved our ass in May this year."[34]

---

[31] SEC v. Terraform Labs Pte. Ltd., No. 1:23-cv-01346-JSR (S.D.N.Y.), Trial Ex. P-68, https://www.sec.gov/files/terraform-trial-exhibit-p-68.pdf.
[32] *Id.*
[33] See U.S. Sec. & Exch. Comm'n, Terraform Labs Trial Exhibit P-73, https://www.sec.gov/files/terraform-trial-exhibit-p-73.pdf.
[34] Superseding Indictment ¶ 32, United States v. Kwon, https://www.justice.gov/d9/2025-01/do_kwon_superseding_indictment.pdf.

**E.      Jump Conceals Its Role in Rescuing the UST Peg**

80.      Jump's role in stabilizing the May 2021 depeg ultimately propped up the Terra ecosystem at a moment when it otherwise would have failed.  Absent Jump's intervention and deception, Terra would have collapsed at that time.

81.      Jump's secretive intervention to restore the peg led investors, including Plaintiff, to believe that Terraform's algorithm was a proven success and, consequently, to flock to Terraform. This ensured that the Terra ecosystem would continue to grow, LUNA would continue to rise in value, and Jump would continue to profit handsomely.

82.      In September and October 2021, given Jump's conduct, Jump was rewarded with large quantities of LUNA at prices far below market value and without any vesting conditions. Although Terraform guaranteed Jump the right to receive 65 million LUNA, the tokens were distributed over time rather than immediately.  Jump would receive approximately 1.2 million LUNA each month through September 1, 2025.  Jump of course could then trade these tokens for an immediate profit after receipt.  The ongoing monthly deliveries of LUNA incentivized Jump to keep the Terraform ecosystem alive until Jump had received all its LUNA from Terraform.

83.      Consistent with that incentive, Jump and Terraform concealed Jump's role in restoring UST's peg after its price returned to $1.00.  Indeed, Terraform and Jump falsely told the public that the UST algorithm worked as designed.  Jump intentionally caused investors to believe that it was UST's algorithm, not Jump's surreptitious purchases, that restored UST to its $1.00 peg.  Jump continued to promote LUNA and UST through, among other means, websites, web applications, social media accounts, podcast interviews, and through U.S. media.

84.      For example, on May 24, 2021, Terraform published a 29-post thread on its official Twitter account discussing the depeg.  At no point did Terraform disclose that UST's peg was

restored as the result of Jump's efforts, rather than the success of the algorithm. Terraform stated that "[t]he drawdown in the price of LUNA, UST peg deviation, and collateral effects across the ecosystem in such extreme market volatility is about as intense a stress test in live conditions as can ever be expected. We just experienced a black swan. Despite sharp dislocations, the on-chain swap spreading is mending, UST peg is normalizing."[35] This statement was false and misleading. UST's peg was restored not by the algorithm or "on-chain swap spreading" but by Jump's massive purchases. Jump did not do anything to correct the statement, but rather remained silent, and it benefited from its failure to act.

85. In addition to directly trading UST tokens, Jump also helped grow the market and purchaser base for UST through its "Wormhole" bridge protocol, which was adopted by Terraform in August 2021 as the preferred mechanism for transferring UST between the Terra, Ethereum, Binance, and later Solana blockchains. On August 9, 2021, Terraform and Jump (through Wormhole) released a statement that "Terra Goes Live on Wormhole V2." This statement falsely described UST as a "censorship-resistant, infinitely scalable, algo-pegged USD stablecoin."

86. On September 14, 2021, Kariya made it clear just how closely Terraform was working with Jump, omitting that "working" together actually meant Jump's artificially supporting the peg and buying UST from the market in May 2021 to artificially restore the peg: [36]

---

[35] United States v. Kwon, Superseding Indictment at 25 (S.D.N.Y. Jan. 2025), https://www.justice.gov/d9/2025-01/do_kwon_superseding_indictment.pdf.
[36] Kanav Kariya (@KanavKariya), **X** (Sept. 14, 2021), https://x.com/KanavKariya/status/1437822736693407745.



87. That same day, Jump received 10 million LUNA pursuant to its agreements with Terraform. With a market price of approximately $35.00 and a strike price of $0.40, Jump made nearly $350 million of unrealized profits on that day alone.

88. On October 11, 2021, Jump published an article entitled "Stablecoins: The Impending Rise of a Multi-Trillion Dollar Market," suggesting that algorithmically stabilized assets would be one of the stablecoin "winners," and touting Terra as the "most prominent example."[37] Jump further stated: "We are particularly excited about Terra and their dollar stablecoin UST, which we believe is the most elegant solution for creating a highly scalable and more decentralized stablecoin." Jump concealed that it was artificially supporting the peg and bought UST from the market in May 2021 to restore the peg.

89. On January 10, 2022, Jump, through Kariya, admitted it had profited from the scheme, stating "the hotness of fresh money can be jarring" and that "We're up 100% over the last year."[38] But Jump did not disclose its role in the covert scheme to artificially inflate the price of UST.

---

[37] Jump Capital, *Stablecoins: The Impending Rise of a Multi-Trillion-Dollar Market*, TABB Forum (Oct. 11, 2021), https://tabbforum.com/opinions/stablecoins-the-impending-rise-of-a-multi-trillion-dollar-market/.
[38] Kanav Kariya (@KanavKariya), X (Jan. 11, 2022), https://x.com/KanavKariya/status/1480738288835121158.

90. On January 28, 2022, in a ten-part tweet series, Kariya on behalf of Jump tweeted: "There's a lot of confusion and panic on the MIM and UST today. Hoping this thread can provide a clear unemotional take on the situation."[39] Kariya further stated: "It's difficult to imagine a sustained mass exodus to UST given the circumstances. In the event it occurs, there is potential for UST to be sold/burned and provide some downward pressure on LUNA price. Worth noting that the UST supply is >$11B and UST in Abracadabra is ~$900M."[40] This statement was false and misleading. Kariya told the public that UST was stable even though he knew it was not. He knew that UST had regained its peg in May 2021 only because of Jump's assistance. Kariya also omitted any mention of Jump's involvement in the May 2021 depeg.





[39] Kanav Kariya (@KanavKariya), **X** (Jan. 28, 2022), https://x.com/KanavKariya/status/1486930291927175170.
[40] Kanav Kariya (@kanavkariya), **X** (Jan. 28, 2022), https://x.com/kanavkariya/status/1486930299711897605.

91.     Kariya tweeted on March 8, 2022 about the "high demand"[41] for UST, but again concealed that Jump had manipulated the market to manufacture much of that demand and support UST's price.



92.     On April 7, 2022, Kariya publicly celebrated the Terra ecosystem by tweeting: "Alignment across ecosystems and a commitment to a multi chain future.  UST centric DeFi ecosystem, cross pollination of culture with gaming subnet, AVAX as a high quality reserve asset in the LFG.  Win, win, win."  Here, Kariya promoted UST while omitting Jump's financial interest and its role in supporting the peg.

93.     On May 1, 2022, Kariya tweeted: "Terra, even more so than other ecosystems has a really interesting suite of liquidity primitives that are likely to dictate flows.  The governance layer across this is a very natural next step[.] Excited to support a great team tackling this space." This statement was misleading.  Kariya promoted Terra knowing that Terra did not have adequate governance or liquidity in the event of a market panic like the one experienced in May 2021.

94.     On May 3, 2022, Kariya (on behalf of Jump Crypto) appeared on a podcast entitled "Validated"[42] where he promoted the Terra ecosystem and its cross-chain capabilities.  In

---

[41] Kanav Kariya (@kanavkariya), **X** (Mar. 8, 2022), https://x.com/kanavkariya/status/1501189252075429891.
[42] Kanav Kariya, President of Jump Crypto, Episode 65, Apple Podcasts (May. 3, 2022), https://podcasts.apple.com/sk/podcast/kanav-kariya-president-jump-crypto-ep-65/id1476353378?i=1000559444072.

discussing the potential for bad actors to harm investors, Kariya falsely stated that "there is almost no possibility for one collusion across these landscapes, given the composition of the people in the network and the incentive structure, again, is obviously explicitly set up to discourage that." This statement was false and misleading because Jump had colluded with Terraform and Kwon to bail out the UST peg in May 2021. In all instances, Kariya acted and communicated on behalf of Jump and in furtherance of Defendants' scheme to profit by concealing that UST was not in fact a functional stablecoin. On information and belief, DiSomma knew, should have known, or was willfully ignorant of these acts and communications and approved, authorized, acquiesced in, ratified, or accepted the benefits of these false statements and misleading omissions.

95. Jump's concealment of its role allowed Terraform executives to state publicly that the algorithm backing UST had functioned as designed. Jump knew, and in fact demanded, that its role in restoring the peg be kept secret. Terraform's then head of communications, Brian Curran, later testified that he "was directed not to"[43] publicly disclose Jump's role in repegging UST by Kwon himself, reflecting Kariya's repeated requests that Kwon keep Jump's intervention confidential.

96. Jump's concealment successfully induced the market, including Plaintiff, to believe that the algorithm backing UST worked as promised and that UST could be relied upon as an algorithmic based stablecoin.

97. Had the truth been disclosed, Plaintiff would not have purchased tens of millions of dollars' worth of LUNA after UST's repeg in 2021. Instead, Jump's conduct caused Plaintiff to continue trading UST under the false belief that its stability resulted from the algorithm, rather than from undisclosed, discretionary market intervention by Jump.

---

[43] Trial Tr. at 98, *SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-01346-JSR (S.D.N.Y. 2024), ECF No. 258.

27

F.      The LUNA Foundation Guard ("LFG")

98.     In the wake of the May 2021 depeg, Kwon and Jump recognized the fragility of the Terra ecosystem and the inadequacy of relying solely on Jump's covert, unilateral purchases to defend UST's peg, prompting them to consider alternative mechanisms to sustain it.

99.     In subsequent discussions, Kwon and Kariya agreed to establish a public-facing mechanism ostensibly designed to protect against future depegs. Those discussions led to the creation of LFG.

100.    On January 19, 2022, Terraform announced the formation of LFG, a Singapore-based nonprofit organization, which would purportedly serve as an asset reserve to defend UST's $1.00 peg. The announcement stated that LFG was created for "facilitating the growth of the Terra ecosystem" and "improving the sustainability and stability of Terra's algorithmic stablecoins."

101.    The announcement also characterized the May 2021 depegging of UST as a source of "important lessons" and declared that "UST weathered a massive, reflexive drawdown in the LUNA price in May [2021]" "by concentrating almost explicitly on bootstrapping the demand-side of algorithmic stablecoins," which purportedly disproved the "misconception that algo[rithmic] stablecoin designs are unsustainable." This statement was false and misleading. UST did not "weather" the May 2021 depeg through the algorithm. UST's peg was restored only because of Jump's secret intervention.

102.    Kwon publicly stated that LFG would be overseen by a supposedly "independent" "Governing Council," consisting of Kwon, Kariya, and several other individuals (the "LFG Governing Council").

103.    LFG's website (which on information and belief was financially supported by Jump and others) further repeated the false claims that UST's $1.00 peg was effectively maintained by

28

its algorithm. The website further falsely stated that "[n]either LFG nor any other entity that assisted with the UST Reserve protocol profit from it." This statement omitted the material fact that Jump had made over $1.28 billion in profits from selling the LUNA tokens it received at a steep discount in exchange for artificially propping up the price of UST.

104. LFG's sole source of funding consisted of tokens transferred by Terraform. Between LFG's creation and May 2022, at Kwon's direction and just as Jump wanted, Terraform made three separate transfers to LFG, each approximately one month apart. Through these transfers, Terraform conveyed a total of 72 million LUNA and 10 million UST to bolster LFG's reserves. At the time of the transfers, these assets had a combined value over $5.5 billion.

105. Terraform received nothing in return, but these transfers were for the direct benefit of Jump. Defendants encouraged Kwon to funnel Terraform's tokens to LFG. As LFG accumulated reserves through Terraform's contributions, Jump reduced the risks that it would need to deploy its own capital to defend UST's peg again, as it had during the May 2021 depeg, while continuing to prop up the Terraform ecosystem.

106. Following these transfers from Terraform, LFG, acting under the direction of Kwon and Jump, sold LUNA tokens in exchange for other crypto assets, such as Bitcoin, purportedly to hold in reserve for use in defending UST's peg. Jump led and coordinated these transactions on LFG's behalf.

107. For example, on information and belief, in January 2022 LFG entered into two separate token sale arrangements with Jump-controlled entities: a $330 million agreement with J Digital 6 Cayman Ltd. and a $20 million agreement with JCDP7QP LLC. In addition, a March 2022 LFG board resolution noted plans for LFG to acquire $250 million in Bitcoin through Jump Capital. Each of these transactions granted purchasers LUNA at a 40% discount to market value,

29

subject to a two-year lockup period, with 25% of the tokens unlocking every six months. After Jump itself designed these discounted token sale terms, it participated in the sale, acquiring several hundred million dollars' worth of deeply discounted LUNA.

108.    Despite this extensive control and self-dealing, Jump continued to mislead the market by portraying LFG as an independent entity and suggesting that the UST algorithm, supplemented by LFG's reserves, enhanced the stability of the Terra ecosystem.

109.    On February 22, 2022, Jump Crypto tweeted: "We're happy to announce that we are leading the LUNA Foundation Guard's $1B token sale that establishes a $UST forex reserve denominated in #bitcoin...  The UST Forex Reserve (Automated Market Reserve) backstops the UST peg in times of severe volatility."



110.    In a press release accompanying the announcement, Kariya stated that "[t]he UST Forex Reserve further strengthens confidence in the peg of the market's leading decentralized stablecoin[,] UST," comparing the system to "how many central banks hold reserves of foreign currencies."

111.    Similarly, on March 1, 2022, Kariya appeared on Jump Crypto's podcast "The Ship Show" alongside Kwon.  Kwon and Kariya discussed Terra and UST.  Kwon reiterated his false

30

description of UST's re-peg as "purely algorithmic," "natural[]," and "automatically self-healing," omitting the truth about Jump's intervention.[44]  Kariya, who also participated in the episode, did not correct Kwon's false statements or reveal Jump's role.  Kariya explained that "LFG holds a billion dollars of Bitcoin, which is an extremely sizable Treasury reserve, and the LFG also has plans to increase its reserve size."[45]

112.    Contrary to these public statements, Kwon, Kariya, and Jump knew that LFG was not an independent organization set up to allow independent protection against a depeg event.  In fact, LFG's assets were never insulated from the influence or control of either Kwon or Jump.

113.    Instead, Kwon and Kariya (on behalf of Jump) jointly directed the deployment of LFG's resources.  Together, they exercised effective control over LFG by deciding when, how and to whom LFG would sell LUNA and convert the proceeds into Bitcoin for reserve purposes.

114.    For Kwon, LFG provided a vehicle to funnel Terraform assets beyond the reach of creditors.  For Defendants, LFG served as a pool of capital that could be tapped to support the peg without risking its own funds, thereby protecting the value of Defendants' LUNA holdings, and ensuring Jump did not have to deploy its own capital to do so.

**G.      The Second Depeg in May 2022**

115.    The illusion of stability did not last long.  In May 2022, UST experienced another significant depeg.  By this time, the Terra ecosystem had grown to approximately $45 billion based, in large part, on the many public statements about independence and the strength of the algorithm.

---

[44] U.S. Sec. & Exch. Comm'n, *Terraform Labs Trial Exhibit P-59B*, https://www.sec.gov/files/terraform-trial-exhibit-p-59b.pdf.
[45] *Id.*

116. On May 7, 2022, the price of UST began to decline, and its price dropped to $0.986. The first depegging of UST occurred on the decentralized exchange ("DEX"), Curve. A DEX is a peer-to-peer protocol facilitating cryptocurrency trading directly between users without intermediaries like banks or centralized entities. DEXs operate via smart contracts on a blockchain, ensuring users maintain full custody of their funds in private wallets, which they use to interact with the DEX. Trades on a DEX occur through a smart contract called a liquidity pool. Curve is one such DEX and operates on multiple blockchains, including the Ethereum blockchain.

117. Curve had a liquidity pool that included UST, known as Curve3 or the 3pool (the "Curve 3Pool"), and it provided liquidity for UST and other cryptocurrency stablecoins pegged to the U.S. dollar. In May 2022, Terraform had plans to expand the Curve 3Pool to a 4pool (the "Curve 4Pool"), which would include UST, USDC, USDT, and FRAX, another stablecoin pegged to the U.S. Dollar. The Curve4Pool would be the preferred liquidity venue for UST on Ethereum. Kwon announced the Curve 4pool via a tweet on May 3, 2022.

118. To migrate from the Curve 3Pool to the Curve 4Pool, Terraform and, upon information and belief, Jump, withdrew UST liquidity from the Curve 3Pool. The exact date and time for these liquidity withdrawals and subsequent creation and planned movement of liquidity into the Curve 4Pool was not announced to the public.

119. On May 7, 2022, Terraform started to withdraw large amounts of UST from the Curve 3Pool to migrate the liquidity to the Curve 4Pool. The removal of large amounts of UST liquidity in the Curve3Pool made the peg of UST vulnerable. Less than 10 minutes following Terraform's withdrawal, multiple large institutional traders began to exchange UST for other stablecoins in the Curve 3Pool. One of those institutional traders was later discovered as Jane

Street, a trading firm. These large sales of UST in the Curve 3Pool started the final downfall of UST.

120. By the morning of May 8, 2022, as UST's price continued to drift away from $1.00, Kwon and Kariya determined that it was time to deploy the assets Terraform had previously transferred to LFG (and thus Jump) in an effort to defend the peg. On information and belief, Kwon instructed Defendants to artificially increase demand by deploying hundreds of millions in Bitcoin as purchasing power to support UST in the open market. On information and belief, Kwon did not seek input or approval from the Governing Council—he simply relayed the decision that had already been made by Kwon and Jump.

121. At Kwon's and Jump's direction, LFG transferred the Bitcoin to Jump, which was tasked with executing the transactions, ostensibly to defend UST's peg.

122. At Defendants' and Kwon's direction, LFG sent Jump nearly 50,000 Bitcoin,[46] worth nearly $2 billion, for no consideration. There was no agreement or restriction governing how Jump could deploy the Bitcoin, including whether Jump could trade the Bitcoin for its own benefit, prioritize its own positions over other UST or LUNA investors, or even whether it had to return any proceeds from Bitcoin sales to LFG or Terraform.

123. In the midst of the depeg, on information and belief, Kariya and other Jump executives proposed additional strategies to Kwon to maintain UST's peg, including efforts to enlist other cryptocurrency trading firms to raise new capital for Terraform. Rather than functioning as a price-neutral market maker, Jump actively sought to extend the life of the scheme by any means available, aiming to preserve Terraform long enough to extract even more LUNA

---

[46] Sam Kessler, *Luna Foundation Guard Left With 313 Bitcoin After UST Crash*, CoinDesk (May 16, 2022), https://www.coindesk.com/business/2022/05/16/luna-foundation-guard-left-with-313-bitcoin-after-ust-crash/.

profits from unsuspecting investors. All the while, those investors continued to believe that UST was a viable stablecoin whose peg was free from manipulation by self-interested actors like Jump.

124. On information and belief, DiSomma led these coordination efforts by contacting executives at multiple crypto trading firms to solicit emergency bailout funding for Terra. The goal was to secure additional capital to continue purchasing UST, thereby propping up its price and reinforcing the artificial market conditions that Jump had already helped create.

125. These outreach efforts ultimately compounded the damage to the Terraform ecosystem and further destabilized the UST peg. Several of the firms contacted by Jump and DiSomma were themselves aggressive, quantitatively driven trading firms, which, on information and belief, turned around and used the information they had received from Jump to trade against UST and LUNA, accelerating their collapse. For example, in February 2026, the Terraform estate sued Jane Street, a trading firm, for its insider role in the May 2022 collapse of UST. The allegations included that Jane Street used material non-public information to trade UST and profit.

126. The May 2022 depeg decimated the Terraform ecosystem. As confidence collapsed, UST's price continued to fall, prompting more investors to withdraw and liquidate their UST and LUNA, which in turn accelerated the decline. This feedback loop rendered both UST and LUNA effectively worthless and left unwitting investors with nothing.

127. As one Jump trader remarked to his colleagues during the collapse, Jump's defense of UST's peg in May 2021 took place in "simpler times," noting that "[u]nfortunately it wasn't so simple this time" compared to when "about $100 M[illion] committed was enough to re-peg."[47]

128. The May 2022 crash of UST and LUNA resulted in over $40 billion in investor losses.

---

[47] *See* Kwon Superseding Indictment at 29.

**H.     Jump Continues to Mislead the Public About Its Central Role in Terraform's Collapse**

129.    Aware that its efforts were in vain, Jump soon ceased its efforts to defend UST's peg as the price of UST neared $0.50.  Thereafter, Jump and its executives immediately sought to protect themselves.  They sought to downplay and conceal Jump's long-standing relationship with Terraform and its pivotal role in propping up UST, profiting off LUNA, defrauding investors, and destroying the Terra ecosystem.

130.    Kariya, in particular, acting on Jump's behalf, sent multiple messages to the LFG Governing Council attempting to minimize Jump's involvement in the depeg.  On May 15, 2022, he proposed edits to public statements to emphasize that Jump had not acted "as an agent of [LFG]," but merely traded over the counter with LFG.  Through this framing, Jump attempted to cast itself as a mere arms-length counterparty, even though Kariya and Jump exercised significant influence over decisions concerning the timing and manner of deploying LFG's assets, even though Jump was actively using those assets during the second depeg, and even though Jump was effectively on both sides of the transfers from LFG to Jump.  Because of Jump's and Kariya's efforts to conceal Jump Crypto's role, the eventual publication on X from May 16, 2022 did not mention any involvement of Jump Crypto or any other affiliate.  Instead, the tweet simply mentioned that LFG assets were transferred "to a counterparty."[48]

131.    Kariya repeated this effort days later.  On May 21, 2022, he revised another proposed public statement, writing to Kwon: "Hey Do, we [Jump] did one OTC [over-the-counter] trade with the LFG trading BTC [Bitcoin] for UST, we did not act as an agent for the LFG in

---

[48] Luna Foundation Guard (@LFG_org), *post* (May 16, 2022),
https://x.com/LFG_org/status/1526126703046582272.

executing any trades on its behalf." In fact, LFG transferred, for no consideration, funds to Jump for the purpose of trading for LFG to try to restore the peg.

132. Jump continued this pattern of misdirection in public communications. On June 2, 2022, Jump published an article on the Jump Crypto website entitled "The Depegging of UST."[49] The article repeated the misleading description of UST as having an "automatic"[50] mechanism to maintain its purported $1.00 peg, but ignored Jump's May 2021 intervention to manipulate the price of UST. In other words, Jump was covering its tracks.

133. Through these and other public messages, Kariya and Jump deliberately misrepresented the facts to portray Jump as a passive observer. In reality, Jump was not an innocent bystander at all, but a key participant in the market wide fraud and in the events that led to the collapse of UST and the LUNA ecosystem.

## I. Terraform Bore the Consequences While Jump Largely Escaped Accountability

134. Terraform has been left to absorb the full force of regulatory and legal fallout. The SEC investigated Terraform and Kwon and ultimately brought a civil enforcement action against them. That action concluded with Terraform and Kwon agreeing to a settlement exceeding $4 billion.

135. The Department of Justice subsequently indicted Kwon, alleging nine criminal counts, including fraud, conspiracy, market manipulation, and money laundering. In 2025, Do Kwon pleaded guilty to criminal fraud charges and was sentenced to 15 years in prison.

136. Jump was referenced, but not identified by name, in both the SEC's civil action against Terraform and the Department of Justice's indictment of Kwon. Both pleadings referenced an unnamed "Trading Firm" that participated in Kwon's fraud. That "Trading Firm" was later

---

[49] Jump Crypto, *The Depegging of UST*, https://www-webflow.jumpcrypto.com/resources/the-depegging-of-ust.
[50] *Id.*

revealed to be Jump. Similarly, Kariya and DiSomma were referenced only as "Trading Firm Executives," and their identities were not disclosed until months after Jump's role became public.

137. During the SEC's investigation, both Kariya and DiSomma were deposed. Each invoked the Fifth Amendment hundreds of times and refused to answer any substantive questions. Their explicit involvement were not publicly confirmed until March 28, 2024, when both filed motions to quash trial subpoenas in the SEC's case against Terraform.

138. The SEC's investigation additionally focused on Tai Mo Shan Ltd., a Jump subsidiary. The SEC alleged that Tai Mo Shan acted as a statutory underwriter in connection with Terraform's offers and sales of LUNA, a crypto asset offered and sold as a security, thereby violating Sections 5(a) and 5(c) of the Securities Act. The SEC further alleged that Tai Mo Shan violated Section 17(a)(3) of the Securities Act by engaging in transactions and practices that operated as a fraud or deceit on purchasers in the offer or sale of securities.[51]

139. According to the SEC, Tai Mo Shan began purchasing UST to support its market price and entered into a formal agreement with Terraform on July 21, 2021. Under that agreement, Tai Mo Shan would receive monthly installments of unlocked LUNA beginning in September 2021. The SEC concluded that Tai Mo Shan engaged in a scheme that deceived investors about the effectiveness of Terraform's arbitrage mechanism. Although the public observed UST's price rising, investors were not informed that a significant portion of demand resulted from Tai Mo Shan's purchases.

140. In December 2024, Tai Mo Shan settled with the SEC for $123 million, agreeing to pay over $73 million in disgorgement and $36 million in civil penalties.[52]

---

[51] U.S. Sec. & Exch. Comm'n, *Tai Mo Shan Limited*, https://www.sec.gov/enforcement-litigation/distributions-harmed-investors/tai-mo-shan-limited.
[52] *Id.*

141. Despite Terraform facing billions of dollars in liabilities for its role in the UST and LUNA scheme, Tai Mo Shan's settlement represented only a fraction of the penalties imposed on Terraform and a small fraction of Jump's total profits from the misconduct. Meanwhile, the remaining Jump entities and individuals involved in the fraudulent scheme have suffered no consequences for their conduct.

142. Indeed, Jump has continued to operate as usual, while earning massive returns from its fraudulent support of the Terraform scheme with no consequence and no accountability for the hundreds of millions of dollars in value that it wiped out.

### CAUSES OF ACTION
### COUNT ONE
### Violations of RICO, 18 U.S.C. § 1962(c)
### (Against All Defendants)

143. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

144. At all relevant times, Plaintiff was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

145. At all relevant times, each Defendant was and is a person within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c).

146. Together with Terraform, Defendants constitute an association-in-fact enterprise (the "Enterprise") within the meaning of 18 U.S.C. §§ 1961(4) and 1962(c). These individual persons have bonded together to form a distinct enterprise through which they could conduct a pattern of racketeering activity.

147. The Enterprise had the common goal of defrauding Plaintiff and other investors through a sophisticated, coordinated, sustained, and well-orchestrated scheme of deceptive

38

conduct and material misrepresentations made in connection with UST, LUNA, and the Terra ecosystem, in order to funnel its ill-gotten gains and promote their activities.

148. The members of the Enterprise had long-standing and ongoing relationships and agreements rooted in common ownership, common control, ongoing business dealings, and a mutual interest and participation in common activities. For example, Defendant Tai Mo Shan is a wholly owned subsidiary of Defendant Jump Crypto, which is itself a subsidiary and affiliate of Defendant Jump Trading. Defendant Kariya served as President of Jump Crypto and was a member of the Governing Council of LFG alongside Kwon. The Enterprise members entered into multiple secret agreements, including a November 2019 market-making agreement, a September 2020 LUNA options agreement, and a so-called "Gentleman's Agreement" under which Jump agreed to help maintain UST's peg. Jump further led and coordinated LFG's token sales, including a $330 million token-sale agreement with J Digital 6 Cayman Ltd. and a $20 million token-sale agreement with JCDP7QP LLC, both of which were controlled by Jump. These relationships were bound together by a shared financial interest in ensuring UST maintained its peg and the Terra ecosystem survived, so that Jump's deeply discounted LUNA options would vest and Jump could monetize its positions for billions of dollars in profits.

149. Each of the Defendants knew of the existence of, and conducted or participated in the operation or management of, the Enterprise and its affairs.

150. Each Defendant was indispensable to achievement of the Enterprise's goals.

151. At all relevant times, the Enterprise was engaged in, and its activities affected, interstate and foreign commerce within the meaning of 18 U.S.C. § 1962(c). The Enterprise regularly participated in the multi-billion-dollar international cryptocurrency industry, purchased or facilitated the purchase of UST and LUNA, and held and transferred funds and assets.

152. Defendants conducted or participated in, directly or indirectly, the management or operation of the Enterprise and its affairs through a "pattern of racketeering activity" within the meaning of 18 U.S.C. § 1961(5) and in violation of 18 U.S.C. § 1962(c), to wit, they have consistently and regularly committed multiple – more than two within 10 years of each other – predicate acts of racketeering activity, including:

**A.      Multiple Instances of Wire Fraud in Violation of 18 U.S.C. § 1343.**

153. Defendants engaged in a scheme to defraud Plaintiff and other investors. The scheme involved Defendants' facilitation of purchases and sales of UST and LUNA, as well as deceptive business practices that misrepresented the true value of UST and LUNA purchased by Plaintiff. Defendants also funneled their ill-gotten gains from Plaintiff and other investors. The ultimate objective of Defendants' scheme to defraud was and is to deceive and induce Plaintiff and other investors into purchasing UST and LUNA, which directly benefitted Defendants individually and collectively.

154. Defendants effectuated their scheme to defraud Plaintiff by engaging in a sustained course of deception, including material misrepresentations and omissions, falsification of transaction and financial records, and the use of sham transactions. In particular, Defendants misrepresented that UST was a functional "algorithmic stablecoin" capable of automatically maintaining its $1.00 peg without human intervention, when in fact UST's peg was restored in May 2021 only through Jump's secret purchase of more than 62 million UST tokens. Defendants also misrepresented that the Luna Foundation Guard was an independent organization with adequate reserves to defend UST's peg, when in fact LFG was jointly controlled by Kwon and Kariya, lacked sufficient capital to withstand a future depeg, and served primarily to shield Jump from having to deploy its own funds. Defendants further concealed their coordination with

Terraform and Kwon, including Jump's secret agreements to receive deeply discounted LUNA tokens and its "Gentleman's Agreement" to defend the peg, and misrepresented the true nature of their fraudulent business practices.

155. To advance their scheme, Defendants transmitted, or caused to be transmitted, by means of wire communication in interstate or foreign commerce, writings, signs, signals, pictures, and sounds, including, but not limited to, the following: (a) Emails, telephone calls, Signal messages, and other communications by wire and mail from or caused to be sent by Defendants encouraging or facilitating the purchase of UST and LUNA, including or incorporating false or misleading statements, or omitting material information about such tokens, the Defendants' business practices, or the relationships and connections between and among Defendants and Terraform; (b) Communications between and among each of the Defendants and Terraform facilitating the sale of UST and LUNA to Plaintiff in furtherance of the fraudulent scheme; (c) Tweets, press releases, blog posts, podcasts, and other public statements promoting the Terra ecosystem while concealing Jump's role in the May 2021 repeg; and (d) Funds transferred between and among the Defendants as payment and reward for participation in the scheme, as incentive and motivation for continuing and future participation in the scheme.

156. In operating and managing their scheme to defraud Plaintiff, Defendants engaged in numerous financial transactions. These transactions included (i) transactions constituting predicate acts of wire fraud, and (ii) transactions through which Defendants diverted proceeds of the scheme from Terraform and LFG to their personal crypto wallets. Through these transactions, Defendants siphoned funds away from the Terra ecosystem and LFG. The transactions were intended to enrich Defendants, further conceal the scheme, and prevent recovery of funds by Plaintiff and other investors.

157.    Defendants knew that the property involved in these transactions represented proceeds of unlawful activity, specifically wire fraud, based on their direct involvement in planning and executing the scheme. Defendants conducted the transactions with the intent to promote the unlawful activity and with knowledge that the transactions were designed to conceal or disguise the nature, source, location, ownership, or control of the illicit proceeds.

158.    Specifically, the predicate acts of wire fraud include the following:

a.  **Jump Trading, Jump Crypto, and Tai Mo Shan**: Between approximately May 23 and May 27, 2021, at the direction of Defendants DiSomma and Kariya, Jump Trading (through its subsidiaries Jump Crypto and Tai Mo Shan) transmitted or caused to be transmitted wire communications in interstate and foreign commerce to execute the purchase of more than 62 million UST tokens across multiple cryptocurrency exchanges, including KuCoin, for the purpose of artificially restoring UST's $1.00 peg. On May 23, 2021, between approximately 9:30 a.m. and 10:00 a.m. Central Time, Jump purchased 10 million UST—more than twice its typical daily volume on KuCoin in a single half-hour period. On May 24, 2021, DiSomma communicated via Slack that Jump was "deploying $100 million to buyback UST." These purchases were executed anonymously across multiple platforms to conceal that a single entity was artificially propping up the peg, and the proceeds and profits from this scheme were transferred electronically among the Jump entities.

b.  **Defendant Kariya**: Defendant Kariya personally participated in and directed the fraudulent scheme through numerous wire communications. On May 23, 2021, Kariya engaged in at least five Signal calls with Kwon to coordinate the secret

42

intervention to restore UST's peg. That same day, during a company-wide "Always On" Zoom call, Kariya announced to DiSomma and other Jump employees that Kwon had agreed to "vest us," meaning Terraform would eliminate all vesting conditions on Jump's LUNA options in exchange for Jump's intervention. Thereafter, Kariya made numerous false public statements transmitted via the internet promoting UST and the Terra ecosystem while concealing Jump's intervention, including: (i) a September 14, 2021 tweet praising his work "with [Kwon] and the Terra team"; (ii) an October 11, 2021 Jump article describing UST as "the most elegant solution for creating a highly scalable and more decentralized stablecoin"; (iii) a January 28, 2022 ten-part tweet series falsely assuring investors that UST was stable; (iv) a February 22, 2022 tweet promoting the LUNA Foundation Guard's "$1B token sale" and claiming its reserves would "backstop[] the UST peg"; and (v) a May 3, 2022 podcast appearance in which Kariya falsely stated that "there is almost no possibility for one collusion across these landscapes."

c. **Defendant DiSomma**: Defendant DiSomma personally participated in and directed the fraudulent trading scheme through numerous wire communications. On May 23, 2021, during Jump's internal "Always On" Zoom call, DiSomma instructed Jump traders on how to trade UST to restore the peg, and he continued to direct traders over Slack in the days that followed. On May 24, 2021, DiSomma transmitted a Slack message stating that Jump was "deploying $100 million to buyback UST." During the May 2021 depeg, DiSomma also wrote in an internal communication that LUNA was "under massive selling pressure, LUNA down 40%—fear of a bank run given that UST is 'backed' by LUNA … Needed to

43

support UST directly on [offshore cryptocurrency exchange] KuCoin." DiSomma further instructed Jump's trading team to unwind UST positions slowly to avoid triggering another collapse. In May 2022, DiSomma led coordination efforts by contacting executives at multiple cryptocurrency trading firms via electronic communications to solicit emergency bailout funding for Terra, which efforts resulted in those firms trading against UST and LUNA and accelerating their collapse.

d. All of this was part of a scheme or artifice to defraud or for obtaining money or property by means of false or fraudulent pretenses. Defendants engaged in secret, coordinated conduct to restore the $1.00 peg in 2021, hide their involvement, and thereby convince the investing public that UST was a working stablecoin. The artificial restoration of the peg in 2021 was, in and of itself, a scheme or artifice to get the investing public to part with their money and property in exchange for crypto that would have been worthless had Defendants told the truth.

**B.** **Multiple Instances of Money Laundering in Violation of 18 U.S.C. §§ 1956 and 1957.**

159. Defendants engaged in numerous, unlawful financial transactions constituting predicate acts of mail and wire fraud as part of their scheme to defraud Plaintiff and other investors. These transactions generated proceeds, which Defendants then funneled from Terraform and the Luna Foundation Guard into their private cryptocurrency wallets. Specifically:

a. **LUNA Token Transfers from Terraform to Jump**: Beginning in September 2021, Terraform transferred approximately 1.2 million LUNA tokens per month to Jump pursuant to the parties' secret agreements. On information and belief, on September 14, 2021 alone, Jump received 10 million LUNA tokens. With a

44

market price of approximately $35.00 per token and a strike price of just $0.40 per token, on information and belief, Jump realized nearly $350 million in profits on that single day. In total, these monthly distributions were scheduled to continue through September 1, 2025, with Jump entitled to receive up to 65 million LUNA tokens at prices far below market value. However, due to the crash in May 2022, Jump's maximum profit potential was cut short, limiting its total profits to $1.28 billion.

b. **Discounted Token Sales Through LFG**: In January 2022, on information and belief, LFG entered into two separate token sale arrangements with Jump-controlled entities: a $330 million agreement with J Digital 6 Cayman Ltd. and a $20 million agreement with JCDP7QP LLC. An LFG board resolution dated March 2022 documented additional plans for LFG to acquire $250 million in Bitcoin through Jump Capital. Each of these transactions granted Jump and its affiliates LUNA tokens at a 40% discount to market value. After Jump itself designed these discounted token sale terms, it participated directly in the sale, acquiring several hundred million dollars' worth of deeply discounted LUNA tokens that it could later sell for enormous profits.

c. **Bitcoin Transfers from LFG to Jump**: In May 2022, on information and belief, at Kwon's and Kariya's direction, the Luna Foundation Guard transferred nearly 50,000 Bitcoin, with a market value of nearly $2 billion, directly to Jump. By May 9, 2022, LFG had transferred a total of approximately 52,189 Bitcoin from its reserves to Jump, purportedly for use in defending UST's peg. These Bitcoin reserves were themselves proceeds of unlawful activity: they had been acquired

45

by LFG through the sale of LUNA tokens that Terraform transferred to LFG as part of the fraudulent scheme to prop up UST's price and deceive investors, and the value of those LUNA tokens was artificially inflated by the very misrepresentations and market manipulation that Defendants had perpetrated since May 2021. Jump provided no consideration to LFG or Terraform in exchange for these assets, and there was no agreement or restriction governing how Jump could deploy the Bitcoin, including whether Jump could trade it for its own benefit, prioritize its own positions over other investors, or return any proceeds to LFG.

160. Through these transactions, Defendants siphoned funds away from the Terra ecosystem and LFG for their own benefit. Defendants knew that the property involved in these transactions represented proceeds derived from unlawful activity because Defendants themselves had planned, directed, and executed the underlying scheme that generated those proceeds. They also knew that those reserves existed only because of the fraudulent inflation of LUNA's value through Defendants' misrepresentations about UST's algorithmic stability. But for Jump's fraudulent and concealed intervention, LUNA would have been worth nothing, and thus would not have been able to be sold or exchanged for hundreds of millions of dollars The purpose of these transactions was to profit Defendants, promote the ongoing fraudulent scheme, conceal its existence, and prevent recovery of the misappropriated funds by Plaintiff and other investors.

C. **Multiple Instances of Obstruction of Justice in Violation of 18 U.S.C. § 1503**.

161. On information and belief, in multiple instances, Defendants have unlawfully obstructed justice by hiding their criminal scheme from law enforcement, including the SEC and the Department of Justice, and international law enforcement authorities.

46

162.    Specifically, Defendants deliberately used the Signal messaging application with its disappearing messages feature enabled to communicate with Terraform and Kwon about the manipulation of UST, the secret agreement to restore the peg in May 2021, and other aspects of the fraudulent scheme.  Defendants did so specifically to destroy evidence of their misconduct, to prevent law enforcement from discovering the full scope of their criminal conduct, and to prevent anyone from using the communications against Defendants in an official proceeding.

163.    On February 10, 2021, Defendant Kariya asked Do Kwon to communicate exclusively through Signal, writing: "Compliance feels much mor[e] comfortable here with the disappearing chats."  Three weeks later, on March 2, 2021, Kariya followed up: "Compliance really stepping up the heat on moving over to Signal."  In chats with Kwon, Kariya further stated that Jump was "strongly pushed to move all conversation here." These messages illustrate Defendants' knowing and improper efforts to destroy evidence of their misconduct and obstruct justice.  They also show Defendants' egregious and callous wrongdoing.  The fact that Jump's *compliance department*—ostensibly responsible for developing, implementing, and ensuring that Jump and its agents followed policies and procedures meant to comply with the law felt *more comfortable* with disappearing messages is proof that Defendants knew what they were doing was wrong and did it anyway to avoid detection.

164.    Terraform and Kwon represented in their summary judgment briefing in the SEC enforcement action that Jump had "requested that communications be done through Signal" and that Kariya had "no Signal messages between him and Mr. Kwon on May 23, 2021, either because (a) there were no messages between the two or (b) they were deleted by the disappearing messages

47

function in the President's Signal app, which the record demonstrates that he, not Mr. Kwon, turned on for their chat."[53]

165. Upon information and belief, Defendants specifically used Signal chats and its auto-deletion function in their communications with Kwon and Terraform to hide evidence that could potentially be uncovered in litigation and subject Defendants to civil and/or criminal liability.

**D.      Pattern of Racketeering Actions**

166. The pattern of racketeering actions committed by Jump and Kariya includes three predicate acts, and multiple counts of each predicate act, all committed within 10 years of one another as alleged in Sections A-C above. Specifically, the pattern of racketeering actions includes: (i) causing, and then concealing, the repeg of UST in 2021, and misleading investors that the Terra Ecosystem and UST had stabilized on its own, because of the algorithm; (ii) accepting and concealing a secret quid pro quo agreement with Terraform, pursuant to which Jump agreed to artificially prop up UST's $1.00 peg in exchange for the removal of vesting restrictions on millions of LUNA tokens, issued at a strike price far below market value and immediately saleable for profit; (iii) helping to form the Luna Foundation Guard to appease skeptics and mislead consumers into believing that the Terra Ecosystem would be safe in a market downturn; (iv) siphoning billions of dollars in profits from discounted LUNA token sales and Bitcoin from the Luna Foundation Guard to private wallets; (v) using Signal disappearing message features to destroy evidence of communications regarding the scheme and to obstruct law enforcement investigations and prosecutions; and (vi) issuing ongoing and repeated false statements through

---

[53] *SEC v. Terraform Labs Pte. Ltd.*, No. 1:23-cv-01346-JSR (S.D.N.Y.), Dkt. No. 100, at 37.

their Twitter accounts, podcasts, and other media outlets designed to mislead investors about all of the foregoing.

167. Plaintiff has been injured in his business and property by reason of Defendants' violations of 18 U.S.C. § 1962(c). The injuries to Plaintiff directly, proximately, and reasonably foreseeably resulting from or caused by these violations include the loss of an amount to be proven at trial, but no less than $500 million.

168. Pursuant to 18 U.S.C. § 1964(c), Plaintiff is entitled to recover treble damages, plus costs and attorneys' fees from Defendants.

### COUNT TWO
### Conspiracy to Violate RICO, 18 U.S.C. § 1962(d)
### (Against All Defendants)

169. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

170. Defendants have unlawfully, knowingly, and willfully combined, conspired, confederated, and agreed together and with others to violate 18 U.S.C. § 1962(c) as described above, in violation of 18 U.S.C. § 1962(d).

171. By and through each of the Defendants' close business relationships with one another, and their close coordination with one another in the affairs of the Enterprise, each Defendant knew the nature of the Enterprise and each Defendant knew that the Enterprise existed beyond the Defendant's individual role.

172. Each Defendant agreed to facilitate, conduct, and participate in the conduct, management, or operation of the Enterprise's affairs through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c).

173. The participation and agreement of each of the Defendants was necessary to allow the commission of this pattern of racketeering activity.

174. Plaintiff has been injured in his business and property by reason of Defendants' violations of 18 U.S.C. § 1962(d), as set forth above.

## COUNT THREE
### Violation of the Illinois Consumer Fraud Act (ICFA), 815 Ill. Comp. Stat. 505/2
### (Against All Defendants)

175. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

176. Defendants committed deceptive acts and practices by making material misrepresentations and omissions to Plaintiff and to the broader market concerning, among other things, (i) that UST was a working "stablecoin"; (ii) Defendants' and LFG's roles in supporting or manipulating UST's peg; (iii) Defendants' financial incentives, undisclosed compensation, and discounted token arrangements; and (iv) the true risks associated with holding, purchasing, or investing in UST and LUNA.

177. Defendants' deceptive acts and practices include the specific misrepresentations and omissions alleged elsewhere in this Complaint with particularity, including (a) the public statements identified in Paragraphs 86 through 117 and 137; (b) the omissions regarding Defendants' agreements, trading conduct, and compensation alleged in Paragraphs 47 through 54; and (c) Defendants' misleading half-truths alleged in Paragraphs 86 through 117. Plaintiff incorporates those allegations in this paragraph as if fully set forth herein.

178. Defendants' omissions were material and were made with the intent that Plaintiff and other market participants rely on the absence of the concealed facts in evaluating whether to purchase, hold, or invest in UST, LUNA, and Terra-related positions.

179. In addition to being deceptive, Defendants' conduct was unfair because they exploited Plaintiff's and the investing public's ignorance of Defendants' involvement in restoring the UST peg in 2021 as a means to monetize and increase the value of their rights to acquire discounted LUNA.

180. Defendants' unfair conduct includes, among other things, exploiting information asymmetries and superior market access to influence or distort the perception of UST's stability while failing to disclose conflicts, compensation, and conduct that were necessary for market participants to evaluate the true nature and risks of holding UST and LUNA.

181. Defendants intended that Plaintiff and other market participants rely on Defendants' deceptive and unfair acts and practices. They said so themselves: they wanted "to make UST feel real" to investors.

182. At all relevant times, Defendants were engaged in "trade or commerce" within the meaning of the ICFA, including the advertising, offering for sale, promotion, and sale of goods, services, and other intangibles to market participants in connection with the Terra ecosystem.

183. Plaintiff suffered actual damages as a direct and proximate result of Defendants' deceptive and unfair acts and practices, including but not limited to losses on UST and LUNA-related positions and other Terra-related exposures.

184. Defendants' deceptive and unfair conduct proximately caused Plaintiff's damages because the truth about Defendants' role, incentives, and conduct was material to the market's assessment of UST's stability and risk profile and, had the truth been disclosed, Plaintiff would not have entered into (or would have reduced, hedged, or exited) the relevant positions.

185. Defendants engaged in unfair acts and practices from Illinois and/or on behalf of businesses based in Illinois. Jump is an Illinois-founded business that is headquartered, managed,

based, and operates in Illinois. On information and belief, the deceptive and unfair acts, practices, or statements alleged in this Complaint were conceived, formulated, and disseminated from Illinois.

186. The circumstances relating to Defendants' deceptive and unfair practices occurred primarily and substantially in Illinois. Defendant Jump and its affiliated entities are headquartered in Chicago, Illinois, which served as the central hub from which the challenged scheme was conceived, developed, and executed. The core misconduct alleged in this Complaint, including the covert May 2021 UST repeg intervention, the concealment of that intervention, and the ongoing promotional campaign and omissions that induced market reliance, was formulated and orchestrated through Defendants' Illinois-based leadership and trading operations and disseminated from Illinois as part of a coordinated course of conduct directed at market participants

187. As alleged above, Defendants DiSomma and Kariya personally directed and implemented key components of the scheme through Illinois-centered management and communications. During the relevant period, Defendants utilized Jump's centralized communication channels, including company-wide Zoom calls and internal Slack communications originating from Illinois, to develop, refine, and coordinate the messaging and omissions that were subsequently conveyed to and relied upon by market participants, including Plaintiff.

**COUNT FOUR**
**Fraudulent Concealment**
**(Against All Defendants)**

188. Plaintiff repeats and realleges all preceding allegations as if fully set forth herein.

189. Defendants made numerous false statements of material fact to Plaintiff and the investing public. The central misrepresentation was that UST was an "algorithmic stablecoin" whose price would remain pegged at $1.00 automatically, without any human intervention. That

52

was a lie. When UST's algorithm failed in May 2021, Defendants secretly intervened by purchasing more than 62 million UST tokens to artificially restore the peg.

190. These artificial purchases distorted true market demand for UST and misled investors into believing that UST's peg had been restored by an automatic computer algorithm, rather than by extraordinary human intervention.

191. Jump was not a price-agnostic market maker. Instead, it was deeply self-interested in the continued survival of the UST and LUNA ecosystem. Jump stood to, and ultimately did, earn approximately $1.28 billion from its LUNA options. To realize those profits, Jump needed UST and LUNA to live long enough for those options to vest.

192. Jump improperly concealed its intervention in its scheme to purchase UST. Jump knew it stood to gain more if the market believed its manipulation rather than understood the vulnerabilities of the Terra tokens. Despite possessing insider knowledge that the algorithmic mechanism had failed and that UST was truly unstable, Jump continued to promote the purported success of UST's algorithmic design.

193. Defendants omitted material information, including as follows:

- Defendants concealed that, Jump entered into secret agreements with Terraform in November 2019 and September 2020, pursuant to which Jump obtained the right to purchase up to 65 million LUNA tokens at a strike price of $0.40 per token—a price far below market value—subject to varying vesting periods. This omission was material because it concealed Jump's substantial financial interest in promoting UST and LUNA.

- Defendants concealed that, in addition to acting as a purported market maker for the Terra ecosystem, Jump also entered into a "gentleman's agreement" with Terraform to assist in defending UST's peg, going beyond ordinary market-making activities. This omission was material because it revealed that UST's stability depended on secret human intervention, not an automatic algorithm.

- Defendants concealed that Jump traded large blocks of UST in May 2021, including the anonymous purchase of more than 62 million UST tokens across multiple cryptocurrency exchanges, for the specific purpose of restoring UST's $1 peg. During a single half-hour period on May 23, 2021, Jump purchased more than twice the amount

of UST it ordinarily purchased over an entire day. This omission was material because it concealed that UST's peg was restored through extraordinary human intervention, not the algorithm as represented to investors.

- Defendants concealed that, in exchange for its role in re-pegging UST, Jump received a material pecuniary benefit exceeding $1.28 billion, including Terraform's removal of vesting restrictions on millions of LUNA tokens allocated to Jump. This omission was material because it revealed Jump's self-interest in promoting UST's supposed algorithmic success.

194. After Jump's secret intervention in May 2021 to restore the peg, Jump and Kariya acting on its behalf made numerous public statements touting the strength of UST's algorithmic design and the stability of the Terraform ecosystem. These statements omitted Defendants' role and actively misled investors about the efficacy of the Terra algorithm. Jump repeatedly suggested that the repeg was achieved through the algorithm and arbitrage dynamics alone, despite knowing that Jump's own actions were required to restore UST to parity.

195. Defendants' omissions and concealment about their own role in the May 2021 repeg and the creation and undercapitalization of LFG were material.

196. The true cause of UST's repeg in May 2021 was critical to any assessment of whether UST was a viable algorithmic stablecoin. A reasonable investor would have considered it highly significant to know that: (a) UST's algorithm had failed during a period of market stress; (b) UST's peg was restored only through secret purchases by a financially interested third party; (c) the entity promoting UST's stability had a $1.28 billion financial stake in UST's survival; and (d) LFG's reserves were inadequate to defend the peg if a similar crisis occurred.

197. Defendants acted with scienter. Defendants knew they were concealing truthful information and intended to mislead people by doing so. Defendants knew that: (a) UST's algorithm had failed in May 2021 and was incapable of restoring the peg on its own; (b) Jump's secret intervention, not the algorithm, had restored UST's peg; (c) Jump was receiving billions of dollars in compensation for this intervention through discounted LUNA tokens; (d) the investing

54

public believed UST was a successful algorithmic stablecoin; and (e) disclosure of Jump's intervention would undermine investor confidence in UST and LUNA and destroy the value of Jump's holdings.

198.    Defendants' consciousness of wrongdoing is further demonstrated by their efforts to evade detection.  On February 10, 2021, Defendant Kariya asked Kwon to communicate exclusively via the disappearing-message application Signal, stating: "Compliance feels much mor[e] comfortable here with the disappearing chats."

199.    Three weeks later, on March 2, 2021, Kariya followed up: "Compliance really stepping up the heat on moving over to Signal." Kariya further stated that Jump was "strongly pushed to move all conversation here." These communications demonstrate that Defendants were aware that their conduct was improper and took affirmative steps to conceal it—and even more egregiously, their own compliance department counseled this.

200.    Defendants' scienter is also evidenced by their refusal to answer questions about their involvement.  When questioned by the SEC, both Kariya and DiSomma invoked their Fifth Amendment privilege against self-incrimination hundreds of times.

201.    Defendants concealed material information in order to induce Plaintiff and other investors to purchase and hold UST and LUNA.

202.    At the time Defendants omitted material information, Plaintiff was unaware that Defendants had received over $1.28 billion in compensation for promoting UST and LUNA, that Jump had secretly intervened to restore UST's peg in May 2021, and that the Terra ecosystem would not have survived the May 2021 depeg event absent Jump's extraordinary intervention.

203.    Defendants had a duty to disclose their role in restoring UST's peg in May 2021 by virtue of, *inter alia*, their special knowledge of material facts involving their active participation

in the scheme with Terraform. Further, Defendants knew that the investing public would rely on their omissions about their covert role in supporting the peg.

204. Jump, a sophisticated and well-known trading firm with extensive experience in digital assets, made numerous public statements promoting UST's algorithmic stability that were misleading absent disclosure of Jump's intervention.

205. Investors, including Plaintiff, placed trust and confidence in Jump's expertise and market position, which gave Jump a position of influence and superiority over retail investors. Jump also possessed exclusive knowledge of material facts, including its secret agreement with Terraform, its massive purchases of UST, and the failure of the algorithm, none of which were reasonably discoverable by investors. In essence, the re-peg itself was an affirmative misrepresentation and Defendants' later false statements and omissions repeated that lie.

206. Plaintiff justifiably relied on Defendants' misrepresentations and omissions in purchasing and holding UST and LUNA.

207. Plaintiff observed that UST successfully repegged in May 2021 and, in the absence of any disclosure of Jump's intervention, reasonably believed that UST's algorithmic mechanism had proven reliable under stress.

208. Plaintiff made his first purchase of LUNA on or about May 24, 2021, shortly after observing that UST had repegged. Had Plaintiff been aware that Jump's secret purchases, not the algorithm, had restored UST's peg, he would not have purchased LUNA or UST.

209. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff suffered substantial damages. Plaintiff purchased $80 million in LUNA and UST, which was worth no less than $500 million at the time of the May 2022 collapse. Plaintiff's holdings are now worth only a tiny fraction of that amount.

**COUNT FIVE**
**Aiding and Abetting Common Law Fraud**
**(Against All Defendants)**

210.    Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

211.    Terraform and Do Kwon committed common law fraud by making material misrepresentations to Plaintiff and other investors concerning the stability and functionality of UST and the Terra ecosystem.  These misrepresentations included false statements that UST was an "algorithmic stablecoin" that would maintain its $1.00 peg automatically without human intervention, false statements that UST had successfully recovered from the May 2021 depeg through the operation of the algorithm, and omissions of material facts including Jump's secret intervention to restore the peg.

212.    Defendants had actual knowledge that Terraform and Kwon were committing fraud.  Defendants knew that UST's algorithm had failed in May 2021 and that the peg was restored only through Jump's secret intervention, not through the algorithm as Terraform and Kwon represented to investors.  Defendants knew that Terraform and Kwon were making false statements about UST's stability while concealing Jump's role.

213.    Defendants provided substantial assistance to Terraform and Kwon in perpetrating their fraud.  Defendants' substantial assistance included: (a) secretly purchasing over 62 million UST tokens to artificially restore the peg in May 2021; (b) entering into secret agreements with Terraform to receive discounted LUNA tokens in exchange for this market manipulation; (c) making false public statements promoting UST's algorithmic stability while concealing Jump's intervention; (d) using Signal with disappearing messages to help conceal the fraudulent scheme; (e) helping to form the LUNA Foundation Guard to mislead investors into believing the Terra

ecosystem would be safe in a market downturn; and (f) continuing to promote UST and LUNA through public statements, podcasts, tweets, and publications while knowing that the algorithm had previously failed.

214. Defendants intended to assist Terraform and Kwon in committing fraud. Defendants had powerful financial incentives to perpetuate the fraud, including billions of dollars in discounted LUNA tokens that would be worthless if the fraud were exposed. Defendant Kariya had five Signal calls with Do Kwon on May 23, 2021, the key date of the fraudulent repeg scheme. Defendant DiSomma personally led Jump's UST trading efforts to restore the peg. Both Kariya and DiSomma invoked their Fifth Amendment privilege against self-incrimination in response to questions about their involvement in the scheme, and a jury may draw an adverse inference from such invocations.

215. As a direct and proximate result of Defendants' aiding and abetting Terraform's and Kwon's fraud, Plaintiff suffered damages in an amount to be proven at trial, but no less than $500 million in value of his LUNA holdings, plus interest, attorneys' fees, and costs.

**COUNT SIX**
**Fraudulent Misrepresentation**
**(Against All Defendants)**

216. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

217. Defendants made false statements of material fact, including that UST's repeg in May 2021 was accomplished by the algorithm rather than Jump's intervention, that UST was a stable and reliable algorithmic stablecoin, and that LFG provided adequate protection for UST's peg.

58

218. Defendants knew these statements were false when made. Defendants knew the algorithm had failed in May 2021 and that Jump's intervention, not the algorithm, had restored the peg. Defendants knew LFG was undercapitalized and could not defend the peg if a similar crisis occurred.

219. Defendants made these statements with intent to induce Plaintiff to rely on them and to purchase and hold LUNA and UST.

220. Plaintiff justifiably relied on the repeg as proof of UST's viability as an algorithmic stablecoin, as characterized by Defendants.

221. As a direct and proximate result of Plaintiff's reliance on Defendants' fraudulent misrepresentations, Plaintiff suffered damages as set forth above.

**COUNT SEVEN**
**Unjust Enrichment**
**(Against Jump Trading and Jump Crypto)**

222. Plaintiff incorporates by reference each of the paragraphs set forth above as though fully alleged herein.

223. As a reward for manipulating the price of, and market for, UST, Defendants Jump Trading and Jump Crypto received more than 65 million LUNA tokens at a greater than 99% discount from their market price, which Jump later resold at more than $1.28 billion in profit. Jump also received market-making fees for the trades it executed during and after the May 2021 depeg. Those market-making fees were ill-gotten gains that Jump received only because it engaged in fraudulent conduct and market manipulation. In total, Defendants retained a benefit in the form of billions of dollars in profits from their manipulation of UST and sale of discounted LUNA tokens.

224. Jump Trading and Jump Crypto obtained this benefit through the wrongful conduct of price and market manipulation. Defendants' retention of this benefit is unjust because it was obtained through fraud, deception, and manipulation of the price and market for UST.

225. Jump Trading and Jump Crypto retained this benefit to the detriment of Plaintiff, who made purchases of UST and LUNA during the relevant period in reliance on public statements by Jump Crypto, Kariya, Terraform, and Kwon. Plaintiff was deprived of the value of his purchases as a result of Jump Trading and Jump Crypto's manipulation when the price of, and market for, UST collapsed.

226. Jump Trading and Jump Crypto profited from their manipulation of the price of, and market for, UST, and it would be unjust for Jump Trading and Jump Crypto to retain the more than $1.28 billion in ill-gotten gains from their misconduct, as it would violate the fundamental principles of justice, equity, and good conscience, and no contract governs the relationship between Plaintiff and Defendants concerning this dispute.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in their favor and against Defendants and award the following relief:

A. Enter a judgment in favor of Plaintiff on all Counts of this Complaint;

B. Award Plaintiff compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Award Plaintiff rescissory damages in connection with claims under Section 12(a)(1) of the Securities Act;

D.  Award Plaintiff treble damages pursuant to 18 U.S.C. § 1964(c) on Plaintiff's RICO claims;

E.  Order disgorgement of Defendants' ill-gotten gains, plus prejudgment interest thereon;

F.  Award Plaintiff punitive damages;

G.  Award Plaintiff pre-judgment and post-judgment interest, as provided by law;

H.  Award Plaintiff reasonable attorneys' fees and costs of suit herein; and

I.  Grant such other and further relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated:   May 7, 2026

MCDERMOTT WILL & SCHULTE LLP

*/s/ Daniel-Charles V. Wolf*

Daniel-Charles V. Wolf
444 W Lake St,
Chicago, IL 60606
Telephone: (312) 372-2000
dcwolf@mcdermottlaw.com

Joseph B. Evans (*pro hac vice* application forthcoming*)*
M. Elias Berman (*pro hac vice* application forthcoming*)*
Daniel H. Kaltman (*pro hac vice* application forthcoming*)*
One Vanderbilt Avenue
New York, New York  10017
Telephone: (212) 547-5400
jbevans@mcdermottlaw.com
eberman@mcdermottlaw.com
dkaltman@mcdermottlaw.com

*Attorneys for Plaintiff*

61