**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

ZHEWEN HU,

Plaintiff,

v.

JUMP TRADING, LLC, JUMP CRYPTO HOLDINGS LLC, TAI MO SHAN LTD., KANAV KARIYA and WILLIAM DISOMMA,

Defendants.

Case No. 1:26-cv-05335

Hon. Jeffrey I. Cummings

**ORAL ARGUMENT REQUESTED**

**PLAINTIFF ZHEWEN HU'S CONSOLIDATED OPPOSITION TO DEFENDANTS JUMP TRADING, LLC'S, JUMP CRYPTO HOLDINGS LLC'S, TAI MO SHAN LIMITED'S AND WILLIAM DISOMMA'S MOTIONS TO DISMISS**

# TABLE OF CONTENTS


INTRODUCTION ........................................................................................................ 1

RELEVANT BACKGROUND ................................................................................... 2

A. Terraform Creates UST as an Algorithmic Stablecoin Tethered to LUNA ........................................................................................................ 2

B. The Algorithm Fails in May 2021 and Jump Secretly Buys the Peg Back in Exchange for Accelerated Vesting .................................... 3

C. Jump Conceals Its Role, Promotes the Algorithm's Success, and Plaintiff Buys the Stablecoin in Reliance on UST's Apparent Recovery ................................................................................ 4

D. Jump Co-Creates the Luna Foundation Guard and Transmits Lulling Communications, All to Conceal the May 2021 Rescue .......... 5

E. UST Loses Its Peg Again and Collapses ............................................... 6

ARGUMENT ............................................................................................................ 7

I. Legal Standard ..................................................................................... 7

II. Plaintiff Has Adequately Alleged Fraud Under Illinois Law ........................... 8

A. Plaintiff's Fraud-Based Allegations Satisfy 9(b) .................................. 8

B. Plaintiff Adequately Alleges that Defendants Defrauded Him About the Efficacy of the Algorithm and Their Role in the 2021 De-peg ..................................................................................... 11

C. Defendants Unquestionably Aided and Abetted Terraform's Fraud— The Fraud Would Not and Could Not Have Happened Without Them .................................................................................... 24

III. Plaintiff Adequately Alleges a Claim for Civil RICO .................................... 27

A. The Complaint Pleads RICO Standing ................................................ 27

B. Plaintiff's Injury Is Domestic ................................................................ 32

C. Plaintiff Has Adequately Alleged a Pattern of Racketeering Activity ................................................................................................ 34

D. Plaintiff Adequately Alleges Multiple Predicate Acts ......................... 38

E. Defendants Engaged in An Association-in-Fact Criminal Enterprise by Secretly Inflating UST's Value for Jump's Benefit ................................................................................................. 48

F. The PSLRA Does Not Bar Claims Targeting Fraud Independent of Securities Transactions .............................................. 50

IV. Plaintiff Has Stated a Claim for Conspiracy to Commit RICO ...................... 52

A. Each Defendant Agreed to Participate in an Endeavor That Would Violate RICO ......................................................................... 53

B. Defendants Agreed to Commit At Least Two Overt Acts in Furtherance of the Conspiracy ........................................................ 54

V. Plaintiff Adequately Alleges a Claim Under the Illinois Consumer Fraud Act ....................54

A. The ICFA Claim Is Not Time-Barred ....................55

B. Plaintiff Alleges a Sufficient Connection to Illinois ....................56

C. Plaintiff Alleges Actionable Misconduct, Intent to Induce Reliance, and Proximate Causation ....................56

VI. Plaintiff States a Claim for Unjust Enrichment ....................57

VII. Any Perceived Deficiencies in the Complaint Can Be Cured By Amendment ....................59

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AbbVie Inc. v. Payer Matrix, LLC*,
No. 23 CV 2836, 2025 WL 2374490 (N.D. Ill. Aug. 15, 2025) ........................... 32, 36, 48

*ABN AMRO, Inc. v. Capital Int'l, Ltd.*,
595 F. Supp. 2d 805 (N.D. Ill. 2008) ........................................................................ 22, 29

*Aguilar v. Baton Corp.*,
No. 25-CV-880 (CM), 2026 WL 2568764 (S.D.N.Y. Aug. 31, 2026) ............................ 33

*Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*,
No. 12 C 1920, 2014 WL 2459674 (N.D. Ill. June 2, 2014) ........................................... 56

*Allant Grp., Inc. v. Ascendes Corp.*,
231 F. Supp. 2d 772 (N.D. Ill. 2002) ............................................................................... 58

*Allied Metal Co. v. Elkem Materials, Inc.*,
No. 20-cv-06, 2022 WL 16540199 (N.D. Ill. Oct. 28, 2022) .......................................... 16

*Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*,
722 F. Supp. 2d 948 (N.D. Ill. 2010) ....................................................................... 18, 19, 53

*Anza v. Ideal Steel Supply Corp.*,
547 U.S. 451 (2006) ......................................................................................................... 30

*Applied Sys., Inc. v. PBC Consulting Inc. & Ardent Labs., Inc.*,
No. 25 CV 14251, 2026 WL 2559570 (N.D. Ill. Aug. 31, 2026) ..................................... 12

*Appvion, Inc. v. Richards*,
No. 18-C-1861, 2025 WL 346736 (E.D. Wis. Jan. 30, 2025) ......................................... 24

*Avery v. State Farm Mut. Auto. Ins. Co.*,
835 N.E.2d 801 (Ill. 2005) ................................................................................................ 56

*B & T Supplies, Inc. v. GemJ Chehebar Grat, LLC*,
No. 23-CV-11241 (GHW) (HJR), 2024 WL 5181330 (S.D.N.Y. Dec. 20, 2024) ........................................................................................................................... 52

*Beedie v. Battelle Mem'l Inst.*,
No. 01 C 6740, 2002 WL 22012 (N.D. Ill. Jan. 7, 2002) ................................................ 22

*Beiersdorf, Inc. v. International Outsourcing Services, LLC*,
No. 06 C 0726, 2008 WL 11456224 (E.D. Wis. Apr. 30, 2008) ................................ 49, 54

*Bell Atlantic v. Twombly*,
550 U.S. 544 (2007) ........................................................................................................... 7

*Benzakry v. Patel*,
77 N.E.3d 1116 (Ill.App. 3 Dist., 2017) ....................................................................23

*Bible v. United Student Aid Funds, Inc.*,
799 F.3d 633 (7th Cir. 2015) ....................................................................................48

*Boyle v. United States*,
556 U.S. 938 (2009)....................................................................................................48

*Brandolino v. Schlak*,
No. 19-CV-00102, 2019 WL 3287891 (N.D. Ill. July 22, 2019)......................................55

*Bridge v. Phoenix Bond & Indem. Co.*,
553 U.S. 639 (2008)..............................................................................................29, 32

*In re Canopy Fin., Inc.*,
No. 12-CV-04646, 2015 WL 3505010 (N.D. Ill. June 2, 2015)........................................26

*Chen v. Mayflower Transit, Inc.*,
159 F. Supp. 2d 1112 (N.D. Ill. 2001) ..........................................................................49

*Chiarella v. United States*,
445 U.S. 222 (1980)....................................................................................................16

*Clay v. Philip Morris USA Inc.*,
No. 18-CV-03549, 2020 WL 5540195 (N.D. Ill. Feb. 20, 2020) ...............................21, 25

*Cleary v. Philip Morris Inc.*,
656 F.3d 511 (7th Cir. 2011) ......................................................................................59

*Corley v. Rosewood Care Ctr., Inc.*,
142 F.3d 1041 (7th Cir. 1998) ...............................................................................10, 14

*Crichton v. Golden Rule Ins. Co.*,
576 F.3d 392 (7th Cir. 2009) ................................................................................14, 15

*D'Addario v. D'Addario*,
75 F.4th 86 (2d Cir. 2023) ..........................................................................................51

*Daly v. FitLife Brands, Inc.*,
No. 1:22-CV-00762, 2023 WL 6388112 (N.D. Ill. Sept. 29, 2023).................................57

*DeGuelle v. Camilli*,
664 F.3d 192 (7th Cir. 2011) ................................................................................28, 29

*Denkewalter v. Thomas*,
No. 20 C 5013, 2023 WL 3479165 (N.D. Ill. May 16, 2023) ....................................28, 38

*Dexia Credit Local v. Cuppy*,
No. 10 C 1563, 2010 WL 3257873 (N.D. Ill. Aug. 16, 2010).........................................47

*Diallo v. 50 E. Chestnut Condo Ass'n*,
No. 23-CV-13985, 2026 WL 958557 (N.D. Ill. Apr. 9, 2026) ........ 26

*Dixon v. Gatzke*,
790 F. Supp. 3d 679 (N.D. Ill. 2025) ........ 50

*Doe v. Dilling*,
888 N.E.2d 24 (Ill. 2008) ........ 11

*Doherty v. Fed. Deposit Ins. Corp.*,
No. 18-CV-0703, 2022 WL 888937 (N.D. Ill. Mar. 25, 2022) ........ 57

*Domanus v. Lewicki*,
779 F. Supp. 2d 739 (N.D. Ill. 2011) ........ 44, 53

*Donamaria v. Reprod. Genetic Innovations, Inc.*,
825 F. Supp. 3d 688 (N.D. Ill. 2026) ........ 14

*Durk v. Daum Trucking, Inc.*,
No. 07 CV 6844, 2008 WL 4671721 (N.D. Ill. Oct. 22, 2008) ........ 30

*Eastern Trading Co. v. Refco, Inc.*,
229 F.3d 617 (7th Cir. 2000) ........ 24

*Edelman v. Belsheim & Bruckert, LLC*,
No. 11-CV-1121-MJR-PMF, 2012 WL 1933755 (S.D. Ill. May 29, 2012) ........ 22

*Elder v. Bimbo Bakeries USA, Inc.*,
No. 3:21-CV-637-DWD, 2023 WL 6382354 (S.D. Ill. Sept. 29, 2023) ........ 20, 21, 42

*In re Eletson Holdings Inc.*,
No. 23-10322 (JPM), 2026 WL 2225569 (Bankr. S.D.N.Y. Aug. 3, 2026) ........ 34

*Emerald Parkway Valley Equity Grp., LLC v. Sun Life Assurance Co. of Canada*,
No. 24 C 3039, 2024 WL 4590726 (N.D. Ill. Oct. 28, 2024) ........ 18, 21, 23

*Emery v. Am. Gen. Fin.*,
71 F.3d 1343 (7th Cir. 1995) ........ 16

*Empress Casino Joliet Corp. v. Johnston*,
763 F.3d 723 (7th Cir. 2014) ........ 28, 35

*Ferguson v. The Republic of Trinidad & Tobago*,
422 So. 3d 717 (Fla. Dist. Ct. App. 2025) ........ 33

*Fid. Nat'l Title Ins. Co. v. Howard Sav. Bank*,
436 F.3d 836 (7th Cir. 2006) ........ 55

*Fifth Third Mortg. Co. v. Kaufman*,
934 F.3d 585 (7th Cir. 2019) ........ 26

*Fleury v. GM LLC*,
No. 22 C 03862, 2023 WL 3792411 (N.D. Ill. June 2, 2023) .......................................... 57

*G & S Holdings LLC v. Cont'l Cas. Co.*,
697 F.3d 534 (7th Cir. 2012) .......................................................................................... 17

*Gas Tech. Inst. v. Rehmat*,
No. 05 C 2712, 2006 WL 3422190 (N.D. Ill. Nov. 27, 2006) .......................................... 20

*Gen. Motors Acceptance Corp. v. Cent. Nat. Bank of Mattoon*,
773 F.2d 771 (7th Cir. 1985) .......................................................................................... 23

*Glob. Master Int'l Grp., Inc. v. Esmond Nat'l, Inc.*,
76 F.4th 1266 (9th Cir. 2023) ......................................................................................... 33

*Gondeck v. A Clear Title & Escrow Exch., LLC*,
No. 11 C 6341, 2012 WL 5200091 (N.D. Ill. Oct. 22, 2012) .......................................... 26

*Greene v. Mizuho Bank, Ltd.*,
206 F. Supp. 3d 1362 (N.D. Ill. 2016) ............................................................................ 13

*Gress v. Commonwealth Edison Co.*,
559 F. Supp. 3d 755 (N.D. Ill. 2021), *aff'd sub nom* ...................................................... 30

*Guaranteed Rate, Inc. v. Barr*,
912 F. Supp. 2d 671 (N.D. Ill. 2012) .............................................................................. 27

*Gunn v. Cont'l Cas. Co.*,
622 F. Supp. 3d 694 (N.D. Ill. 2022) ......................................................................... 15, 31

*H.J. Inc. v. Nw. Bell Tel. Co.*,
492 U.S. 229 (1989) ................................................................................................... 34, 37

*Hale v. State Farm Mut. Auto. Ins. Co.*,
No. 12-0660-DRH, 2013 WL 1287054 (S.D. Ill. Mar. 28, 2013) .............................. 34, 35

*Havrilla v. Centene Corp.*,
No. 1:22-CV-4126, 2024 WL 1932916 (N.D. Ill. May 2, 2024) ...................................... 18

*Heinrich v. Waiting Angels Adoption Servs., Inc.*,
668 F.3d 393 (6th Cir. 2012) .......................................................................................... 36

*Hemi Group, LLC v. City of New York*,
559 U.S. 1 (2010) ............................................................................................................ 30

*Heredia v. Sewon Am., Inc.*,
766 F. Supp. 3d 1251 (N.D. Ga. 2025) ............................................................................ 34

*Heritage Ins. Co. v. First Nat'l Bank of Cicero*,
629 F. Supp. 1412 (N.D. Ill. 1986) .................................................................................. 37

*Holmes v. City of Racine*,
No. 14-CV-208-JPS, 2014 WL 5514181 (E.D. Wis. Oct. 31, 2014)....................................28

*Holmes v. Sec. Inv. Prot. Corp.*,
503 U.S. 258 (1992)....................................27

*HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*,
545 N.E.2d 672 (Ill. 1989)....................................58

*Inteliquent, Inc. v. Free Conferencing Corp.*,
No. 16-CV-06976, 2017 WL 1196957 (N.D. Ill. Mar. 30, 2017)....................................35

*IRN Payment Sys. v. Direct Furniture, LLC*,
No. 07 C 0141, 2007 WL 2713366 (N.D. Ill. Sept. 12, 2007)....................................37

*Jannotta v. Subway Sandwich Shops, Inc.*,
125 F.3d 503 (7th Cir. 1997)....................................16

*Jay E. Hayden Found. v. First Neighbor Bank, N.A.*,
610 F.3d 382 (7th Cir. 2010)....................................49

*Kim v. Fayazi*,
No. 96 C 6966, 1998 WL 729753 (N.D. Ill. Oct. 14, 1998)....................................11

*Kim v. H Guys, LLC*,
No. 1:20-CV-03588, 2022 WL 888871 (N.D. Ill. Mar. 26, 2022)....................................20

*Kinnetz v. Benaiah Holdings, Inc.*,
No. 4:25-CV-04134-CCT, 2026 WL 1413678 (D.S.D. May 20, 2026)....................................52

*Klueh v. Paul Vallas for All Chi.*,
No. 19-CV-00249, 2020 WL 4934975 (N.D. Ill. Aug. 24, 2020)....................................18

*Kousisis v. United States*,
605 U.S. 114, 145 S. Ct. 1382 (2025)....................................38

*Lacy v. Village of Maywood*,
No. 1:21-CV-3081, 2022 WL 4048538 (N.D. Ill. Sept. 2, 2022)....................................55

*Lanzetta v. 11902 Longwood LLC*,
No. 24 C 11404, 2025 WL 2576746 (N.D. Ill. Sept. 4, 2025)....................................53

*Latimer v. Hall Financial Group, Inc.*,
No. 90 C 0156, 1991 WL 164332 (N.D. Ill. Aug. 20, 1991)....................................49

*Lin v. Chojnacki*,
No. 24 C 3725, 2025 WL 2720664 (N.D. Ill. Sept. 24, 2025)....................................19

*Linet Americas, Inc. v. Hill-Rom Holdings, Inc.*,
No. 21 CV 6890, 2024 WL 5481336 (N.D. Ill. Jan. 17, 2024)....................................55

*Malik v. Prairie Raynor LLC*,
No. 23 C 1182, 2026 WL 2655115 (N.D. Ill. Sept. 9, 2026)....48

*Med. Marijuana, Inc. v. Horn*,
604 U.S. 593 (2025)....33

*Menzies v. Seyfarth Shaw LLP*,
943 F.3d 328 (7th Cir. 2019)....8, 10, 35, 50, 51

*Mezzonen, S.A. v. Wright*,
No. 97 CIV. 9380 LMM, 1999 WL 1037866 (S.D.N.Y. Nov. 16, 1999)....52

*Midwest Grinding Co. v. Spitz*,
976 F.2d 1016 (7th Cir. 1992)....35

*Mitchell v. Skubiak*,
248 Ill. App. 3d 1000 (1993)....13

*Moak v. Roszak*,
No. 05 C 1652, 2006 WL 2413698 (N.D. Ill. Aug. 17, 2006)....21

*Morgan v. Bank of Waukegan*,
804 F.2d 970 (7th Cir. 1986)....27, 36

*Mougrabi v. Covenant Air & Water*,
LLC, No. 05 C 1615, 2005 WL 2230178 (N.D. Ill. Sept. 8, 2005)....37

*Mullen v. GLV, Inc.*,
No. 18 C 1465, 2018 WL 3218693 (N.D. Ill. July 2, 2018)....31

*Napleton's Arlington Heights Motors, Inc. v. FCA US LLC*,
214 F. Supp. 3d 675 (N.D. Ill. 2016)....30

*Newman v. Metro. Life Ins. Co.*,
885 F. 3d. 3d 992 (7th Cir. 2018)....16

*Olympic Fed. v. Remp*,
No. 87 C 8705, 1988 WL 64410 (N.D. Ill. June 16, 1988)....37

*OSF Healthcare Sys. v. Banno*,
No. 08-1096, 2009 WL 1259048 (C.D. Ill. May 6, 2009)....28

*Ouwinga v. Benistar 419 Plan Servs.*,
694 F.3d 783 (6th Cir. 2012)....51

*Patterson v.* Jump *Trading LLC*, No. 5:22-CV-03600-PCP, 2026 WL 2605224....17, 51, 56

*Petri v. Gatlin*,
997 F. Supp. 956 (N.D. Ill. 1997)....16

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*,
631 F.3d. 436 (7th Cir. 2011)....14

*Prasinos v. National Mortgage Bank of Greece*,
No. 89 C 5378, 1990 WL 114713 (N.D. Ill. July 23, 1990) .......... 42

*Puttkammer v. Stifel, Nicolaus & Co.*,
365 F. Supp. 495 (N.D. Ill. 1973) .......... 55

*Resnick v. Schwartz*,
430 F. Supp. 3d 492 (N.D. Ill. 2019) .......... 55

*Resolution Trust Corp. v. S & K Chevrolet*,
868 F. Supp. 1047 (C.D. Ill. 1994) .......... 36

*Rezner v. Bayerische Hypo-Und Vereinsbank AG*,
630 F.3d 866 (9th Cir. 2010) .......... 51

*Richmond v. Advanced Pain Consultants, S.C.*,
No. 15 C 479, 2015 WL 7710371 (N.D. Ill. Nov. 30, 2015) .......... 8, 25-27

*RJR Nabisco, Inc. v. European Community*,
579 U.S. 325 (2016) .......... 32

*Rougeau v. Ahlstrom Rhinelander, LLC*,
785 F. Supp. 3d 438 (W.D. Wis. 2025) .......... 30

*Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*,
786 F.3d 510 (7th Cir. 2015) .......... 59

*RWB Servs., LLC v. Hartford Computer Grp., Inc.*,
539 F.3d 681 (7th Cir. 2008) .......... 28, 31

*S. Branch LLC v. Commonwealth Edison Co.*,
46 F.4th 646 (7th Cir. 2022) .......... 30

*Saleh v. Merchant*,
No. 14-CV-09186, 2019 WL 1331788 (N.D. Ill. Mar. 25, 2019), *aff'd sub nom. Muskegan Hotels, LLC v. Patel*, 986 F.3d 692 (7th Cir. 2021) .......... 25

*Salinas v. United States*,
522 U.S. 52 (1997) .......... 53, 54

*Schaefer v. Graf*,
2021 WL 1784788 (N.D. Ill. 2021) .......... 51

*Schlifke v. Seafirst Corp.*,
866 F.2d 935 (7th Cir. 1989) .......... 16

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985) .......... 27

*Shapo v. O'Shaughnessy*,
246 F. Supp. 2d 935 (N.D. Ill. 2002) .......... 18, 19, 45

*Shields Enterprises, Inc. v. First Chicago Corp.*,
975 F.2d 1290 (7th Cir. 1992) ........................................................................35

*Shifrin v. Associated Banc Corp.*,
No. 3:12-CV-00839-JPG, 2013 WL 1192766 (S.D. Ill. Mar. 22, 2013) ..........................14

*Siegal v. GEICO Cas. Co.*,
523 F. Supp. 3d 1032 (N.D. Ill. 2021) ................................................................57

*Sindelar v. Essig*,
No. 25 C 7991, 2026 WL 93123 (N.D. Ill. Jan. 13, 2026) ...........................................30

*Sor v. TCF Nat'l Holdings, Inc.*,
No. 23 C 2401, 2023 WL 8451805 (N.D. Ill. Dec. 6, 2023) ..........................................49

*Speed Boats of Texas L.P. v. Novoselsky*,
No. 11 C 3970, 2012 WL 1605610 (N.D. Ill. May 8, 2012) ..........................................29

*Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*,
897 F.3d 797 (7th Cir. 2018) ...........................................................................11

*St. Clair Cnty. v. Trinity Indus.*,
No. 14-1320-DRH, 2016 WL 676453 (S.D. Ill. Feb. 18, 2016) .......................................58

*Tamayo v. Blagojevich*,
526 F.3d 1074 (7th Cir. 2008) ...........................................................................8

*Thornwood, Inc. v. Jenner & Block*,
799 N.E.2d 756 (Ill. App. Ct. 2003) ...................................................24, 25-27

*Tritoncap LLC v. Nat'l Bank Holdings*,
No. 23 CV 16661, 2024 WL 7002996 (N.D. Ill. Oct. 22, 2024) .....................................58

*Turek v. Revolution Glob., LLC*,
No. 25 CV 01842, 2026 WL 710946 (N.D. Ill. Mar. 13, 2026) .......................................57

*Trs. of the AFTRA Health Fund v. Biondi*,
303 F.3d 765 (7th Cir. 2002) .....................................................................12, 18

*United States Transmission Systems, Inc. v. Casey*,
No. 87 C 2987, 1991 WL 10941 (N.D. Ill. Jan. 23, 1991) ...........................................36

*United States v. Aslan*,
644 F.3d 526 (7th Cir. 2011) ...........................................................................43

*United States v. Biesiadecki*,
933 F.2d 539 (7th Cir. 1991) ...........................................................................40

*United States v. Black*,
469 F. Supp. 2d 513 (N.D. Ill. 2006) ..................................................................43

*United States v. Chanu*,
40 F.4th 528 (7th Cir. 2022) .......... 41

*United States v. Crump*,
179 F.4th 1137 (8th Cir. 2026) .......... 39

*United States v. Esterman*,
324 F.3d 565 (7th Cir. 2003) .......... 44, 46

*United States v. Febus*,
218 F.3d 784 (7th Cir. 2000) .......... 45

*United States v. Gracia*,
272 F.3d 866 (7th Cir. 2001) .......... 44

*United States v. Hansmeier*,
988 F.3d 428 (8th Cir. 2021) .......... 39

*United States v. Hosseini*,
679 F.3d 544 (7th Cir. 2012) .......... 48

*United States v. Kidd*,
963 F.3d 742 (8th Cir. 2020) .......... 40

*United States v. Lambert*,
No. 20-4590, 2022 WL 2871909 (4th Cir. July 21, 2022) .......... 39

*United States v. Martin*,
411 F. Supp. 2d 370 (S.D.N.Y. 2006) .......... 38

*United States v. Masten*,
170 F.3d 790 (7th Cir. 1999) .......... 46

*United States v. Matthews*,
140 F.4th 893 (7th Cir. 2025) .......... 45

*United States v. McGowan*,
590 F.3d 446 (7th Cir. 2009) .......... 38

*United States v. Pacilio*,
85 F.4th 450 (7th Cir. 2023) .......... 38

*United States v. Palma*,
182 F.4th 663 (7th Cir. 2026) .......... 42

*United States v. Powell*,
576 F.3d 482 (7th Cir. 2009) .......... 19

*United States v. Pust*,
798 F.3d 597 (7th Cir. 2015) .......... 42

*United States v. Quintanilla*,
2 F.3d 1469 (7th Cir. 1993) ........ 53, 54

*United States v. Reynolds*,
64 F.3d 292 (7th Cir. 1995) ........ 47

*United States v. Swan*,
250 F.3d 495 (7th Cir. 2000) ........ 54

*United States v. Trapilo*,
130 F.3d 547 (2d Cir. 1997)........ 38

*United States v. Turner*,
400 F.3d 491 (7th Cir. 2005) ........ 42, 46

*United States v. Vorley*,
420 F. Supp. 3d 784 (N.D. Ill. 2019) ........ 41

*United States v. Weimert*,
819 F.3d 351 (7th Cir. 2016) ........ 38, 39

*Vanzant v. Hill's Pet Nutrition, Inc.*,
934 F.3d 730 (7th Cir. 2019) ........ 54, 56

*Walls v. VRE Chi. Eleven, LLC*,
2016 WL 5477554 (N.D.Ill., 2016) ........ 12

*Wertymer v. Walmart, Inc.*,
142 F.4th 491 (7th Cir. 2025) ........ 7, 29

*White v. Kenneth Warren & Son, Ltd.*,
No. 99 C 1740, 2000 WL 91920 (N.D. Ill. Jan. 14, 2000) ........ 55

*Williams v. Chicago Osteopathic Health Sys.*,
654 N.E.2d 613 (Ill. App. 1st Dist. 1995)........ 14

*Yegiazaryan v. Smagin*,
599 U.S. 533 (2023)........ 32, 33

*Zimmerman v. Northfield Real Estate, Inc.*,
156 Ill. App. 3d 154 (1986) ........ 12

**Statutes**

18 U.S.C. § 1343........ 17, 38

18 U.S.C. § 1956........ 42, 45, 46, 51

18 U.S.C. § 1957........ 42, 43, 51

18 U.S.C. § 1961(5) ........ 34

18 U.S.C. § 1962(c) ........ 27, 32, 48

18 U.S.C. § 1962(d) .......... 52, 53, 54

28 U.S.C. § 1367(a) .......... 54

**Other Authorities**

Fed. R. Civ. P. 9(b) .......... *passim*

Fed. R. Civ. P. 12(b)(6) .......... *passim*

Fed. R. Civ. P. 15(a)(2) .......... 59

## INTRODUCTION

Defendants[1] coordinated a secret rescue of a fraudulent stablecoin from collapse to create an illusion to traders like Zhewen Hu ("Plaintiff") that the stablecoin TerraUSD ("UST") was "stable." UST was not. Absent Defendants' illicit coordinated trading, Plaintiff never would have thought UST was stable and would not have invested in it. Now, Defendants put their hands up, arguing that despite all their coordination, including with a convicted fraudster, they are nothing but opportunistic traders and are not responsible for the demise of UST. According to Defendants, they cannot be held liable simply because they did not advertise their trades on social media and instead let their blockchain transactions do the talking. The Court should see through Defendants' "innocent trader" defense and allow the claims to proceed.

Plaintiff bought approximately $80 million in the digital tokens LUNA and UST (Compl. ¶ 209.) He did so in reliance on a central promise: that UST maintained a one-dollar peg automatically, through an autonomous algorithm, without human intervention. (Dkt. 1 ("Complaint" or "Compl.") ¶¶ 2, 34–42.) That promise was false, and Defendants are the ones who presented it. Specifically, when UST "de-pegged" in 2021 and began losing value, Defendants secretly purchased tens of millions of dollars in UST on the open market until the price recovered—to make it look like the algorithm had worked and was self-healing. (Compl. ¶¶ 70–75.) Defendants then concealed that rescue, promoted the algorithm's supposed success, and profited from the resulting market confidence. (Compl. ¶¶ 83–88.) A year later, the same structural vulnerability in UST's algorithm resurfaced. Defendants attempted to secretly obscure that vulnerability a second time, but their playbook failed. UST and LUNA collapsed

[1] Defendant Jump Trading, LLC ("Jump Trading") is a Chicago-based proprietary trading firm. (Compl. ¶ 17.) Defendant Jump Crypto Holdings, LLC ("Jump Crypto") is Jump Trading's cryptocurrency arm and alter ego. (Compl. ¶ 18.) Defendant Tai Mo Shan Limited ("Tai Mo Shan") is a Cayman Islands subsidiary of Jump Crypto that executed certain of the transactions underlying Plaintiff's allegations. (Compl. ¶ 19.) Defendant William DiSomma co-founded Jump Trading and personally directed the May 2021 trading. (Compl. ¶ 21.) (Jump Trading, Jump Crypto, Tai Mo Shan, and DiSomma are referred to collectively as "Jump" or "Defendants"). Defendant Kanav Kariya served as President of Jump Crypto from September 2021 through June 2024. (Compl. ¶ 20.) He has not moved to dismiss and is not included in the term "Defendants" for purposes of this motion.

in response to that failure, causing over $40 billion in investor losses (Compl. ¶¶ 10, 115–128.) Plaintiff lost almost all of his $80 million purchase. (Compl. ¶ 209.)

Defendants' motions (ECF 34 and 35, collectively the "Motions") fail. Far from engaging in good-faith purchases at what it believed was a fair price, Jump agreed in May 2021 to rescue UST only after Terraform bribed Jump by unlocking discounted LUNA—which allegedly generated over $1 billion in profit. After getting what it wanted, Jump executed tens of millions of dollars in UST purchases using anonymous accounts on various exchanges to hide its tracks. Jump then unloaded those holdings after the peg recovered and trumpeted the repeg as proof of an autonomous, self-healing algorithm. Plaintiff observed that false signal in 2021, purchased UST based on the misrepresentations it implied, and was injured when the same weakness resurfaced in May 2022 that led to UST's downfall. The Complaint identifies each Defendant's role and pleads particularized facts supporting causation, material half-truths, and resulting loss. The Motions should be denied.

## RELEVANT BACKGROUND

### A. Terraform Creates UST as an Algorithmic Stablecoin Tethered to LUNA

Terraform Labs Pte. Ltd. ("Terraform") and its founder Do Kwon ("Kwon") created the Terra blockchain in 2018, along with TerraUSD ("UST") and its companion token Luna ("LUNA"). (Compl. ¶¶ 2, 35.) Defendants and Terraform marketed UST as an "algorithmic stablecoin": a digital asset designed to always be worth a dollar (i.e., "pegged" to the dollar) using just software code rather than traditional bank reserves. (Compl. ¶¶ 2, 34.) It purportedly worked by linking UST and LUNA in a mint-and-burn arbitrage system. If UST traded below a dollar, holders could redeem for one dollar's worth of LUNA, which reduced UST's supply and pushed its price back up. If UST traded above one dollar, holders could mint new UST by burning LUNA, increasing UST's supply and pushing its price down. (Compl. ¶¶ 37–40.)

In November 2019, Jump agreed with Terraform to provide liquidity for LUNA in the market. In consideration for their first secret market-making agreement, Terraform "loaned" 30 million LUNA to Jump, but with repayment prices far below LUNA's market value. (Compl. ¶¶ 47–49.) The arrangement functioned as an option for Jump to purchase LUNA at a steep discount. (Compl. ¶ 47.) In August 2020, Kariya agreed that Jump would "help maintain" UST's one-to-one peg under a so-called "Gentleman's Agreement." Pursuant to that agreement, Jump had the right to purchase up to an additional 65 million LUNA at $0.40 per token, subject to vesting conditions. (Compl. ¶¶ 47–55.) As in the November 2019 agreement, that pricing represented a steep discount to LUNA's market price. (*Id.*)

Kwon, who was later convicted of conspiracy to commit fraud, wanted to publicize their deal, but Jump insisted that it remain secret, noting that "at Jump's request, we are keeping this arrangement strictly confidential." (Compl. ¶ 52.) Kariya later urged Kwon to communicate on Signal, an encrypted app where messages would not be preserved, because Jump's "Compliance [team] feels much more comfortable here with [us on Signal using] the disappearing chats." (Compl. ¶ 56.)

**B. The Algorithm Fails in May 2021 and Jump Secretly Buys the Peg Back in Exchange for Accelerated Vesting**

On May 19, 2021, UST depegged for the first time. (Compl. ¶ 58.) The algorithm that was supposed to restore UST's price to one dollar on its own did not work. (Compl. ¶ 60.) By May 23, UST had sunk to around $0.90. (Compl. ¶ 63.) Kariya spoke repeatedly with Kwon that day to formulate plans to secretly restore the peg. (Compl. ¶ 63.)

Because LUNA's performance was intimately tied to UST's stability, Jump's potential returns on its then-unvested LUNA options would have been decimated if UST collapsed. (Compl. ¶¶ 55, 59, 66.) DiSomma's contemporaneous messages captured the severity of the May 2021 crisis: He described LUNA as "under massive selling pressure . . . down 40%," warned of "fear of a bank run given that UST is 'backed' by LUNA," and directed that Jump

"[n]eeded to support UST directly on [cryptocurrency exchange] KuCoin." (Compl. ¶ 65.) Jump informed Kwon, however, that it would not intervene until Terraform removed all vesting conditions on Jump's LUNA purchase rights. (Compl. ¶ 68.) Kwon agreed, and on May 23, 2021, Kariya announced during a company-wide call that he had "spoke to Do [Kwon, and] he's going to vest us." (Compl. ¶ 69.)

After extracting that concession, DiSomma directed Jump's traders to accumulate UST, and between May 23 and May 27, Jump purchased more than 62 million UST anonymously across multiple cryptocurrency exchanges. (Compl. ¶¶ 70, 73–74.) By May 27, UST was once again stable at its one-dollar peg due to Jump's covert purchases. (Compl. ¶ 75.)

But Jump knew that its intervention had not fixed UST's shortcomings. In a contemporaneous conversation with a Jump executive, DiSomma stated that UST's repegging was "a good start" and that he was "bracing for another sell storm" in case Jump needed to deploy more capital. (Compl. ¶ 76.) Afterwards, because the algorithm could not withstand the immediate liquidation of Jump's purchased UST without revealing the intervention—and because Defendants did not believe UST was actually worth a dollar or worth holding onto—DiSomma directed Jump's traders to unwind their UST positions slowly so that Jump could sell its UST without moving the market. (Compl. ¶ 77.)

### C. Jump Conceals Its Role, Promotes the Algorithm's Success, and Plaintiff Buys the Stablecoin in Reliance on UST's Apparent Recovery

Jump and Terraform concealed Jump's role in restoring the peg. (Compl. ¶¶ 83, 95.) They did so because they wanted "to make UST feel real" for buyers (and preserve their own substantial upside). (Compl. ¶ 181.) To further that goal, on May 24, 2021, Terraform published a Twitter thread touting the algorithm as surviving an "intense stress test" of the depeg. Terraform failed to disclose that Jump's purchases, not the algorithm, restored the peg. Terraform's head of communications later testified that Kwon directed him not to disclose Jump's role. (Compl. ¶¶ 84, 95.) Jump likewise kept its role in the re-peg quiet despite being

named directly in that thread with reference to UST's "downward reflexivity experienced" in May 2021. (Compl. ¶¶ 83, 84, 95.)

Plaintiff observed that UST repegged on May 24, 2021, and—based on Jump's fraudulent conduct in propping up what Plaintiff thought was self-healing—believed that UST had proven itself to be a functional stablecoin even under stress. (Compl. ¶ 207.) Plaintiff perceived value in this purportedly self-correcting system and made his first LUNA purchase on or about May 24, 2021. (Compl. ¶¶ 71, 74, 208.) From May 2021 through May 2022, Plaintiff bought approximately $80 million in LUNA and UST. (Compl. ¶¶ 15, 208–209.)

### D. Jump Co-Creates the Luna Foundation Guard and Transmits Lulling Communications, All to Conceal the May 2021 Rescue

On October 11, 2021, Jump published an article touting Terra as the "most prominent example" of algorithmically stabilized assets and calling UST "the most elegant solution for creating a highly scalable and more decentralized stablecoin." (Compl. ¶ 88.) Jump said nothing about its purchases of tens of millions of dollars of UST.

On January 19, 2022, Terraform announced the Luna Foundation Guard ("LFG"), a Singapore-based nonprofit organization intended to hold reserves that provided additional, redundant levels of defense for UST's one-dollar peg. (Compl. ¶ 100.) Jump then endorsed that announcement when Kariya retweeted it shortly after publication. Kariya later sat on LFG's Governing Council alongside Kwon. (Compl. ¶ 102.)

Jump stepped up its public promotion of Terraform following the launch of LFG. On January 28, Kariya published tweets on behalf of Jump, stating that it was "difficult to imagine a sustained mass exodus" from UST. (Compl. ¶ 90.) Jump stated that the resulting reserve would "backstop[] the UST peg in times of severe volatility." (Compl. ¶ 109.) Kariya said the reserve "further strengthens confidence in the peg of the market's leading decentralized stablecoin[,] UST." (Compl. ¶ 110.) On March 1, 2022, Kariya appeared alongside Kwon on Jump Crypto's podcast, "The Ship Show," during which Kwon described UST's May 2021

recovery as "purely algorithmic," "natural[]," and "automatically self-healing." (Compl. ¶ 111.) Kariya did not correct those statements. (Compl. ¶ 111.) Instead, Kariya reiterated the confidence that UST's purportedly "algorithmic" recovery had instilled in the market by later tweeting that "UST is in high demand and generally trading at a premium." (Compl. ¶ 91.)

**E. UST Loses Its Peg Again and Collapses**

By May 2022, due in large part to the supposed safety and durability of the algorithm, the Terra ecosystem had grown to roughly $45 billion. (Compl. ¶ 115.) Buyers like Plaintiff believed that the algorithm worked and poured money into UST and LUNA. Jump encouraged them to do so up to the last possible moment. On May 1, 2022, Kariya tweeted that "Terra, even more so than other ecosystems, has a really interesting suite of liquidity primitives that are likely to dictate flows" and that he was "[e]xcited to support a great team" in Kwon and Terraform. (Compl. ¶ 93.) Similarly, on May 3, 2022, Kariya stated that "there is almost no possibility for one collusion across these landscapes," furthering the appearance of UST's organic, rather than engineered, recovery. (Compl. ¶ 94.)

However, on May 7, 2022, Terraform began withdrawing large amounts of UST from a central trading liquidity pool. Minutes later, institutional traders began exchanging UST for other stablecoins, putting selling pressure on UST. (Compl. ¶¶ 116–119.) In response, Kwon and Kariya directed LFG to deploy its reserves. LFG publicly announced that it would use its Bitcoin reserves to defend the peg and then transferred nearly 50,000 Bitcoin to Jump, worth nearly $2 billion, for that purpose. (Compl. ¶¶ 120–122.) DiSomma also contacted executives at multiple trading firms to solicit emergency funding. (Compl. ¶¶ 123–125.) But the selling pressure, fueled by the growth of the Terraform ecosystem, proved insurmountable. As confidence in the algorithm collapsed, traders liquidated LUNA and UST, and the resulting feedback loop rendered both tokens effectively worthless. (Compl. ¶ 126.) By May 15, LUNA had fallen from over $90 to under 30 cents, and UST was trading at $0.1284.

On that same day, Jump, through Kariya and LFG, began efforts to distance itself from UST's collapse. Kariya proposed language for an LFG public statement designed to hide Jump's role as the recipient of LFG's 50,000 Bitcoin transfer. The following day, LFG released that statement, identifying an anonymous "counterparty" that had entered into over-the-counter trades with LFG. (Compl. ¶ 130.) On May 21, 2022, Kariya attempted to muddy the investigatory record by messaging Kwon on Telegram: "Hey Do, we [Jump] did one OTC [over-the-counter] trade with the LFG trading BTC [Bitcoin] for UST, we did not act as an agent for the LFG in executing any trades on its behalf." (Compl. ¶ 131.) On June 2, Jump published "The Depegging of UST," again describing an "automatic" mechanism while omitting Jump's two interventions. (Compl. ¶¶ 129–132.)

The crash produced more than $40 billion in investor losses. The revelation of Jump's fraud reduced the value of Plaintiff's holdings to a tiny fraction of the $80 million he had originally invested. (Compl. ¶¶ 128, 15, 215.) Had the truth about the algorithm's flaws been revealed during the 2021 depeg, Plaintiff would never have purchased into the Terraform ecosystem. (Compl. ¶ 97.) Terraform and Kwon have since been held accountable, with Kwon serving a lengthy prison sentence and Terraform paying billions in fines to settle criminal and civil fraud charges. (Compl. ¶¶ 12, 134.) Most Defendants, however, have suffered no consequences. (Compl. ¶¶ 141–142.)

## ARGUMENT

### I. Legal Standard

To survive a motion to dismiss, a complaint must contain sufficient facts, accepted as true, to "state a claim for relief that is plausible on its face." *Wertymer v. Walmart, Inc.*, 142 F.4th 491, 494-95 (7th Cir. 2025). A court must draw all reasonable factual inferences in the plaintiff's favor. *Bell Atlantic v. Twombly*, 550 U.S. 544, 555–56 (2007). "A complaint need

not 'allege all, or any, of the facts logically entailed by the claim,' and it certainly need not include evidence." *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

## II. Plaintiff Has Adequately Alleged Fraud Under Illinois Law

Jump is liable for fraud based on its concealment and misrepresentations regarding its role in the failure of UST and LUNA, and because that conduct aided and abetted Terraform's fraud. The Complaint establishes three points that Jump cannot avoid. *First*, Jump's secret purchases to rescue UST from certain failure in May 2021 constitute an actionable misrepresentation. *Second*, Plaintiff purchased LUNA and UST because Jump's secret intervention, together with Jump's and Terraform's misrepresentations, caused Plaintiff and the broader market to believe—incorrectly—that UST's algorithm functioned as advertised. *Third*, it was reasonable for Plaintiff to rely on the misrepresentation conveyed by Jump's conduct in orchestrating the fraudulent repeg: that UST's algorithm was self-stabilizing.

### A. Plaintiff's Fraud-Based Allegations Satisfy 9(b)

The Complaint pleads fraud with particularity. "A plaintiff satisfies Rule 9(b) when he provides a general outline of the fraud scheme sufficient to reasonably notify the defendants of their purported role in the fraud." *Richmond v. Advanced Pain Consultants, S.C.*, No. 15 C 479, 2015 WL 7710371, at *2 (N.D. Ill. Nov. 30, 2015) (denying dismissal of fraudulent misrepresentation claims over particularity arguments). Plaintiff has met his pleading burden because the Complaint identifies the "who, what, when, where, and how" of Jump's fraudulent scheme, *Menzies v. Seyfarth Shaw LLP*, 943 F.3d 328, 338 (7th Cir. 2019).

The Complaint identifies "who" committed the fraud: Kariya, DiSomma, Jump, Tai Mo Shan, and Terraform. It also alleges the "what" the fraud was:

- In order **"to make UST feel real"** to prospective buyers, Jump and Terraform entered a series of secret agreements for Jump to act as a major market maker on the Terraform blockchain and thereby create an illusion of liquidity and demand—including by defending the peg under the "Gentleman's Agreement." (Compl. ¶¶ 50-51.)

- Jump—with the specific involvement of Kariya, DiSomma, and Tai Mo Shan—purchased UST in a way to make it falsely appear that UST had self-corrected after depegging in May 2021. Jump concealed what it received in exchange for that intervention: that the immediate vesting of in-the-money options before Jump would secretly purchase UST. (Compl. ¶¶ 68-69, 193.)

- Jump concealed its massive financial interests: the November 2019 agreement and the September 2020 arrangement giving Jump the right to acquire up to 65 million LUNA at a $0.40 strike. Jump ultimately monetized its holdings for more than $1.28 billion profit. (Compl. ¶¶ 54–55, 193, 223.)

- Jump stayed silent while Terraform lied about UST's stability, even though Jump's conduct enabled those lies to be told. Terraform's May 24, 2021 twenty-nine post thread described the episode as a "black swan" "stress test" that UST had survived autonomously, and Jump neither disclosed its purchases nor corrected that account, despite being named directly in the thread. (Compl. ¶¶ 83–84, 95.)

- Kariya and Jump then promoted UST while omitting Jump's role, including Jump's October 11, 2021 article calling UST "the most elegant solution" for a stablecoin, Kariya's January 28, 2022 thread assuring it was "difficult to imagine a sustained mass exodus" from UST, and his May 3, 2022 statement that "there is almost no possibility for one collusion across these landscapes." (Compl. ¶¶ 88, 90, 94, 158(b).)

- Defendants presented LFG as an independent reserve even though Kwon and Kariya jointly controlled it, and, during the May 2022 de-peg the reserves LFG was intended to deploy were secretly transferred to Jump so that it could rescue UST for a second time. (Compl. ¶¶ 100-101, 112-113.)

- DiSomma contacted executives at multiple trading firms to solicit emergency funding during the May 2022 depeg, in an effort to continue Jump's fraudulent scheme with Terraform. (Compl. ¶¶ 123–125.)

- After the collapse, Kariya edited LFG's public statements to recast Jump as a mere OTC counterparty that "did not act as an agent for the LFG," and Jump's June 2, 2022 article again called UST's peg "automatic." (Compl. ¶¶ 130-132.)

The Complaint also alleges each Defendant's role in the fraud. Kariya and Kwon negotiated a series of secret agreements going back to 2019. (Compl. ¶ 47.) When UST depegged in 2021, Kariya negotiated with Kwon for Terraform to remove the vesting restrictions on in-the-money options. (Compl. ¶¶ 68–69.) Jump personnel, including Kariya and DiSomma, engaged in Signal calls with Kwon on May 23, 2021, to effectuate Jump's intervention to save UST's peg. (Compl. ¶ 63.) DiSomma directed approximately $100 million in UST purchases. (Compl. ¶¶ 65, 70–77.) Tai Mo Shan Ltd. executed purchases across multiple exchanges. (Compl. ¶¶ 17, 70–77.) After making these purchases, at DiSomma's

instruction, Jump and Tai Mo Shan Ltd. began quietly unwinding their UST positions to lock in their profit on a failing asset. (Compl. ¶ 77.)

The Complaint alleges the "when" and "where" of the fraud. *Menzies*, 943 F.3d at 338. The parties' relationship began in November 2019, when Jump became a silent market maker to "make UST feel real"; it continued with the execution of the Gentleman's Agreement in August 2020, which obligated Jump to secretly intervene; it carried that fraud into the market through Jump's trading from May 23 through May 27, 2021. (Compl. ¶¶ 71, 74, 129–132.) Jump entered into its agreements with Terraform from its Illinois-based offices, (Compl. ¶¶ 17, 26), communicated internally and with Terraform through United States wires (Compl. ¶¶ 155, 162–165), promoted its scheme and concealed its involvement through U.S.-based social-media channels like X and various podcasts (Compl. ¶¶ 83, 88, 90–94, 109–111), and directed the trading on various cryptocurrency exchanges from Illinois (Compl. ¶¶ 65, 71, 74.)

Finally, the Complaint alleges the "how" of the fraud plainly: Jump's transactions include more than 62 million UST purchased anonymously from May 23 through May 27, 2021. (Compl. ¶ 74.) It further alleges that Jump, in cooperation with Terraform, ensured that its fraud reached its intended victims by leveraging social media and other forms of public-facing communications. (Compl. ¶¶ 83–84, 88, 90–94, 109–111.)

Jump argues that the Complaint fails to identify the actors, communications, and transactions underlying the alleged fraud with the precision Rule 9(b) demands. (Jump Motion ("Mot."), Dkt. 35, at 18–19, 30–31.) Jump is not only incorrect on the substance; it also disregards the fact that the relevant internal facts (trading records, entity-level allocation decisions, and Signal communications) that would allow more specific allegations are uniquely within Defendants' control to the extent they have not been deleted. *Corley v. Rosewood Care Ctr., Inc.*, 142 F.3d 1041, 1051 (7th Cir. 1998) (finding 9(b) particularity where a complaint "emphasizes that such specific information is in the hands of defendants, who at the time had

resisted his attempts in discovery to obtain a list of other [victims] affected by the alleged scheme"). In such circumstances, courts in this District and Circuit require only "a general outline of the alleged fraud scheme" sufficient to notify each defendant of its purported role. *Kim v. Fayazi*, No. 96 C 6966, 1998 WL 729753, at *3 (N.D. Ill. Oct. 14, 1998) (denying dismissal where the plaintiff could not access internal records and the complaint provided adequate notice of each defendant's role in the scheme). As detailed further below (*see* Section II.B.1, *infra*), Defendants created an information gap and now seek to benefit from it to avoid liability. Jump demanded secrecy from the outset (Compl. ¶ 52), used Signal's disappearing messages to limit the record (Compl. ¶ 56), and traded anonymously across multiple exchanges to conceal Jump's purchases (Compl. ¶¶ 74, 158(a)). Rule 9(b) does not permit defendants to benefit from an information barrier they purposefully created to avoid accountability.

### B. Plaintiff Adequately Alleges that Defendants Defrauded Him About the Efficacy of the Algorithm and Their Role in the 2021 De-peg

Defendants' core arguments that they did not make any false statements (Mot. at 24–27; DiSomma Motion ("DiSomma Mot."), Dkt. 34, at 5–6) or had no duty to correct Terraform's false statements (Mot. at 27–28) are wrong. Plaintiff adequately states fraud claims based on Defendants' misrepresentations about UST's functionality and their concealment to make UST "feel real" as an algorithmic stablecoin. Fraudulent misrepresentation under Illinois law requires (1) a false statement of material fact; (2) knowledge or belief of falsity by the person making it; (3) an intent to induce the plaintiff to act; (4) action by the plaintiff in justifiable reliance on the statement; and (5) damages. *Doe v. Dilling*, 888 N.E.2d 24, 34–36 (Ill. 2008). Similarly, actively concealing a material fact that the plaintiff could not reasonably discover is actionable as fraud even in the absence of an affirmative misrepresentation. *Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*, 897 F.3d 797, 805 (7th Cir. 2018) (recognizing that Illinois law permits a claim for fraudulent concealment where the defendant concealed a material fact when he was under a duty to disclose that fact to plaintiff.). Finally, even absent

an affirmative misrepresentation or active concealment, a defendant is liable for fraud by omission where it conceals a material fact under circumstances creating a duty to speak and does so with intent to induce a false belief. *See Trs. of the AFTRA Health Fund v. Biondi*, 303 F.3d 765, 777 (7th Cir. 2002). The Complaint alleges all three theories: fraudulent misrepresentation, fraudulent concealment, and omissive fraud. (Compl. ¶¶ 189–209.)

### 1. Jump and DiSomma Made False Representations and Concealed Material Facts about the Algorithm's Viability and Their Involvement in Propping it Up

#### a. The Covert May 2021 Effort to Save the Peg Is Actionable as Fraudulent Conduct

On May 24, 2021, in exchange for accelerated vesting from Terraform, DiSomma directed Jump's traders to covertly purchase large sums of UST, thereby affirmatively misrepresenting through their conduct that UST's algorithm had successfully restored the peg. (Compl.¶¶ 68–70, 73–74.) Illinois courts and courts in this District recognize that fraudulent misrepresentations can take the form of conduct rather than spoken or written words. *Applied Sys., Inc. v. PBC Consulting Inc. & Ardent Labs., Inc.*, No. 25 CV 14251, 2026 WL 2559570, at *1 (N.D. Ill. Aug. 31, 2026) (denying dismissal of a conduct-based fraud claim based on access to computer software that the defendant obtained by creating a fake company it held out as an insurance agency); *Walls v. VRE Chi. Eleven, LLC*, 2016 WL 5477554 (N.D. Ill. 2016) (denying dismissal of a fraudulent-conduct claim against real-estate agents alleged to have acted fraudulently in selling the plaintiff's home).

Jump's conduct in restoring UST's peg in 2021 constituted a misrepresentation that UST's algorithm functioned as advertised. (Compl. ¶¶ 7, 74–75, 83.) Jump acted to keep its purchases and arrangement confidential. (Compl. ¶ 52.) And Jump knew that covertly injecting millions of dollars into UST would cause market participants to misperceive the efficacy of UST's algorithm. *Zimmerman v. Northfield Real Estate, Inc.*, 156 Ill. App. 3d 154, 162 (1986) (reversing dismissal of a claim premised on fraudulent conduct where it was "reasonable to

infer that [defendant] kn[o]w of the flooding and of the lot size" of the plaintiff's home, which had incurred damages, because "the complaint alleged that defendant lived next door to [plaintiff's] home"). Thus, Jump's covert effort to save the UST peg in May 2021 is actionable as fraudulent conduct.

#### b. Defendants Actively Concealed Both that the Algorithm Did Not Work and Their Role in Making It Seem as Though It Did

"Silence accompanied by deceptive conduct or suppression of material facts results in *active concealment* and it then becomes the duty of a person to speak." *Mitchell v. Skubiak*, 248 Ill. App. 3d 1000, 1005 (1993) (emphasis in original). Here, Jump and DiSomma engaged in numerous acts of active concealment. The entire 2021 secret-buying operation—which DiSomma directed—constitutes a misrepresentation by conduct and an active effort to conceal that the algorithm had been unable to restore the peg on its own without the massive covert infusion of investment from Jump.

Defendants also concealed their role in restoring UST's peg so the public believed that UST had returned to $1 autonomously. (Compl. ¶¶ 81, 82–83.) "[I]ntentional concealment of a material fact is the equivalent of a false statement of material fact," and that is precisely what Defendants did here. *Greene v. Mizuho Bank, Ltd.*, 206 F. Supp. 3d 1362, 1375 (N.D. Ill. 2016) (denying dismissal where "Mizuho's silence [about crypto platform's failure] as it continued to accept deposits actually suppressed facts that were salient and material for the depositors").

The Complaint details a scheme engineered to leave no trace: Defendants communicated on Signal using disappearing messages (Compl. ¶ 56), executed the covert repeg through anonymous trading accounts (Compl. ¶¶ 74, 158(a)), and operated under explicit secrecy instructions from Jump's principals (Compl. ¶¶ 52–53). After Jump secretly deployed millions of dollars to purchase UST, DiSomma instructed his traders to unwind those positions slowly to avoid detection or another collapse that would have revealed the prior intervention

and endangered Jump's capital. (Compl. ¶ 77.) DiSomma also secretly attempted to solicit emergency rescue funding from third-party firms during the May 2022 depeg. (Compl. ¶ 124.) He did so to reinforce the artificial market conditions Jump had created. (Compl. ¶ 124.) These allegations are more than sufficient to survive dismissal, particularly because Rule 9(b)'s requirements are less stringent for fraudulent concealment claims. *Shifrin v. Associated Banc Corp.*, No. 3:12-CV-00839-JPG, 2013 WL 1192766, at *3 (S.D. Ill. Mar. 22, 2013) (relaxing Rule 9(b)'s particularity requirements due to concealed material facts); *Donamaria v. Reprod. Genetic Innovations, Inc.*, 825 F. Supp. 3d 688, 705 (N.D. Ill. 2026) (denying dismissal because "[c]ourts in this circuit have recognized that the standard to state a fraudulent omission claim under Rule 9(b) is more relaxed than the typical fraud claim"); *Corley*, 142 F.3d at 1051 (denying dismissal and holding that a fraudulent-concealment claim need not identify the precise time, place, and content of an event that, by definition, did not occur).[2]

**c. Jump Made Multiple Statements Actionable As Half-Truths**

Jump also made multiple "half-truth" statements that are actionable as misrepresentations and created a duty for Jump to tell the whole truth about UST's financial weaknesses. *Williams v. Chicago Osteopathic Health Sys.*, 654 N.E.2d 613, 622 (Ill. App. 1st Dist. 1995) (reversing dismissal of fraudulent concealment and finding that partial disclosure made "concealment and an affirmative misrepresentation is virtually indistinguishable"). Jump's decision to describe UST's functionality while concealing its inorganic inflation of UST's price is sufficient to establish a duty owed to Plaintiff. *Crichton v. Golden Rule Ins. Co.*,

[2] Plaintiff's pleading of certain facts on information and belief is appropriate for the same reasons. *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 442–43 (7th Cir. 2011) (permitting information-and-belief pleading where the missing facts are inaccessible and the complaint supplies grounds for the belief); *Corley*, 142 F.3d at 1051 (finding that the Rule 9(b) particularity requirement "must be relaxed where the plaintiff lacks access to all facts necessary to detail his claim"). Rule 9(b) permits pleading facts on information and belief where the facts are peculiarly within the defendant's control. *Pirelli,* 631 F.3d at 442–43; *Corley*, 142 F.3d at 1051. The Complaint grounds its information-and-belief allegations in sources that survived the intentional deletion: internal communications recovered through the SEC investigation, trading-activity data, public postings, and contemporaneous events. (Compl. ¶¶ 63–79, 85–111, 120–125, 137–142.) Defendants' demand for internal attribution of every entity-level decision (Mot. at 30–31; DiSomma Mot. at 5) asks for proof Plaintiff could not possibly possess at this stage.

576 F.3d 392, 398 (7th Cir. 2009) (holding that an insurer who concealed practices to inflate premiums had a duty to disclose when making "affirmative statements. . .while omitting material facts that render the statement a misleading 'half-truth'").

Jump's October 11, 2021 article, "Stablecoins: The Impending Rise of a Multi-Trillion Dollar Market," is actionable because it paired a confident description of UST's design and its potential profitability with silence about the algorithm's known failure. In addition to trumpeting the stablecoin's promise of creating dizzying wealth, the article called UST the "most prominent example" of algorithmically stabilized assets and "the most elegant solution for creating a highly scalable and more decentralized stablecoin." (Compl. ¶ 88.) There is no disagreement that UST was none of those things. Jump merely argues that the statement is puffery (Mot. at 25). Not so. The article served as a credible source for how UST's redemption mechanism worked and purported to offer an informed assessment of UST's prospects of becoming a "winner" in the stablecoin space. (Compl. ¶¶ 75, 88, 192.) A statement about the "elegance" of a stablecoin's design, made after establishing that level of credibility about how it functions, implies that the assessment is grounded in that credibility. Because Jump made the statement while omitting UST's fundamental failure in May 2021, it plausibly constituted a half-truth giving rise to a duty to disclose. *Gunn v. Cont'l Cas. Co.*, 622 F. Supp. 3d 694, 707 (N.D. Ill. 2022) (denying dismissal of a fraud claim because "a statement that is technically true may nevertheless be fraudulent where it omits qualifying material"). Similarly, on May 3, 2022, Kariya stated that "there is almost no possibility for one collusion across these landscapes." (Compl. ¶ 94.) By then, Jump had already colluded with Terraform to orchestrate the May 2021 repeg. (Compl. ¶¶ 50–52, 66–69, 83.) When a speaker volunteers information, the speaker assumes a duty to tell the whole truth, *Crichton*, 576 F.3d at 398, and Kariya, on behalf of Jump, failed to do so.

Jump cites *Chiarella v. United States*, 445 U.S. 222 (1980), for the proposition that silence absent a duty is not fraud. 445 U.S. at 235. (Mot. at 27–28.) DiSomma similarly argues that he made no public statement and had no relationship with Plaintiff. (DiSomma Mot. at 11-13.) "But it is not true that if you are not a fiduciary anything goes, short of false statements." *Emery v. Am. Gen. Fin.*, 71 F.3d 1343, 1348 (7th Cir. 1995) (finding that, although the finance company had no fiduciary relationship with the plaintiff, its half-truth was still actionable as fraud because it was "intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled"). Each of the alleged public-facing statements described UST's stability or Terraform's ecosystem while omitting that the algorithm had failed and Jump had funded the rescue. The half-truth doctrine requires a speaker to disclose facts necessary to prevent a statement from becoming materially misleading on the subject it addresses.[3] *Newman v. Metro. Life Ins. Co.*, 885 F.3d 992, 1004 (7th Cir. 2018). Moreover, these half-truths are attributable to DiSomma. *Petri v. Gatlin*, 997 F. Supp. 956, 974 (N.D. Ill. 1997) (holding that there is "a presumption that the allegedly false and misleading 'group published information' complained of is the collective action of officers and directors"); *see also Jannotta v. Subway Sandwich Shops, Inc.*, 125 F.3d 503, 514 (7th Cir. 1997) (a principal "could be found liable for fraud based upon: (1) his own conduct; (2) the conduct of an agent acting within the scope of the agent's authority; and/or (3) the conduct of an agent of an alter ego corporation acting within the scope of the agent's authority").

Further, Jump's partial disclosures regarding UST's algorithm created a duty to disclose or correct those disclosures with an honest statement of its role in restoring UST's peg. *Allied Metal Co. v. Elkem Materials, Inc.*, No. 20-cv-06, 2022 WL 16540199, at *3 (N.D. Ill. Oct. 28, 2022) (denying dismissal where the supplier learned it could not fulfill the purchaser's order

[3] Jump argues that a speaker need not disclose every fact about a subject it addresses. Mot. at 24-25 (citing *Schlifke v. Seafirst Corp.,* 866 F.2d 935, 944–45 (7th Cir. 1989)). That argument fails. *Schlifke* concerned offering documents that described a transaction's structure and were faulted for omitting collateral facts about it. 866 F.2d at 944-45. The omission here is not collateral, it is central and material.

but continued making partial deliveries without disclosing the shortfall, and finding a duty to disclose because "the defendant's acts contribute to the plaintiff's misapprehension of a material fact, and the defendant intentionally fails to correct [the] misapprehension").[4] Jump's failure to do so created a misleading impression, making its silence actionable. *Id.* at *5. Indeed, one court has held that Jump's "role as a market maker" in the Terraform ecosystem, "combined with its tangled incentives and eventual realization of enormous profits from the LUNA holdings," created a duty of affirmative disclosure "when making statements that touted the ability of the algorithm to keep the value of UST steady without outside intervention." *Patterson v.* Jump *Trading LLC*, No. 5:22-CV-03600-PCP, 2026 WL 2605224, at *8 (N.D. Cal. Sept. 2, 2026) (denying dismissal against Defendants).

**d. The Misrepresented and Concealed Facts were Material**

Defendants pin their defense on the lack of any statement (Mot. at 24), that their statements were not misleading (Mot. at 24-27), and that they had no duty to disclose their role in the repeg (Mot. at 27-28; DiSomma Mot. at 13). As set forth above, those arguments fail. Importantly, Defendants do not argue that the concealed facts at the center of Plaintiff's allegations—that UST's algorithm did not function properly and that UST regained its peg in May 2021 only because Jump secretly propped up its price—are immaterial to Plaintiff's otherwise well-pleaded fraud claims. The Court should therefore treat materiality as conceded. *G & S Holdings LLC v. Cont'l Cas. Co.*, 697 F.3d 534, 538 (7th Cir. 2012) (holding that a "party waives an argument by failing to make it . . . in support of a motion to dismiss").

Defendants do not challenge the materiality of the concealed facts underlying Plaintiff's fraud claims because they cannot. Jump's concealment of UST's weakness was material

[4] Jump invokes *Janus* to remove two entities from the misstatement theory at the threshold. (Mot. at 24.) *Janus* is a Rule 10b-5 case. It construes the word "make" in a rule that addresses making an untrue statement and holds that the maker is the person with ultimate authority over the statement's content. 564 U.S. at 142. Neither the wire-fraud statute nor Illinois common law contains that limitation. Section 1343 reaches any person who knowingly participates in a scheme to defraud through the wires, whether or not that person is the speaker, and the Complaint does not plead a securities-fraud claim to which the maker doctrine could attach.

because Plaintiff alleges that he would have "decided not to go through with the purchase" had he known the truth about that weakness or Jump's intervention. *Emerald Parkway Valley Equity Grp., LLC v. Sun Life Assurance Co. of Canada*, No. 24 C 3039, 2024 WL 4590726, at *4 (N.D. Ill. Oct. 28, 2024) (denying dismissal of fraudulent concealment and fraudulent misrepresentation claims related to building defects because the court could "not [] say at this point [that] information about a building's persistent cracking and repairs would have no value in negotiations, regardless of the building's ultimate structural soundness"). The Complaint alleges exactly that: "[h]ad the truth been disclosed, Plaintiff would not have purchased" UST or LUNA. (Compl. ¶ 97.) In any event, the materiality of a misrepresentation or omission is a question of fact. *Biondi*, 303 F.3d at 777.

#### e. Each of the Complaint's Alleged Misrepresentations Is Collectively Attributable to All Defendants

Jump's active concealment, conduct-based fraud, and half-truths are collectively attributable to all Defendants. Plaintiff's collective allegations and the group-published content underlying the Complaint support claims against all Defendants as individual actors participating in a fraudulent scheme. *Am. Int'l Grp., Inc. v. ACE INA Holdings, Inc.*, 722 F. Supp. 2d 948, 965–66 (N.D. Ill. 2010), *opinion vacated in part on reconsideration*, No. 07C2898, 2010 WL 3730980 (N.D. Ill. Sept. 16, 2010) (denying dismissal where collective allegations supplied each defendant notice of its role); *Shapo v. O'Shaughnessy*, 246 F. Supp. 2d 935, 957 (N.D. Ill. 2002) (presumption that false group-published information is collective action by the company's officers and directors).

Collective allegations are permissible against a network of parties such as Jump when the Complaint provides each Defendant with notice of its alleged participation in the underlying scheme. *Klueh v. Paul Vallas for All Chi.*, No. 19-CV-00249, 2020 WL 4934975, at *7 (N.D. Ill. Aug. 24, 2020) (denying dismissal because collective allegations may be directed at multiple defendants when they provide each defendant notice of its alleged conduct); *Havrilla*

*v. Centene Corp.*, No. 1:22-CV-4126, 2024 WL 1932916, at *8 (N.D. Ill. May 2, 2024) (denying dismissal because the complaint's representative allegations supplied a general outline of a multiyear fraud). The Complaint does so by alleging that Jump Trading, Jump Crypto, and Tai Mo Shan executed fraudulent UST purchases across multiple exchanges to artificially prop up the price of UST (Compl. ¶¶ 74, 158(a)); that DiSomma personally directed those trading operations (Compl. ¶ 74, 158(c)); and that Kariya negotiated the terms of those operations and later promoted the fraudulent impression they created in the market. (Compl. ¶¶ 86, 88, 90-94, 109-111, 158(b).) Because Plaintiff plausibly alleges that each Defendant "knowingly participated in the asserted scheme," the conduct of each Defendant is sufficiently attributable to all Defendants. *Lin v. Chojnacki*, No. 24 C 3725, 2025 WL 2720664, at *5 (N.D. Ill. Sept. 24, 2025) (citing *United States v. Powell,* 576 F.3d 482, 490 (7th Cir. 2009)).

Additionally, where, as here, an entity's official communications are group-published, courts presume that its officers and directors drafted, approved, or distributed them. *Shapo*, 246 F. Supp. 2d at 957 ("[U]nder Rule 9(b), there is a presumption that false and misleading 'group published information' is a collective action of the company's officers and directors"). "Group-published information" includes press releases and other official communications from the company. *Am. Int'l Grp., Inc.*, 722 F. Supp. 2d at 965. Jump's article calling UST "the most elegant solution," Kariya's tweets about Terraform's ecosystem, Jump Crypto's podcast, "The Ship Show," and the LFG press release are all corporate-sponsored publications originating from Jump's official social-media accounts. (Compl. ¶¶ 88, 90–94, 109–111.) Kariya was President of Jump Crypto, and DiSomma co-founded Jump Trading and directed the trading that these statements misrepresented. (Compl. ¶¶ 20–21.) Both are therefore presumed to have drafted, approved, or distributed these group-published communications.[5]

[5] The Complaint separately alleges that Jump Crypto and Tai Mo Shan were alter egos of Jump Trading and operated as a unit, while also pleading each entity's distinct role in the scheme. (Compl. ¶¶ 17–19.) Whether those allegations ultimately establish alter-ego liability is not a question to resolve on a motion to dismiss.

Defendants' attempt to recast Plaintiff's allegations as impermissible "group pleading" fails. (Mot. at 18-19.) As described above, the Complaint adequately alleges specific facts and conduct by each Defendant. (*See* Section II.A, *supra*.) *See Kim v. H Guys, LLC*, No. 1:20-CV-03588, 2022 WL 888871, at *3 (N.D. Ill. Mar. 26, 2022) (denying dismissal over a group-pleading argument where the complaint alleged that the defendants "made numerous false statements of material fact to persuade the [plaintiffs] to invest in the doomed venture"). Moreover, in addition to the reasons above, the acts of one co-conspirator in furtherance of the scheme may be attributed to others for pleading purposes. *Gas Tech. Inst. v. Rehmat*, No. 05 C 2712, 2006 WL 3422190, at *36 (N.D. Ill. Nov. 27, 2006) (holding that "it is not necessary that each member of the conspiracy actually commit an act of fraud and Plaintiff here would not be required to plead as much, even under 9(b)'s heightened pleading rules").

#### *2.* The Complaint Adequately Alleges Jump's and DiSomma's Fraudulent Intent

The Complaint adequately alleges that Jump made its misrepresentations and concealed material information with fraudulent intent. Rule 9(b) permits intent to "be alleged generally." Fed. R. Civ. P. 9(b). It is enough to allege facts from which a reasonable inference of fraudulent intent can be drawn. *Elder v. Bimbo Bakeries USA, Inc.*, No. 3:21-CV-637-DWD, 2023 WL 6382354, at *3 (S.D. Ill. Sept. 29, 2023) ("Accordingly, the question becomes 'whether the allegedly false and misleading statements can be read to create a likelihood of deception or to have the capacity to deceive' a reasonable consumer").

Defendants attempt to argue that Jump, a large sophisticated company whose ***compliance department was urging its executives*** to use Signal's disappearing messages ***to hide evidence*** of their involvement (Compl. ¶ 56) in a scheme that would have been impossible without them—lacked fraudulent intent. Defendants' public statements and concealment served a single objective: preserving market confidence in UST's algorithmic design to "make UST feel real" long enough to monetize Jump's LUNA holdings. (Compl. ¶¶ 80–81, 191–192.)

DiSomma himself acknowledged the crisis in real time, warning of "fear of a bank run given that UST is 'backed' by LUNA" and concluding that Jump "[n]eeded to support UST directly." (Compl. ¶ 65.) DiSomma therefore knew that any claims of UST's "purely algorithmic" recovery would be false. Jump and Terraform then concealed Jump's intervention because they wanted "to make UST feel real" for buyers. (Compl. ¶ 181.) These allegations demonstrate both knowledge of falsity and intent to induce reliance. Jump knew the algorithm had failed and it intervened to induce prospective buyers to purchase UST based on its purported algorithmic success. *Clay v. Philip Morris USA Inc.*, No. 18-CV-03549, 2020 WL 5540195, at *2 (N.D. Ill. Feb. 20, 2020) (denying dismissal where the alleged context and timing of statements supported inference that defendant "made [those] false statements and misrepresentations for the purpose of inducing Plaintiff to rely on them"). Defendants then took affirmative steps to inspire a false sense of security in UST's algorithm, even though Jump knew it was anything but secure. (Compl. ¶¶ 80–81, 191–192.) *Emerald Parkway Valley*, 2024 WL 4590726, at *3 (denying dismissal where the defendant concealed a material fact and made affirmative statements that "creat[ed] a false sense of security").

Jump then affirmatively promoted UST's falsified stability through articles, tweets, and podcast appearances. (Compl. ¶¶ 83, 88, 111, 158(b).) The alleged context and timing of these statements and omissions sufficiently support an inference that Defendants "made those false statements and misrepresentations for the purpose of inducing Plaintiff to rely on them." *Clay*, 2020 WL 5540195, at *2. The false sense of security that Jump created by concealing its role supports an inference that its half-truths were intended to induce a false belief in UST's algorithm. *Elder*, 2023 WL 6382354, at *2–3 (holding that intent may be pleaded generally and inferred from the design of the concealment). Plaintiff need not plead more at this stage. *Moak v. Roszak*, No. 05 C 1652, 2006 WL 2413698, at *6 (N.D. Ill. Aug. 17, 2006) (holding

that "the pleadings are not the proper vehicle for ascertaining with particularity whether Defendants intended to defraud investors at the time of the investment").

### 3. The Complaint Adequately Alleges Plaintiff's Justifiable Reliance on Jump's Fraudulent Conduct, Concealment, and Half-Truths

Plaintiff pleads justifiable reliance on the successful repeg's implied representation, which Defendants' later public statements reinforced. Plaintiff purchased UST and LUNA "shortly after observing that UST had successfully repegged" following the May 2021 depeg event. (Compl. ¶¶ 15, 207–208.) Plaintiff alleges reliance on the implied representation conveyed by the successful repeg and on Defendants' affirmative public statements reinforcing that impression. (Compl. ¶¶ 81, 83, 88, 90, 94, 109–111.) Whether Plaintiff's reliance was justifiable is a question of fact inappropriate here. *ABN AMRO, Inc. v. Capital Int'l, Ltd.*, 595 F. Supp. 2d 805, 840 (N.D. Ill. 2008).

Defendants suggest that Plaintiff should have investigated further or that publicly available information put him on constructive notice. But Plaintiff alleges that Defendants' concealment prevented discovery of their scheme. (Compl. ¶¶ 80-97.) In any event, constructive notice, as relevant to Defendants' argument that the LFG announcement rendered Plaintiff's reliance unreasonable, is a factual issue that cannot be resolved at the pleading stage.[6] *Edelman v. Belsheim & Bruckert, LLC*, No. 11-CV-1121-MJR-PMF, 2012 WL 1933755, at *6 (S.D. Ill. May 29, 2012). Defendants spent more than a year publicly promoting UST's algorithmic integrity; they cannot now argue that Plaintiff was unjustified in taking them

[6] Even if Defendants could make constructive-notice arguments here (Mot. at 23–24), which they cannot, the announcement to which they refer did put Plaintiff on such notice. LFG's launch announcement portrayed its reserves as an additional, redundant layer of support meant to "backstop" the UST peg and did not suggest that the fake May 2021 repeg occurred only because of Jump's secret efforts in exchange for massive payments from Kwon. (Compl. ¶¶ 98–101, 109–111.) Jump's reference to the March 2022 discussion on the Ship Show, in which Kariya "explained that LFG's reserve was 'extremely useful to have' to address 'extreme price movements, which do happen,'" proves the same point: the reserve was "useful to have" moving forward and was not described as "something we have employed in the past to secretly support the algorithm." (Mot. at 4 n.2, 10–11.) The LFG announcement therefore did not immunize Jump from liability for its earlier concealment and continuing half-truths. *Beedie v. Battelle Mem'l Inst.*, No. 01 C 6740, 2002 WL 22012, at *4 (N.D. Ill. Jan. 7, 2002) (denying dismissal and holding that a general disclaimer that "does not address specific statements" does not bar fraud claims).

at their word. *Emerald Parkway*, 2024 WL 4590726, at *3 (a defendant that inhibits inquiry by creating a false sense of security cannot rely on the plaintiff's failure to investigate independently).

**4. Plaintiff Adequately Alleges Jump's Fraud Caused His Injury**

The causal chain is direct. Plaintiff observed UST's successful repeg in May 2021. (Compl. ¶ 207.) Plaintiff thus "reasonably believed that UST's algorithmic mechanism had proven reliable under stress." (Compl. ¶ 207.) If Jump had not intervened to achieve the repeg, or if it had disclosed its involvement, UST would have continued its collapse and Plaintiff would not have purchased. Instead, Plaintiff made his first purchase on or about May 24, 2021, shortly after observing the repeg. (Compl. ¶ 208.) Defendants then continued the deception. (Compl. ¶¶ 83, 88, 111.) A similar depeg occurred in May 2022, and the algorithmic weakness Jump concealed in May 2021 materialized. (Compl. ¶¶ 126–128.) Plaintiff's losses are directly tied to that concealed risk. (Compl. ¶ 209.) The Complaint makes Plaintiff's actual reliance and injury "patently clear." *Moak*, 2006 WL 2413698, at *7 (holding loss causation alleged where the contention is "[h]ad Defendants had not misappropriated funds . . . the . . . project would not have sustained the 'staggering losses' that it did").

Plaintiff need not show that Jump caused every dollar of the loss. *Benzakry v. Patel*, 77 N.E.3d 1116, 1129 (Ill. App. 3 Dist., 2017) (affirming denial of dismissal of fraud and claim, holding that "[p]roximate cause means any cause which, in natural or probable sequence, produced the injury complained of" because it "need not be the sole cause or the last or nearest cause."). Plaintiff alleges that Jump's concealed rescue created the false impression, induced his purchase, and concealed the weakness that later destroyed the value of the same interdependent tokens. (Compl. ¶¶ 75, 80–81, 96–97, 126–128, 207–209.) *See Gen. Motors Acceptance Corp. v. Cent. Nat. Bank of Mattoon*, 773 F.2d 771, 781–82 (7th Cir. 1985) (affirming fraud conviction because a defendant's fraud "need only be the proximate cause and

not the sole cause" and the defendant's "deliberate failure to report . . . created a false impression."). Whether other actors also contributed to his losses is a fact issue that requires discovery and is irrelevant at this stage. *Appvion, Inc. v. Richards*, No. 18-C-1861, 2025 WL 346736, at *4 (E.D. Wis. Jan. 30, 2025).

### C. Defendants Unquestionably Aided and Abetted Terraform's Fraud— The Fraud Would Not and Could Not Have Happened Without Them

Jump and DiSomma, as aiders and abettors, are separately liable as participants in Terraform's fraud. *Eastern Trading Co. v. Refco, Inc.*, 229 F.3d 617, 624 (7th Cir. 2000) (holding that "[o]ne who aids and abets a fraud is guilty of the tort of fraud"). To state a claim for aiding and abetting common-law fraud, a plaintiff must allege (1) a wrongful act by the party aided that caused injury, (2) the defendant's awareness of its role when assistance was provided, and (3) knowing and substantial assistance. *Thornwood, Inc. v. Jenner & Block*, 799 N.E.2d 756, 767 (Ill. App. Ct. 2003). Defendants are liable for aiding and abetting because they actively participated in and promoted that same fraud.

#### 1. Kwon and Terraform Committed an Underlying Wrong That Caused Plaintiff's Injury

Terraform made fraudulent representations to its buyers, including Plaintiff. It marketed UST as an "algorithmic stablecoin" whose dollar peg would be maintained automatically, without human intervention. (Compl. ¶¶ 38–47, 211.) When the algorithm failed in May 2021, Kwon publicly attributed UST's recovery to its "purely algorithmic" and "automatically self-healing" design. (Compl. ¶¶ 84, 111.) Each statement was false: the peg was restored by Jump's secret purchase of more than 62 million UST. (Compl. ¶¶ 74–75, 189–190.)

Terraform and Kwon made these misrepresentations with knowledge of their falsity. Kwon knew that UST's recovery was not "purely algorithmic" because Kwon personally negotiated the terms under which Jump intervened to do what the algorithm could not: restore UST to its purported $1 value. (Compl. ¶¶ 68–69.) Kwon also knew that the way he and Jump

described the May 2021 repeg was materially inaccurate, as he directed Terraform's head of communications to avoid disclosing Jump's role in the same. (Compl. ¶ 95.)

Terraform's intent to induce reliance is manifest: the concealment was designed to preserve buyer confidence in the algorithm's viability, thereby attracting new capital to the Terra ecosystem. (Compl. ¶¶ 80–81, 96–97.) *Clay*, 2020 WL 5540195, at *2 (denying dismissal where context of concealed information and timing of concealment inferred defendant "intended to induce" the plaintiff to rely on the false impression created by concealment).

Plaintiff justifiably relied on the false impression. Plaintiff observed that UST successfully repegged in May 2021 and, in the absence of any disclosure of Jump's intervention, reasonably believed that the algorithmic mechanism had proven reliable under stress. (Compl. ¶ 207.) Had Plaintiff known that Jump's secret purchases, not the algorithm, had restored the peg, he would not have purchased $80 million in LUNA and UST on or about May 24, 2021. (Compl. ¶¶ 208–209.) These allegations are sufficient to survive a motion to dismiss. *Richmond*, 2015 WL 7710371, at *4 (holding that "at this early stage in litigation" reliance cannot "be determined as a matter of law").

#### 2. Defendants Were Generally Aware of Their Role in the Tortious Activity.

The Terraform fraud could not have happened without Defendants—and they know it. Under Illinois aiding-and-abetting law, this element requires that the defendant was "regularly aware of his role as part of [an] overall [illegal] or tortious activity at the time that he provides the assistance." *Thornwood, Inc.*, 799 N.E.2d at 767. General awareness means that the defendant knew its conduct was part of an overall wrongful course of action; it does not require knowledge of every detail of the underlying fraud. *Id.* The Complaint alleges Jump's central role in Terraform's fraud: if Defendants had not intervened to save UST's peg in May 2021, Kwon would never have been able to represent that its recovery was "purely algorithmic," as no such recovery would have taken place. The cases Defendants cite are distinguishable. *Saleh*

*v. Merchant*, No. 14-CV-09186, 2019 WL 1331788, at *6 (N.D. Ill. Mar. 25, 2019), *aff'd sub nom. Muskegan Hotels, LLC v. Patel*, 986 F.3d 692 (7th Cir. 2021); *In re Canopy Fin., Inc.*, No. 12-CV-04646, 2015 WL 3505010, at *7 (N.D. Ill. June 2, 2015); *Thornwood*, 799 N.E.2d at 767; *Diallo v. 50 E. Chestnut Condo Ass'n*, No. 23-CV-13985, 2026 WL 958557, at *14 (N.D. Ill. Apr. 9, 2026). Each involved a defendant that observed indicia of irregularity from outside the scheme. Here, Terraform's fraud ran through—and depended on—Jump's conduct.

**3. Defendants Knowingly and Substantially Assisted the Fraud**

The Complaint alleges substantial assistance through the rescue, trading, concealment, and continued promotion of the false belief in UST's algorithm. Substantial assistance exists where a defendant "affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables the fraud to proceed." *Gondeck v. A Clear Title & Escrow Exch., LLC*, No. 11 C 6341, 2012 WL 5200091, at *4 (N.D. Ill. Oct. 22, 2012). Each Defendant's assistance is individually alleged. Kariya ordered that the relationship remain secret. (Compl. ¶ 52.) *Gondeck*, 2012 WL 5200091, at *4 (holding that affirmative assistance and concealment constitute substantial assistance). DiSomma directed the trading necessary for Terraform to make its misrepresentations. (Compl. ¶¶ 65, 70–77.) *Richmond*, 2015 WL 7710371, at *6 (finding knowing and substantial assistance where conduct was directed at furthering the principal fraud). Tai Mo Shan Ltd. executed the transactions, and Jump directed the strategy facilitating all of the above. Moreover, on March 1, 2022, Kwon made false statements about UST's algorithmic recovery on Jump's podcast, "The Ship Show," which Kariya hosted. (Compl. ¶¶ 68–69, 111.) *Fifth Third Mortg. Co. v. Kaufman*, 934 F.3d 585, 590 (7th Cir. 2019) (affirming liability against an attorney who knowingly facilitated a fraudulent mortgage scheme by hosting sham closings at his law firm).

Jump and DiSomma argue that the May 2021 trading was "entirely legitimate," "not indicative of intent to aid TFL's and Kwon's alleged fraud" (Mot. at 44), and that the Complaint

fails to allege "actual knowledge" of Terraform's fraud because the trading allegations are "conclusory." (DiSomma Mot. at 14–15.) Defendants are wrong. The Complaint alleges awareness based not merely on Jump's trading, but also on the secret agreements, the vesting quid pro quo, Jump's willful destruction of evidence, repeated communications with Kwon, instructions to conceal the rescue, continuing public promotion, and use of LFG to preserve that narrative. (Compl. ¶¶ 47–56, 63–84, 95, 102–114, 109–111, 191–214.) These allegations plausibly show that Jump and DiSomma knew Terraform and Kwon were making false statements about UST and knowingly provided substantial assistance. *Thornwood*, 799 N.E.2d at 767; *Richmond*, 2015 WL 7710371, at *6 (denying dismissal where allegations that the defendant knowingly made harmful false statements and assisted the underlying scheme plausibly pleaded awareness and substantial assistance). Moreover, those are factual disputes that require discovery.

## III. Plaintiff Adequately Alleges a Claim for Civil RICO

To state a claim under 18 U.S.C. § 1962(c), a plaintiff must allege (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). The Complaint satisfies each element. Jump suggests that RICO reaches only organized crime, not commercial misconduct. (Mot. at 7 (*citing Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 689 (N.D. Ill. 2012)).) That suggestion is inconsistent with RICO's "tremendous breadth," which permits fraud-based claims in federal court. *Morgan v. Bank of Waukegan*, 804 F.2d 970, 973–76 (7th Cir. 1986).

### A. The Complaint Pleads RICO Standing

"RICO standing" requires injury to business or property "by reason of" the § 1962 violation and "some direct relation between the injury asserted and the injurious conduct alleged." *Holmes v. Sec. Inv. Prot. Corp.*, 503 U.S. 258, 268 (1992). Defendants incorrectly

portray RICO standing as an exceptionally high bar, but it requires only "but-for" and proximate causation. *DeGuelle v. Camilli*, 664 F.3d 192, 199 (7th Cir. 2011).

Plaintiff has alleged that Jump's scheme was both the but-for and proximate cause of his injuries. Absent the alleged scheme, Plaintiff would not have purchased UST or LUNA. (Compl. ¶¶ 81, 96–97, 207–209.) *RWB Servs., LLC v. Hartford Computer Grp., Inc.*, 539 F.3d 681, 686–88 (7th Cir. 2008) (reversing dismissal on causation grounds and stating that courts must examine the alleged predicate acts in "the context of the entire violation when assessing factual causation" and that it is sufficient if a predicate act was enough "to cause the plaintiff's injury"). Plaintiff has also adequately alleged proximate causation because his losses were the "object of the conspiracy": the scheme aimed to trap cryptocurrency buyers such as Plaintiff by falsely convincing them that UST functioned as promised and had repegged on its own, partly so that Jump could secure its massive gains before the market crashed. *Empress Casino Joliet Corp. v. Johnston*, 763 F.3d 723, 733 (7th Cir. 2014); *Holmes v. City of Racine*, No. 14-CV-208-JPS, 2014 WL 5514181, at *14 (E.D. Wis. Oct. 31, 2014) (denying dismissal and finding adequate causation under RICO where the injury was the "object of the conspiracy," despite third-party decisionmakers within the causal chain). Plaintiff's injury was "direct" because he was a "reasonably foreseeable" victim of Jump's fraud; indeed, traders such as Plaintiff were the scheme's targets, as Jump needed exit liquidity for its LUNA. *OSF Healthcare Sys. v. Banno*, No. 08-1096, 2009 WL 1259048, at *2 (C.D. Ill. May 6, 2009) (stating that "an injury to the plaintiff is direct if the victim was reasonably foreseeable"). That is enough to survive dismissal. *Denkewalter v. Thomas*, No. 20 C 5013, 2023 WL 3479165, at *6 (N.D. Ill. May 16, 2023) (denying dismissal where a predicate act sufficient to cause the plaintiff's injury was part of the overall violation, even if the scheme also injured third parties).

Defendants argue that (1) Plaintiff's losses arose from third-party conduct in May 2022; (2) public disclosures severed the causal chain; and (3) no one relied on any Jump statement in

deciding to buy LUNA and UST. (Mot. at 19–24.) In the first instance, those are factual arguments that require discovery and cannot be resolved on a Rule 12(b)(6) motion. *DeGuelle*, 664 F.3d at 199 (reversing dismissal and holding that a plaintiff need plead only that the defendant is a plausible cause of injury); *ABN AMRO*, 595 F. Supp. 2d at 840 (holding that the reasonableness of reliance is a factual question not properly resolved on a motion to dismiss). Defendants also misstate Plaintiff's pleading burden under RICO. *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 658–59 (2008) (holding that a RICO plaintiff predicated on mail fraud need not show reliance).

Defendants' strained causation arguments fail for multiple reasons. Defendants' lead argument is that Jump can avoid its indispensable role in the fraud because Terraform's Curve3-to-Curve4 liquidity transition, institutional sales, and other traders' conduct "sever the causal chain."[7] That is a summary judgment argument requiring discovery and expert evidence, not a basis for dismissal. The Complaint alleges that Terraform—and, on information and belief, Jump—removed liquidity from Curve3, that the undisclosed withdrawal made UST vulnerable, and that institutional traders began selling within minutes. (Compl. ¶¶ 115–119.) Those events did not create a new, unrelated risk; they exposed a risk that Jump had affirmatively concealed by executing the fake repeg in 2021. Whether Jump participated in the withdrawal, whether the resulting sales were foreseeable, and how each event contributed to the collapse are fact-intensive questions that cannot be resolved at this stage. *Sindelar v. Essig,* No. 25 C 7991, 2026 WL 93123, at *5 (N.D. Ill. Jan. 13, 2026) (agreeing that RICO "causation is a factual issue inappropriate for resolution" on a motion to dismiss); *Speed Boats of Texas L.P. v. Novoselsky*, No. 11 C 3970, 2012 WL 1605610, at *4 (N.D. Ill. May 8, 2012) (denying

[7] Jump argues that Plaintiff's own pleading supplies an "obvious alternative explanation" for his losses, so causation is implausible. Mot. at 9 n.7 (citing *Wertymer v. Walmart, Inc.*, 142 F.4th 491, 497 (7th Cir. 2025)). *Wertymer* applies where the complaint pleads no facts that would let a court choose between an innocent and a fraudulent reading. *Id.* That is not this Complaint. Jump's alternative explanation—that UST recovered on its own—directly contradicts the Complaint's allegation that Jump's concealed, i.e., that self-interested trades saved the peg.

dismissal because the defendant's argument concerning the plaintiff's ability to show proximate causation was for the trier of fact after consideration of the evidence).[8] The same principle applies to Defendants' intervening- and superseding-cause arguments. *Durk v. Daum Trucking, Inc.*, No. 07 CV 6844, 2008 WL 4671721, at *4 (N.D. Ill. Oct. 22, 2008) (denying dismissal where the allegations plausibly supported liability notwithstanding a subsequent intervening cause of damages in the causal sequence); *Rougeau v. Ahlstrom Rhinelander, LLC*, 785 F. Supp. 3d 438, 448 (W.D. Wis. 2025) (denying dismissal because superseding cause was an affirmative defense requiring a fact-intensive allocation of responsibility, disposition at the pleading stage "premature at best").[9]

The May 2022 collapse was not an independent superseding event divorced from Jump's scheme.[10] It was the foreseeable consequence of the fragility Jump concealed and the risk that made its conduct tortious in the first place. The Complaint alleges that, after the ecosystem grew to approximately $45 billion on the strength of the public narrative about stability that Jump's fake repeg fostered, Terraform withdrew liquidity from Curve3 without announcing the timing, institutional traders sold UST, and LFG again deployed reserves in an effort to inflate the peg. (Compl. ¶¶ 98–100, 115–125.) Those events exposed and amplified the very vulnerability Jump had worked to conceal for a year. The Complaint adequately alleges causation because UST's algorithmic weakness and Jump's involvement in the May

[8] Jump's reliance on *Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010), is misplaced. *Hemi* rejected RICO proximate cause where the City sat at the end of a three-step causal chain and no predicate act targeted the plaintiff. 559 U.S. at 10-11. Here, in contrast, Jump's wire fraud targeted Plaintiff and other buyers directly by misrepresenting the nature of UST's algorithmic stability to those same buyers, and Jump's decision-making alone made that misrepresentation and the related injury possible.

[9] Defendants misread *Gress v. Commonwealth Edison Co.* to mean that "independent acts" of third parties provide a suitable basis for dismissal. 559 F. Supp. 3d 755, 767 (N.D. Ill. 2021), *aff'd sub nom. S. Branch LLC v. Commonwealth Edison Co.,* 46 F.4th 646 (7th Cir. 2022). In *Gress*, the Court dismissed the claim because the complaint failed to allege that the supposed cause of the injury was "improper." *Id.* Here, Plaintiff alleges the impropriety of Jump's conduct throughout its scheme with Terraform. (Compl. ¶¶ 47–56, 68–84, 95, 109–111.)

[10] Several cases Jump cites for the proposition that intervening or superseding causes can support dismissal, including *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006), and *Napleton's Arlington Heights Motors, Inc. v. FCA US LLC,* 214 F. Supp. 3d 675 (N.D. Ill. 2016), actually dismissed claims because the plaintiff could have been injured "for any number of reasons unconnected to the asserted pattern of fraud." *Anza*, 547 U.S. at 458; *see also Napleton's Arlington Heights Motors, Inc.*, 214 F. Supp. 3d at 691 ("there are a multitude of independent factors that could have led to the Plaintiffs' alleged harms"). That is not the case here.

2021 repeg were the facts about which Defendants misrepresented and those same facts caused Plaintiff's injury.

If Jump had not secretly purchased more than 62 million UST so that Kwon would immediately vest its LUNA options and support the false narrative that UST had self-stabilized, UST would have depegged in 2021, and Plaintiff would never have purchased. It was reasonably foreseeable that buyers such as Plaintiff would continue to purchase and hold UST and LUNA because Jump's enterprise led them to believe that the algorithm could withstand stress without such intervention. *RWB Servs., LLC*, 539 F.3d at 688. Maintaining that false impression was the direct object of Jump's conspiracy with Terraform as it served to protect Jump's LUNA positions. Whether other traders also participated in the market Jump defrauded does not negate Jump's direct role in creating and preserving the false market signal.

Defendants' reliance-based arguments for "RICO Standing" similarly fail.[11] Defendants' primary argument is that Plaintiff fails to allege that he "relied" on any specific statement by Jump. (Mot. at 11-12.) But as described above, the Complaint alleges that Plaintiff observed the successful repeg and purchased shortly afterward because he believed (a) the representation conveyed by Defendants' conduct—that the algorithm had proved reliable—and (b) the absence of the concealed facts—that the algorithm had not worked and that Defendants had intervened. Plaintiff further alleges that he would not have purchased either token had Jump's secret intervention been disclosed. (Compl. ¶¶ 75, 81, 96–97, 207–208.) Jump's intervention was therefore a substantial factor in Plaintiff's decision to buy. *Mullen v. GLV, Inc.*, No. 18 C 1465, 2018 WL 3218693, at *3 (N.D. Ill. July 2, 2018) (denying dismissal where the allegations included a link between fraudulent conduct and the plaintiff's decision to transact).

---

[11] As with Defendants' causation-based arguments, Jump's attacks on the reasonableness of Plaintiff's reliance (Mot. at 11) are not properly before this Court on a Rule 12(b)(6) motion to dismiss. *Gunn v. Continental Cas. Co.*, 622 F. Supp. 3d 694, 708 (N.D. Ill. 2022) (holding that the reasonableness of reliance is a factual question not suitable for resolution at the pleading stage).

Further, Defendants' focus on the fact that Plaintiff did not "read" their fraudulent misrepresentations is misplaced. A RICO plaintiff need not allege that he received the misrepresentations at issue to be directly injured because first-party reliance is not an element of a claim under § 1962(c). *Bridge*, 553 U.S. at 658–59 (2008) (rejecting first-party reliance as an element or prerequisite to RICO); *see also AbbVie Inc. v. Payer Matrix, LLC*, No. 23 CV 2836, 2025 WL 2374490, at *8 (N.D. Ill. Aug. 15, 2025) ("Although a direct relationship is required, courts permit a plaintiff 'directly injured by a fraudulent misrepresentation to recover even though it was a third party, and not the plaintiff, who relied on the defendant's misrepresentation"). In other words, whether Plaintiff read Jump's statements is immaterial; it is enough that UST, without a working algorithm, thrived in response to Jump's intervention and ensuing half-truths. (Compl. ¶¶ 80-81, 96-97.) The market dynamics created by those fraudulent activities were a "substantial factor" in Plaintiff's decision to purchase on May 24, 2021, continue purchasing for months thereafter, and ultimately hold the LUNA and UST that Jump induced him to believe had value.

**B. Plaintiff's Injury Is Domestic**

Defendants are incorrect that Plaintiff fails to allege a domestic injury. The Complaint alleges that Defendants concocted, promoted, and executed the scheme from Jump's headquarters in Illinois. A RICO plaintiff must allege a "domestic injury." *RJR Nabisco, Inc. v. European Community*, 579 U.S. 325, 346 (2016). An injury is "domestic" when, considering all the facts, "the circumstances surrounding the injury indicate it ***arose*** in the United States," even if the plaintiff is foreign. *Yegiazaryan v. Smagin*, 599 U.S. 533, 543–44 (2023) (emphasis added). This "fact-intensive" inquiry considers "the nature of the alleged injury, the racketeering activity that directly caused it, and the injurious aims and effects." *Id*.

Plaintiff alleges that Jump executed its scheme through Illinois-centered operations: Jump Trading is headquartered in Chicago; Defendants management and trading decisions

were based there; and DiSomma and Kariya directed trading, communications, and public messaging from Illinois, including the interstate wire communications forming the predicate violations. (Compl. ¶¶ 17–21, 25–26, 68–77, 185–187.) Under *Yegiazaryan*'s fact-intensive inquiry, these circumstances support a domestic injury even though Plaintiff resides abroad.

Defendants' argument that the location of Plaintiff's injury is based on situs is inappropriately factual at this stage and, in any event, unavailing. That approach revives the former "injury-felt" test for intangible property, which *Yegiazaryan* rejected. 599 U.S. at 540–41. The Supreme Court's framework focuses on the circumstances surrounding the injury—including the nature of the injury, the activity that directly caused it, and the activity's injurious aims and effects—not on the plaintiff's citizenship or the location of an exchange or wallet. *See Med. Marijuana, Inc. v. Horn*, 604 U.S. 593, 605 (2025) (recognizing that *Yegiazaryan* rejected a situs-based approach to economic and property injuries).

While the Seventh Circuit has not yet considered the issue after *Yegiazaryan*, courts have found a domestic injury from wire fraud in the cryptocurrency context when "the offense involves domestic wire use because . . . transactions used to execute the scheme occur in the United States." *Aguilar v. Baton Corp.*, No. 25-CV-880 (CM), 2026 WL 2568764, at *33 (S.D.N.Y. Aug. 31, 2026). Because Jump's scheme and the offending use of the wires occurred in the United States, Plaintiff's allegations establish a domestic injury at the pleading stage. *Yegiazaryan*, 599 U.S. at 549 (finding domestic injury where a foreign plaintiff's interests "were directly injured by racketeering activity either taken in California or directed from California"); *Glob. Master Int'l Grp., Inc. v. Esmond Nat'l, Inc.*, 76 F.4th 1266, 1276 (9th Cir. 2023) (finding domestic injury even though the plaintiff was a China-based company where it alleged "mail and wire fraud from knowingly producing and delivering nonconforming supplements in the United States"); *Ferguson v. The Republic of Trinidad & Tobago*, 422 So. 3d 717, 719 (Fla. Dist. Ct. App. 2025) (holding that domestic injury was shown for a foreign

plaintiff where many parts of the conspiracy and racketeering activity occurred in Florida); *In re Eletson Holdings Inc.*, No. 23-10322 (JPM), 2026 WL 2225569, at *28 (Bankr. S.D.N.Y. Aug. 3, 2026*)* (denying dismissal and finding domestic injury for an international gas-shipping company that alleged the defendants had schemed to seize its assets through sham litigation and legal procedures in the United States, where the complaint "plausibly plead[ed] . . . an injury originating in the U.S."); *Heredia v. Sewon Am., Inc.*, 766 F. Supp. 3d 1251, 1291 (N.D. Ga. 2025) (denying dismissal and finding domestic injury for a Mexican plaintiff even though the injuries were "incurred while in Mexico").

### C. Plaintiff Has Adequately Alleged a Pattern of Racketeering Activity

Defendants are wrong that Plaintiff has failed to allege a pattern of racketeering activity. A pattern requires at least two related predicate acts within ten years, with continuity shown either by a series of related acts extending over a substantial period ("closed-ended continuity") or by a threat of repetition ("open-ended continuity"). 18 U.S.C. § 1961(5); *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 237–43 (1989). Plaintiff alleges both forms of continuity. The conduct began no later than November 2019 with Jump's secret market-making and LUNA arrangements, continued through the Gentleman's Agreement and the May 2021 rescue, and extended through the LFG transactions, repeated public statements, evidence-destruction efforts, and the May 2022 collapse. (Compl. ¶¶ 47–56, 68–84, 87–111, 121–125, 155–165.) The predicates are related by a common purpose—preserving UST's apparent stability, hiding Jump's involvement, protecting its discounted LUNA positions, and extracting value from the resulting buyer confidence—but are varied in method and effect. *See Hale v. State Farm Mut. Auto. Ins. Co.*, No. 12-0660-DRH, 2013 WL 1287054, at *16 (S.D. Ill. Mar. 28, 2013) (finding a plausible factual basis to infer a RICO enterprise where members associated for a common purpose).

### 1. Defendants' Scheme Satisfies Open-Ended Continuity

Open-ended continuity asks whether the pleaded predicate acts, by their nature, "project into the future with a threat of repetition." *Hale*, 2013 WL 1287054, at *14. The Seventh Circuit recognizes three routes to satisfy that standard: (1) a specific threat of repetition, (2) predicate acts that are "a regular way of conducting [an] ongoing legitimate business," or (3) a long-term criminal association. *Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1023 (7th Cir. 1992); *Menzies,* 943 F.3d at 337; *Empress Casino Joliet Corp.,* 831 F.3d at 828. The Complaint satisfies the first and second routes.

Jump's methods carried an inherent threat of repetition. The Complaint alleges that Jump's market-making relationship with Terraform, its LUNA positions, and its monthly distributions created incentives to maintain the concealment-and-promotion cycle whenever UST faltered. (Compl. ¶¶ 47–56, 68–84, 104–107.) Jump, Terraform, Kwon, Kariya, and DiSomma remained involved, and the Gentleman's Agreement had no expiration date. The parties remained engaged because the alleged conduct continued producing benefits without a natural endpoint. *Inteliquent, Inc. v. Free Conferencing Corp.*, No. 16-CV-06976, 2017 WL 1196957, at *10 (N.D. Ill. Mar. 30, 2017) (finding that a scheme involving an automatically renewed contract and an ongoing business relationship lacked a natural endpoint or terminable goal). Plaintiff's allegations support the inference that the conduct would have endured if Defendants had succeeded.

Jump also maintained an ongoing commercial relationship with Terraform and intended to continue doing business with it. That is sufficient. *Shields Enterprises, Inc. v. First Chicago Corp.*, 975 F.2d 1290, 1295–96 (7th Cir. 1992) (noting that an alleged threat could have lasted a long time because the parties contemplated being involved together for some time). The Complaint alleges that the parties' conduct would have continued but for the failure of the second rescue, not because Jump voluntarily abandoned the scheme. In May 2022, Jump

attempted to deploy the LFG reserves and sought emergency capital from other firms, but the Terraform ecosystem had grown to approximately $45 billion. Jump ceased its efforts only as UST approached $0.50. (Compl. ¶¶ 115–129.) Those allegations support the inference that the concealment-and-promotion cycle had no built-in endpoint and could have continued indefinitely had the market not overwhelmed the rescue effort. *United States Transmission Systems, Inc. v. Casey*, No. 87 C 2987, 1991 WL 10941, at *2 (N.D. Ill. Jan. 23, 1991) (noting that a scheme does not have a "natural ending" and would have continued until the defendants were caught); *Resolution Trust Corp. v. S & K Chevrolet*, 868 F. Supp. 1047, 1061 (C.D. Ill. 1994) (finding open-ended continuity where the scheme could have continued but for the victim financial institution's entry into receivership).

Jump's scheme ended with Terraform because it failed, not because Jump chose to stop.[12] Worse yet, nothing currently prevents Jump from running a similar fraudulent scheme with new protocol-side participants. *See Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 410–11 (6th Cir. 2012) (finding open-ended continuity in a fraudulent adoption scheme because "there is no inherent limit to the number of couples seeking to adopt or to the number of children that the defendants could hold out as available for adoption").

**2. Defendants' Scheme Satisfies Closed-Ended Continuity**

Closed-ended continuity turns on the "number and variety of predicate acts and the length of time over which they were committed, the number of victims, the presence of separate schemes and the occurrence of distinct injuries." *Morgan v. Bank of Waukegan*, 804 F.2d 970, 975 (7th Cir. 1986) (construing RICO broadly). Each factor weighs in Plaintiff's favor.

[12] Jump argues that the collapse of the Terra ecosystem forecloses open-ended continuity because the predicates became "incapable of continuing into the future." Mot. at 15. That inverts the inquiry. Open-ended continuity is assessed by reference to the threat the conduct posed when it occurred, rather than by reference to whether the scheme later failed. *AbbVie Inc.*, 2025 WL 2374490, at *7 (finding open-ended continuity adequately pleaded where nothing indicated the defendant "would not have continued" the conduct absent the intervening event).

Plaintiff has alleged a sufficient duration to survive dismissal. Jump's assertion that the scheme lasted less than a year improperly starts the clock with the initial cluster of wire fraud transactions that achieved the fake May 2021 repeg. (Mot. at 16.) Even if the Court adopted Jump's improper timeline, Plaintiff's allegations would still be sufficiently continuous to survive dismissal. *IRN Payment Sys. v. Direct Furniture, LLC*, No. 07 C 0141, 2007 WL 2713366, at *6 (N.D. Ill. Sept. 12, 2007) (denying dismissal where a complaint "alleged the existence of an enterprise and that the racketeering actions occurred over a five-month period"); *Olympic Fed. v. Remp*, No. 87 C 8705, 1988 WL 64410, at *8 (N.D. Ill. June 16, 1988) (denying dismissal and finding a pattern adequately alleged based on a four-month period); *Heritage Ins. Co. v. First Nat'l Bank of Cicero*, 629 F. Supp. 1412, 1417 (N.D. Ill. 1986) (denying dismissal and finding a six-month period sufficient). The Court should nevertheless decline to adopt that timeline. Jump's relationship with Terraform did not begin in May 2021, when Jump began "deploying $100M" to save UST's peg. (Mot. at 16; Compl. ¶ 74.) Jump simply ignores the November 2019 agreement and August 2020 Gentleman's Agreement, both of which ultimately motivated those purchases. (Compl. ¶¶ 47, 50, 54.) Schemes of far shorter duration than the thirty-month period Plaintiff alleges have satisfied closed-ended continuity. *Mougrabi v. Covenant Air & Water,* LLC, No. 05 C 1615, 2005 WL 2230178, at *3 (N.D. Ill. Sept. 8, 2005) (denying dismissal and finding an eighteen-month scheme sufficient).[13] One victim suffices for the victim-number inquiry. Further, the Complaint alleges a broader impact: the May 2022 collapse destroyed more than $40 billion in investor value and affected purchasers worldwide who relied on the false impression of algorithmic stability. (Compl. ¶¶ 126–128.) That suffices to establish closed-ended continuity.[14]

[13] Indeed, Jump's duration cases are shorter. *J.D. Marshall* involved 13 months, *U.S. Textiles* 16 to 17, and *Hartz* 18. (Mot. at 16.)

[14] Jump's remaining authorities are equally inapposite. *Jones* predates *H.J. Inc.*, which rejected any multiple-scheme requirement and reversed dismissal. 492 U.S. 229, 240 to 41 (1989). *Lipin* involved a single fraudulent stock purchase. 803 F.2d at 324. *Jennings* was a shareholder valuation dispute in which the predicates were

### D. Plaintiff Adequately Alleges Multiple Predicate Acts[15]

#### 1. Plaintiff Adequately Alleges Wire Fraud

To state a claim for wire fraud under 18 U.S.C. § 1343, a plaintiff must allege the defendant's participation in a scheme to defraud, intent to defraud, and use of interstate wires[16] in furtherance of that scheme. *United States v. McGowan*, 590 F.3d 446, 457 (7th Cir. 2009). "The language of the wire fraud statute is undeniably broad." *Kousisis v. United States*, 605 U.S. 114, 135, 145 S. Ct. 1382, 1398 (2025) (affirming a wire-fraud conviction where the defendant was accused of "intentionally lying to induce a victim into a transaction that will cost her money or property") (citations omitted). A scheme to defraud exists if the defendant "made a material false statement, misrepresentation, or promise, or concealed a material fact." *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016). "However, a misrepresentation or omission is not a necessary element of a 'scheme to defraud' under the wire fraud statute"; rather, "the meaning of 'scheme to defraud' is 'measured by a nontechnical standard. It is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general [and] business life of members of society.'" *United States v. Martin*, 411 F. Supp. 2d 370, 372–73 (S.D.N.Y. 2006) (quoting *United States v. Trapilo*, 130 F.3d 547, 550 n.3 (2d Cir. 1997), and holding that an indictment stated a wire-fraud offense where it alleged that defendants schemed to fix a horse race by giving PEDs to a horse and betting on that horse to win). Conduct can form the basis of wire-fraud liability when it involves deceptive acts intended to conceal information or mislead victims. *See United States v. Pacilio*, 85 F.4th 450,

---

undifferentiated mailings. 495 F.3d at 474 to 76. *Olive Can* concerned the concealment of one company's insolvency from one creditor. Here the concealment ran across protocols, counterparties, and markets.

[15] Jump argues that the money-laundering and obstruction predicates are too attenuated from Plaintiff's loss to support standing, and cites no authority for the proposition. Mot. at 8, 12. Defendants cite no authority because no such authority supports their position. It is enough that a predicate act sufficient to cause the injury was part of the overall Section 1962 violation. *Denkewalter*, 2023 WL 3479165, at *6 (denying dismissal on that ground).

[16] Defendants do not challenge that Plaintiff alleged the use of interstate wires. Plaintiff did so. (Compl. ¶¶ 47–56, 68–84, 95, 109–111, 120–125, 129–133.) Their failure to argue otherwise should be treated as a concession.

462 (7th Cir. 2023) (holding conduct actionable "if the omission was intended to induce a false belief and action to the advantage of the schemer and the disadvantage of the victim").

**a. Plaintiff Alleges Jump's Scheme to Defraud**

Plaintiff has adequately alleged a scheme to defraud through Jump's conduct in saving UST from collapse in May 2021 and Jump's subsequent misrepresentations about and concealment of that conduct. The scheme was no different from the one at issue in *Martin*. Just as that defendant schemed to chemically enhance a horse to win bets on fixed races, Defendants artificially enhanced UST to prop its price. Jump's active concealment of the fact that it had "fixed" the UST "race" is similarly actionable. *United States v. Crump*, 179 F.4th 1137, 1150 (8th Cir. 2026) (sustaining a wire-fraud conviction based on concealment because "there is no requirement that the scheme to defraud 'involve affirmative lies'"). Because Jump's conduct involved "deceptive acts or contrivances intended to hide information" about UST's algorithm, and its subsequent lulling communications were intended to "mislead, avoid suspicion, or prevent further inquiry" into UST's algorithmic stability and the May 2021 repeg, that conduct constituted wire fraud. *Id.*; *see also United States v. Lambert*, No. 20-4590, 2022 WL 2871909, at *3 (4th Cir. July 21, 2022) (affirming denial of a motion for acquittal on a wire-fraud conviction where the defendant "concealed the presence of the bribes by using fake invoices, coded language, and a fictitious email address, and by wiring funds to a company").

The Complaint also alleges that Jump made multiple statements actionable as half-truths. *See* Section II.B.1.c, *supra.* Those statements are equally actionable for Plaintiff's wire-fraud predicate. *Weimert*, 819 F.3d at 355 (holding that wire fraud reaches "not only false statements of fact but also misleading half-truths").

Reliance is irrelevant to whether Jump committed wire fraud because that offense "does not require the false statement to be made directly to the victim of the scheme." *Weimert,* 819 F.3d at 355; *see also United States v. Hansmeier,* 988 F.3d 428, 437 (8th Cir. 2021) (affirming

a wire-fraud conviction where third parties "are used to further the scheme to defraud" and rely on misrepresentations "that have a natural tendency to influence, or are capable of influencing, the decision of the decisionmaking body to which they are addressed") (cleaned up). The focus "is not a false representation to a victim, but the development of a scheme to defraud." *United States v. Kidd*, 963 F.3d 742, 749 (8th Cir. 2020); *see also United States v. Biesiadecki,* 933 F.2d 539, 544 (7th Cir. 1991) *(*a scheme to defraud "does not require that the victim actually be defrauded"). Jump's and Kariya's public-facing statements touting the strength of UST's algorithm were designed to defraud traders in the Terraform ecosystem; those statements, coming from a major market participant such as Jump, would "have a natural tendency to influence, or are capable of influencing" those traders. *Kidd*, 963 F.3d at 747. That is sufficient.

Jump and DiSomma argue that the trading at issue was non-actionable: Jump was merely trading an asset priced below its fair value, and DiSomma adds that (1) a "strategy change" is not fraud and (2) because UST did not trade on a rules-based exchange, no implied representation could arise from Jump's market conduct. (Mot. at 20-23; DiSomma Mot. at 8 n.6.) Each argument fails.

*First*, Defendants' argument that the trading was categorically innocent because of UST's "true value" ignores the Complaint's allegation that the Defendants did not believe they were paying fair value. Plaintiff alleges that Defendants made these purchases only because Terraform immediately vested their in-the-money LUNA grants and had they not intervened, the value of those grants would have been destroyed. (Compl. ¶¶ 68-69, 73-74.) That is why Jump accumulated and held more than 62 million UST *anonymously* across multiple exchanges, then allowed the market to attribute the resulting repeg to a functioning algorithm. Further, after the peg was restored, Jump began quietly *unwinding its own holdings* at the expense of the broader market. (Compl. ¶ 77.) Jump's self-interested trades will be a key focus of discovery.

*Second*, contrary to DiSomma's arguments (DiSomma Mot. at 7-8), his directive to Jump's traders to accumulate UST was fraudulent because of the concealed reasons for that directive. DiSomma overhauled Jump's trading strategy to focus on accumulating UST the same day Terraform eliminated the vesting conditions on Jump's LUNA options, and the purchases that followed were executed anonymously across multiple venues. (Compl. ¶¶ 68-74.) The strategy changed not because of "unusual market conditions," as DiSomma would have this Court believe (DiSomma Mot. at 7), but because Kwon asked for Jump's help, Jump demanded more immediate compensation than previously arranged for that help, and Kwon agreed to the deal. (Compl. ¶¶ 63–64, 67–70, 73.)

*Third*, there is no requirement that trading take place on a rules-based exchange; regardless of venue, one who trades with a deceptive purpose or intent may be guilty of wire fraud. *United States v. Chanu*, 40 F.4th 528, 541 (7th Cir. 2022) (holding that a trader who signals an intent to trade while privately intending to cancel advances "a quintessential 'half-truth' or implied misrepresentation"). Plaintiff alleges that Jump's secret intervention supplied the cryptocurrency market with inaccurate information about UST by creating the illusion that its algorithm functioned as designed. That intervention therefore constitutes wire fraud. *See United States v. Vorley,* 420 F. Supp. 3d 784, 801 (N.D. Ill. 2019) (denying dismissal of a wire-fraud claim where the indictment alleged "a scheme to create the illusion of market movement" in which the defendant "supplied the market with inaccurate information" through spoofing orders that had the effect of "inducing by the placement of those orders a false belief about" the underlying asset).

**b. Plaintiff Adequately Alleges Jump's Intent to Defraud**

The Complaint pleads fraudulent intent through Jump's transaction-linked motive, deliberate secrecy, and continued promotion of the false algorithmic narrative. Jump knew that allowing UST to permanently depeg or disclosing its secret involvement in the repeg would

threaten the value of its holdings. (Compl. ¶¶ 192, 197.) Plaintiff's allegations are "strong inference[s] of fraudulent intent" because Jump had "a motive for committing fraud" in the form of potential LUNA profits if UST's price remained stable. *Prasinos v. National Mortgage Bank of Greece,* No. 89 C 5378, 1990 WL 114713, at *2 (N.D. Ill. July 23, 1990) ("strong inference of fraudulent intent can be established by allegations of facts showing a motive for committing fraud"). Jump's pattern of committing and concealing the fraud, representing the algorithm as functional despite knowledge of its problems, and attempting a second rescue in May 2022 further corroborates that inference. *United States v. Pust*, 798 F.3d 597, 600–01 (7th Cir. 2015) (finding that a rational jury could infer knowledge of falsity and intent from the defendant's involvement in the scheme, continued misrepresentations to victims, and continued participation); *United States v. Palma*, 182 F.4th 663, 669 (7th Cir. 2026) (finding that the defendant's pattern of misleading investors about his finances and having his accountant mischaracterize his spending was sufficient for the jury to infer an intent to defraud). Taken together, these facts support a strong inference that Defendants knew the truth, knew the market was being misled, and acted to preserve the deception. *Elder*, 2023 WL 6382354, at *2.

**2. Plaintiff Has Adequately Alleged Money Laundering**

The Complaint alleges money-laundering through transactions involving the proceeds of Jump's wire fraud scheme. To state a money-laundering predicate under 18 U.S.C. §§ 1956 and 1957, a plaintiff must allege (1) a qualifying transaction involving criminally derived proceeds; (2) knowledge of the proceeds' unlawful source, and either (a) intent to promote the unlawful activity or (b) knowledge that the transaction was designed to conceal the nature, source, location, ownership, or control of the funds. *United States v. Turner*, 400 F.3d 491, 497 (7th Cir. 2005) (holding the statutory concealment inquiry turns on indicia "indicative of a design to conceal"). Plaintiff has alleged money laundering under these elements.

**a. Plaintiff Has Alleged That the Transactions Involved the Proceeds of Unlawful Activity**

The alleged vested LUNA and LFG Bitcoin transfers are criminally derived property because the Complaint ties them to value generated by the wire-fraud scheme. Proceeds generated by wire fraud are "criminally derived property" under Section 1957(f)(3). *United States v. Black*, 469 F. Supp. 2d 513, 538 (N.D. Ill. 2006). The Complaint alleges that the criminally derived proceeds are the LUNA transferred to Jump under the vesting concession, the recurring LUNA distributions, the tokens sold to Jump in January 2022 for Bitcoin, and the approximately 52,189 Bitcoin that LFG transferred to Jump in May 2022. (Compl. ¶¶ 68–69, 82, 87, 104–107, 121–122, 156–160.) Each asset was generated by or derived from the fraudulent ecosystem: the vesting concession was the price Terraform paid for Jump's secret rescue of UST (Compl. ¶¶ 68–69); the LUNA transferred through the arrangements had value only because Jump's intervention and concealment kept the ecosystem alive (Compl. ¶¶ 82, 104–107); and LFG held Bitcoin that it could transfer only because of the lies Jump's conduct enabled Terraform and Jump to promote. (Compl. ¶¶ 121–122, 159(c).)

Plaintiff has alleged sufficient separation between the wire fraud transactions and the money laundering transactions. Jump committed wire fraud through its scheme to deceive buyers about UST's algorithm, carrying out that scheme by secretly saving UST's peg in May 2021, releasing public statements touting that same algorithm despite its nonfunctionality, and taking active steps to conceal its role in both. (Compl. ¶¶ 70–77, 80–84, 95, 109–111.) Jump's liability for money laundering arises from subsequent financial transfers through which the conspirators extracted and distributed the proceeds that the scheme generated. (Compl. ¶¶ 121–122, 159(c).) Each transfer occurred after the fraud had generated the value it laundered and is therefore a distinct transaction involving proceeds of completed unlawful activity. *United States v. Aslan*, 644 F.3d 526, 545 (7th Cir. 2011) (finding sufficient separation where the

predicate crime was wire fraud and the money laundering was the intentional concealment of the proceeds).

Moreover, absent Jump's wire fraud, the Complaint plausibly alleges that the Terra ecosystem would have collapsed in May 2021, before Terraform could form and promote LFG as a public reserve. (Compl. ¶¶ 80–81, 98–103.) The subsequent LFG token sales and Bitcoin reserve therefore depended on the confidence created by Jump's secret rescue and continuing public promotion. (Compl. ¶¶ 104–111.) The Bitcoin transfer was made possible by the preceding predicate acts but was sufficiently distinct in time and purpose from the deception to constitute a separate transaction involving proceeds of unlawful activity. (Compl. ¶¶ 120–122, 154–160.) *United States v. Esterman*, 324 F.3d 565, 570 (7th Cir. 2003) (distinguishing transactions "from which illegal proceeds were derived and further transactions designed to conceal the source of those proceeds").

**b. Defendants Knew the Funds Were Criminally Derived**

The Complaint alleges that Defendants knew the funds were criminally derived. Knowledge of the unlawful source of proceeds may be inferred from the defendant's control over the entities that received the proceeds and from the circumstances surrounding the transactions. *Domanus v. Lewicki*, 779 F. Supp. 2d 739, 746 (N.D. Ill. 2011) (declining to dismiss money-laundering predicates where the complaint plausibly alleged that controlled entities knowingly received misappropriated proceeds, with knowledge inferable through the principals who controlled them). However, no such inference is needed here. The same actors who planned and concealed the rescue controlled or received the challenged proceeds. (Compl. ¶¶ 156–160.) *United States v. Gracia*, 272 F.3d 866, 873–74 (7th Cir. 2001) (holding that cumulative circumstantial evidence, including the defendant's supervision and facilitation of transactions in a check kiting scheme, was sufficient to support an inference that the defendant knew the proceeds were derived from unlawful activity). The knowledge Kariya and DiSomma

had about those plans and the subsequent concealment is attributable to all Jump entities. *Shapo*, 246 F. Supp. 2d at 959 (for money-laundering purposes, a principal's knowledge is attributable to entities the principal controls). The Complaint alleges the requisite knowledge directly. *United States v. Matthews*, 140 F.4th 893, 898 (7th Cir. 2025) (holding that the defendant who diverted lender repayment funds to personal accounts and directed employees to mislabel disbursement had sufficient knowledge of the criminal nature of the proceeds to support money laundering convictions).

**c. Plaintiff Alleges the Transactions Promoted Unlawful Activity**

The Complaint plausibly alleges that Jump's transfers of criminal proceeds promoted unlawful activity. The promotion prong of 18 U.S.C. § 1956 reaches the practice of reinvesting proceeds to sustain unlawful activity. *United States v. Febus*, 218 F.3d 784, 789–790 (7th Cir. 2000). The Complaint alleges that Jump and Terraform essentially shuttled the same funds between each other for almost 3 years to create the illusion of thriving liquidity for UST and LUNA: (1) From 2019–2020, Jump received LUNA from Terraform under the terms of the parties' market making agreement and the negotiations between Kariya and Kwon during the May 2021 depeg (Compl. ¶¶ 47, 50, 87.), which Jump progressively liquidated for a total profit of $1.28 billion; (2) in January 2022, LFG sold more LUNA to Jump-controlled entities at a 40% discount from market price, for a total of $350 million; and (3) during the second depeg in May 2022, LFG transferred nearly 50,000 Bitcoin to Jump to fund another effort to defend the peg. (Compl. ¶¶ 68–82, 104–111, 120–125, 156–160.) Each of these transfers served the purpose of sustaining Jump's unlawful activity: (1) the discounted LUNA and recurring distributions created incentives to keep the Terraform ecosystem alive long enough for Jump to receive and monetize its LUNA positions; (2) LFG's LUNA sale to Jump provided Jump with access to more liquidity at a discounted price, which it could later use for any future defense of UST's peg; and (3) LFG's transfer of Bitcoin to Jump was, in its most literal sense,

for the purpose of Jump continuing its scheme with Terraform by using that Bitcoin to defend UST's peg. (Compl. ¶¶ 106–111.) That Jump and Terraform designed LFG to serve as the public-facing "legitimate" front through which Jump could continue its scheme furthers the sufficiency of Plaintiff's allegations under the promotion prong of § 1956. *United States v. Masten*, 170 F.3d 790, 797 (7th Cir. 1999) (holding that a defendant's use of Ponzi scheme proceeds to maintain an appearance of legitimacy satisfied the promotion prong).

#### d. Plaintiff Alleges the Transactions Concealed the Nature of the Funds

The concealment prong of Section 1956(a)(1)(B)(i) is satisfied if, based on the surrounding circumstances, the transaction was "designed in whole or in part" to conceal or disguise the nature, location, source, ownership, or control of the proceeds. *Turner*, 400 F.3d at 496–97 (7th Cir. 2005).[17] The defendant need not have completely succeeded in concealing the transfer from everyone; it is enough that the transaction was designed to obscure the proceeds' character from those outside the scheme. *Esterman*, 324 F.3d at 571 (holding that the defendant's use of a personal account to conceal or disguise proceeds was sufficient).

As explained above (*see* Section II.B.1.b, *supra*), Defendants took numerous steps to conceal Jump's role and ongoing relationship with Terraform. (Compl. ¶¶ 49, 52–53, 56, 74, 95, 100–111, 158(a), 129–132.) Those activities—especially DiSomma's order to unwind the mass UST purchases slowly and routing peg-defense funds through LFG—likewise show a design to conceal the illegal nature of the funds used to pay Jump and to purchase UST fraudulently in 2021. *Turner*, 400 F.3d at 497 (identifying unusual secrecy, structured transactions, third-party routing, and unusual financial moves as circumstances indicative of a

[17]Jump's response to *Turner's* concealment indicia is that the transactions "were memorialized in contracts" known to the LFG Governing Council. Mot. at 33. The contracts were themselves secret at Jump's insistence. (Compl. ¶¶ 49, 52.) The Complaint also alleges that Kwon and Kariya jointly directed LFG's resources and that LFG served Jump's interests. (Compl. ¶¶ 102–114.) Documentation among co-conspirators is not transparency to the market, and the concealment inquiry asks whether the transaction was designed to obscure the proceeds' character from those *outside* the scheme. *United States v. Esterman*, 324 F.3d 565, 571 (7th Cir. 2003).

design to conceal); *United States v. Reynolds,* 64 F.3d 292, 297 (7th Cir. 1995) ("The requirement of concealment or disguise can be directed to the nature, location, source, ownership or control of the proceeds").

The alleged concealment operated through three related steps. *First*, Jump secretly propped up UST in May 2021 by deploying approximately $100 million of its own capital. In exchange, Terraform removed the vesting conditions on Jump's LUNA options, allowing Jump to receive and monetize those positions. (Compl. ¶¶ 68–77, 82, 87.) *Second*, in January 2022, LFG entered token-sale arrangements totaling $350 million with Jump-controlled entities, granting LUNA at a 40% discount to market value. Jump helped design the terms and participated in the sale, acquiring several hundred million dollars' worth of discounted LUNA. (Compl. ¶¶ 104–107, 159(b).) The Complaint alleges that these transactions allowed Jump to benefit from the ecosystem while presenting LFG as an independent reserve and concealing Jump's financial stake. *Third*, in May 2022, LFG transferred nearly 50,000 Bitcoin, worth nearly $2 billion, directly to Jump for no consideration so that Jump could attempt to defend UST's peg. There was no agreement or restriction governing how Jump could deploy the Bitcoin, including whether it could trade for its own benefit or return proceeds to LFG or Terraform. (Compl. ¶¶ 120–122, 159(c).) If Jump intended only to make a transparent reserve investment, it could have disclosed that it would execute the reserve's trades or deployed its own capital openly. Instead, the public was told that LFG was the reserve and that Jump was merely a counterparty with which the Foundation would trade, while Jump in fact received the reserve assets and directed their use. The Complaint plausibly alleges that the transfer was designed, at least in part, to obscure Jump's ownership, control, and role in the second rescue. *Dexia Credit Local v. Cuppy*, No. 10 C 1563, 2010 WL 3257873, at *2 (N.D. Ill. Aug. 16, 2010) (denying dismissal of money-laundering claims where the complaint alleged that

defendants routed loan proceeds through a network of related entities and shell companies to obscure the true beneficiary and disguise the proceeds' origins from outside investigators).

### E. Defendants Engaged in An Association-in-Fact Criminal Enterprise by Secretly Inflating UST's Value for Jump's Benefit

Despite Defendants' claims to the contrary, the Complaint alleges an association-in-fact enterprise. An association-in-fact enterprise under Section 1962(c) requires three structural features: a common purpose, relationships among those associated with the enterprise, and longevity sufficient to permit the associates to pursue that purpose. *Boyle v. United States*, 556 U.S. 938, 946 (2009). *Boyle* deliberately rejected any requirement of an "ascertainable structure" beyond those three features, holding that Congress used "enterprise" capaciously and that courts should not impose structural prerequisites that the statute does not contain. *Id.* at 948. Additionally, "separate from the RICO enterprise, the plaintiff must point to a 'person'—that is, the defendant." *Malik v. Prairie Raynor LLC*, No. 23 C 1182, 2026 WL 2655115, at *12 (N.D. Ill. Sept. 9, 2026). The Complaint satisfies each element.

The enterprise's common purpose was to preserve UST's peg secretly and thereby protect the value of Jump's undisclosed vested LUNA. (Compl. ¶¶ 47–56, 68–84.) *United States v. Hosseini*, 679 F.3d 544, 558 (7th Cir. 2012) (finding a common enterprise purpose of profiting through unreported transactions). Without Jump's intervention, UST would have failed in May 2021; without Terraform's immediate vesting of Jump's LUNA options, Jump would not have intervened. Because the participants in Jump's scheme have an "unusual degree of economic interdependence" and coordinated in a manner "essential to the success of the alleged scheme," they had a common purpose. *AbbVie Inc.*, 2025 WL 2374490, at *5 (citing *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 656 (7th Cir. 2015)).

The relationships ran through the Gentleman's Agreement (Compl. ¶ 50), the vesting quid pro quo (Compl. ¶¶ 68–69), the coordinated trading during the May 2021 depeg (Compl. ¶¶ 70–77), the joint concealment of Jump's intervention (Compl. ¶¶ 80–84, 95), the coordinated

public statements (Compl. ¶ 111), and the LFG Bitcoin transfer (Compl. ¶ 122). Plaintiff alleged the requisite relationships for an enterprise by supplying facts pointing to a coordinated fraudulent scheme. *See, e.g., Jay E. Hayden Found. v. First Neighbor Bank, N.A.*, 610 F.3d 382, 384, 388–89 (7th Cir. 2010) (holding that the plaintiff adequately alleged an enterprise by pointing to a coordinated fraudulent scheme).

The Complaint sufficiently alleges the requisite longevity because the enterprise's operations lasted from at least November 2019 (the first LUNA loan agreement) through May 2022 (the collapse), a period of approximately two and a half years. (Compl. ¶¶ 47, 128.) A scheme has sufficient longevity when it "lasted long enough for its members to pursue the enterprise's purpose of attracting investors and profiting from their purchases." *Sor v. TCF Nat'l Holdings, Inc.*, No. 23 C 2401, 2023 WL 8451805, at *5 (N.D. Ill. Dec. 6, 2023). The Complaint alleges that Jump's intervention instilled confidence in UST, which caused the Terraform ecosystem to balloon to $40 billion in value. (Compl. ¶ 10.) It also alleges that Jump profited $1.28 billion from that expansion. (Compl. ¶ 4.) That is more than what is required.

Finally, the enterprise is distinct from its members. Plaintiff alleges that the Jump entities and Tai Mo Shan are separate corporate forms. *See Beiersdorf, Inc. v. International Outsourcing Services, LLC,* No. 06 C 0726, 2008 WL 11456224, at *5 (E.D. Wis. Apr. 30, 2008) (denying dismissal because a corporation and its outside agents can form an association-in-fact enterprise where each is a legally distinct entity playing a distinct role). The Complaint further alleges that the activities underlying Jump's wire fraud and money laundering departed from Jump's typical role as a neutral market maker. *Chen v. Mayflower Transit, Inc.,* 159 F. Supp. 2d 1112, 1115 (N.D. Ill. 2001) (denying dismissal because the corporation and its agents went beyond the corporation's normal affairs). The same is true of DiSomma and Kariya: although they are associated with Jump, they are "not identical to" it. *Latimer v. Hall Financial Group, Inc.*, No. 90 C 0156, 1991 WL 164332, at *1 (N.D. Ill. Aug. 20, 1991) (denying

dismissal because the defendant was "associated with, but [was] not identical to," the enterprise formed with his entities). Whether Jump or the individual defendants controlled the enterprise is immaterial. *Dixon v. Gatzke*, 790 F. Supp. 3d 679, 703 (N.D. Ill. 2025) (declining to dismiss RICO where allegations that service providers built the platform and performed marketing functions plausibly showed indirect participation in the enterprise).

### F. The PSLRA Does Not Bar Claims Targeting Fraud Independent of Securities Transactions

Defendants' arguments for dismissal under the Private Securities Litigation Reform Act ("PSLRA") misconstrue Plaintiff's RICO theory. The operative question is whether the alleged fraud "would have been actionable as fraud in the purchase or sale of securities," not whether securities happened to be involved in the surrounding events. *Menzies*, 943 F.3d at 334–36 (7th Cir. 2019). Plaintiff does not allege that UST or LUNA are securities, does not allege securities fraud claims, and does not allege facts establishing securities fraud. Nor do Defendants conduct any meaningful analysis under *Howey* or *Reves*. Instead, they confusingly argue that, because the SEC charged and adjudicated *Terraform's* securities fraud, Plaintiff's claims against Jump are likewise chargeable as securities fraud. (Mot. at 13.) But Jump is not Terraform. Terraform and Kwon issued UST and LUNA and, as alleged in the Complaint, made numerous misrepresentations not only about UST, but also about LUNA and the Terraform ecosystem as a whole. (Compl. ¶¶ 2, 4, 9, 35–36, 84, 88, 90–94, 100–101, 109–111.) The SEC's suit against Terraform does not mean that Jump is equally chargeable with securities fraud, particularly because the SEC did not name Jump as a party in its complaint against Kwon and Terraform. (Compl. ¶ 12.)[18]

The Complaint bases the RICO predicates on common-law and statutory fraud concerning UST's algorithm and Jump's secret and concealed intervention. Jump itself

[18] Defendants' focus on an apparent typo in the prayer for relief (Mot. at 14) is an effort to distract from the fact that the complaint does not allege any securities fraud claims or even facts establishing that any assets Plaintiff bought were securities

"dispute[s] that UST and LUNA are securities." (Mot. at 14 n.10.) Indeed, Jump has recently argued that a complaint predicated on substantially the same facts, allegations, misrepresentations, and concealment efforts could *not* be brought as a securities claim. *See Patterson*, 2026 WL 2605224, Dkt. No. 208. This Court should not permit Jump to assert here that these facts support securities fraud, and therefore shield Jump from RICO liability, while repeatedly undermining that same argument in an almost identical proceeding. *Schaefer v. Graf*, 2021 WL 1784788, at *3 (N.D. Ill. 2021) (stating that the PSLRA applies only to securities claims).

The Complaint also alleges money laundering as a separate RICO predicate under 18 U.S.C. §§ 1956 and 1957, based on the discounted LUNA transfers, LFG token-sale arrangements, and the transfer of nearly 50,000 Bitcoin from LFG to Jump. (Compl. ¶¶ 156–160.) These predicates are based on laundering proceeds derived from wire fraud and do not involve the purchase or sale of any security. Because the PSLRA bar applies only where the predicate acts "would have been actionable as fraud in the purchase or sale of securities," *Menzies*, 943 F.3d at 334–36, it has no application to money-laundering predicates grounded in the concealment and promotion of wire-fraud proceeds.

Further, "the RICO Amendment bars claims only when the alleged fraud is in the actual purchase or sale of securities, not when securities are incidental to the fraud." *D'Addario v. D'Addario*, 75 F.4th 86, 94 (2d Cir. 2023) (citing *Menzies*, 943 F.3d at 335); *Ouwinga v. Benistar 419 Plan Servs.*, 694 F.3d 783, 791 (6th Cir. 2012) (denying dismissal of a RICO claim over a PSLRA argument where the purchase of life-insurance policies that qualified as securities was incidental to the defendants' fraud); *Rezner v. Bayerische Hypo-Und Vereinsbank AG*, 630 F.3d 866, 871–72 (9th Cir. 2010) (similar for tax fraud). Here, Jump's purchase of UST, which Jump argues is not a security, was, at most, incidental to its wire fraud and money laundering. Plaintiff's injuries arose from the misapprehension that Jump's

transactions created about UST's validity as an algorithmic stablecoin and from the continued misrepresentations Jump made about that subject. *See Kinnetz v. Benaiah Holdings, Inc*., No. 4:25-CV-04134-CCT, 2026 WL 1413678, at *7 (D.S.D. May 20, 2026) (denying dismissal of a RICO claim related to a cryptocurrency investing arrangement where "the fraud is connected to [the defendant's] representations" rather than to the purchase or sale of a security).

Jump further argues that the PSLRA bars Plaintiff's RICO claims because the Complaint refers to the SEC's action against Terraform and Kwon. (Mot. at 24-26.) But the SEC's separate allegations against different parties do not transform Plaintiff's wire-fraud and money-laundering predicates into securities-fraud claims. The Complaint alleges that Jump secretly manipulated UST's price, concealed the algorithm's failure, and used the resulting false narrative to induce purchases of the stablecoins; it does not plead a Section 10(b) or Section 12 claim. *See B & T Supplies, Inc. v. GemJ Chehebar Grat, LLC,* No. 23-CV-11241 (GHW) (HJR), 2024 WL 5181330, at *7 (S.D.N.Y. Dec. 20, 2024) (finding that "the RICO amendment also must not be construed so broadly as to bar RICO claims based on common law frauds that happen[ed] to involve securities").

Finally, Defendants cannot have it both ways. They argue on one hand that Plaintiff did not "rely upon" any Jump or DiSomma misrepresentation; on the other hand, they invoke the PSLRA on the premise that the same conduct was actionable securities fraud. Reliance on a misrepresentation is part of the securities-fraud theory they say triggers the bar. *Mezzonen, S.A. v. Wright*, No. 97 CIV. 9380 LMM, 1999 WL 1037866, at *4 (S.D.N.Y. Nov. 16, 1999) (denying dismissal over PSLRA argument where a plaintiff "does not rely upon" the statements meant to induce a securities transaction and focused instead on the "concealment" of the fraud).

## IV. Plaintiff Has Stated a Claim for Conspiracy to Commit RICO

The Complaint alleges an agreement by each Defendant to advance the enterprise's racketeering. For a claim under 18 U.S.C. § 1962(d), a plaintiff must allege that each defendant

agreed to participate in an enterprise's affairs through a pattern of racketeering activity and agreed that someone would commit at least two predicate acts in furtherance of that objective. *United States v. Quintanilla*, 2 F.3d 1469, 1484 (7th Cir. 1993). Notably, there is no requirement that each member of the conspiracy commit the underlying predicate acts. (*Id.*) (holding § 1962(d) requires agreement to the RICO objective rather than personal commission of the predicate acts); *Salinas v. United States*, 522 U.S. 52, at 64–65 (1997) (same).[19]

### A. Each Defendant Agreed to Participate in an Endeavor That Would Violate RICO

Plaintiff's allegations support an inference that each Defendant agreed to participate in the enterprise. The agreement required by Section 1962(d) need not be a formal contract; it may be inferred from the circumstances. *Domanus*, 847 F.3d at 428 ("when the acts performed by the alleged members of the conspiracy are unlikely to have been done alone, the court may infer the agreement"); *Lanzetta v. 11902 Longwood LLC*, No. 24 C 11404, 2025 WL 2576746, at *4 (N.D. Ill. Sept. 4, 2025) (denying dismissal because the defendant's senior role and substantial involvement were "strong circumstantial evidence" of knowledge of the conspiracy's "essential scope and nature").

The Complaint pleads the agreement through the original November 2019 market-making agreement, the Gentleman's Agreement, and the vesting quid pro quo. Kariya conditioned Jump's intervention in the 2021 depeg on eliminating the vesting restrictions on Jump's LUNA holdings; Kwon agreed to that condition. (Compl. ¶¶ 68–69.) DiSomma received the message "he's going to vest us" and responded operationally by deploying approximately $100 million and directing the purchases. (Compl. ¶¶ 69, 70–77.) The message

[19] Jump's conspiracy authorities divide into two groups. The first is derivative: *Honey Transshipping* and *Starfish* hold only that a conspiracy count fails when the substantive count does. 87 F. Supp. 3d at 865; 370 F. Supp. 2d at 781. Because the substantive claim is adequately pleaded, those cases have no independent force. The second group condemns conclusory agreement allegations. Those arguments fail for the reasons explained herein. (*See* Section IV, *supra*.) But the Complaint is not vague, and Plaintiff need not plead the conspiratorial agreement with the same particularity as the underlying fraud because the agreement may be inferred from the surrounding conduct. *Am. Int'l Grp., Inc.*, 722 F. Supp. 2d at 965–66 (N.D. Ill. 2010).

"prop to Do [Kwon] was well timed" (Compl. ¶ 76) confirms that the repeg trading was understood within Jump to be connected to the arrangement with Terraform. These allegations identify the agreement, the parties, the consideration, and the participants' knowledge of their roles. *See Beiersdorf,* 2008 WL 11456224, at *6 (agreement to form the enterprise and to commit predicate acts "can be inferred" from allegations and the participants' roles).

### B. Defendants Agreed to Commit At Least Two Overt Acts in Furtherance of the Conspiracy

The Complaint identifies the coordinated acts that implemented the agreement. Section 1962(d) requires an agreement to conduct or participate, directly or indirectly, in the conduct of an enterprise's affairs through a pattern of racketeering activity; a conspirator need not personally commit or agree to commit every predicate act. *Salinas*, 522 U.S. at 61–62; *Quintanilla*, 2 F.3d at 1484–85. As explained above, Jump, Kariya, DiSomma, and Terraform entered into multiple agreements to maintain the UST peg, protect Jump's LUNA options, and preserve the public narrative that the algorithm had succeeded. The Complaint's allegations of written agreements, Signal communications, the vesting concession, coordinated trading, and continuing public statements provide far more than a conclusory assertion of agreement. *United States v. Swan*, 250 F.3d 495, 499–500 (7th Cir. 2000) (affirming a conspiracy conviction because conspiracy requires only knowing agreement to facilitate the scheme).[20]

## V. Plaintiff Adequately Alleges a Claim Under the Illinois Consumer Fraud Act[21]

The Complaint states a claim under the ICFA. To state a claim under the ICFA, a plaintiff must allege (1) a deceptive or unfair act or practice; (2) intent that the plaintiff rely on the deception; (3) the conduct occurred in trade or commerce; and (4) the conduct proximately caused actual damages. *Vanzant v. Hill's Pet Nutrition, Inc.*, 934 F.3d 730, 736 (7th Cir. 2019).

---

[20] DiSomma argues that he cannot have joined a conspiracy because he is not alleged to have dealt with Kwon. DiSomma Mot. at 10. Section 1962(d) requires only an agreement to scheme; each conspirator need not personally commit the predicates or have personal contact with every participant. *Salinas*, 522 U.S. at 63–65.

[21] Jump's suggestion that the state-law claims fail under *Williams Electronics*, Mot. at 36 n.29, presumes dismissal of the federal claims. Because RICO is adequately pleaded, the premise fails. 28 U.S.C. § 1367(a).

### A. The ICFA Claim Is Not Time-Barred

Jump's assertion that Plaintiff's ICFA claims are barred under the 3-year statute of limitations cannot be resolved on the Complaint's face because the alleged concealment bears directly on when Plaintiff could have discovered the injury. The statute of limitations is an affirmative defense that is "normally considered after the pleading stage." *Lacy v. Village of Maywood*, No. 1:21-CV-3081, 2022 WL 4048538, at *3 (N.D. Ill. Sept. 2, 2022). Dismissal under Rule 12(b)(6) based on untimeliness is inappropriate "unless the complaint itself establishes that the suit is untimely and that there is no way around the time bar". *Brandolino v. Schlak*, No. 19-CV-00102, 2019 WL 3287891, at *2 (N.D. Ill. July 22, 2019). Where, as here, the alleged fraud is self-concealing, "concealment is established by the nature of the act" itself, and the plaintiff need not allege additional affirmative acts of concealment beyond the underlying scheme. *Resnick v. Schwartz*, 430 F. Supp. 3d 492, 498 (N.D. Ill. 2019). In such cases, the limitations period is tolled even without separate concealment steps beyond the fraud itself. *Puttkammer v. Stifel, Nicolaus & Co.*, 365 F. Supp. 495, 497 (N.D. Ill. 1973). As detailed above, the nature of Jump's conduct served to conceal that same conduct from Plaintiff. (*See* Section II.B.1.b, *supra*). The limitations period was therefore tolled until Plaintiff discovered Jump's fraud in 2023. Moreover, because the scheme involved coordinated concealment between Defendants and Terraform, the tolling applies to all Defendants. *White v. Kenneth Warren & Son, Ltd.*, No. 99 C 1740, 2000 WL 91920, at *3 (N.D. Ill. Jan. 14, 2000).[22]

Defendants also cannot defeat tolling by pointing to prior lawsuits or press coverage regarding the Terra collapse. The existence of public litigation or media reports does not establish inquiry notice as a matter of law. *Linet Americas, Inc. v. Hill-Rom Holdings, Inc.*, No. 21 CV 6890, 2024 WL 5481336, at *4 (N.D. Ill. Jan. 17, 2024). The Motion's reliance on

[22] Jump relies on *Fid. Nat'l Title Ins. Co. v. Howard Sav. Bank*, 436 F.3d 836, 837 (7th Cir. 2006) in arguing that Plaintiff's ICFA claim is untimely. (Mot. at 37.) That is a summary judgment decision, not a motion to dismiss. Discerning when Plaintiff discovered he had been wrongfully injured requires discovery not yet conducted.

allegations in *Patterson* likewise does not establish when Plaintiff discovered his wrongful injury, what he knew about Jump's secret agreements and compensation, or whether he saw that pleading. (Mot. at 37.) Those are factual questions inappropriate for resolution at this stage.

**B. Plaintiff Alleges a Sufficient Connection to Illinois**

The Complaint alleges an Illinois nexus because Jump conceived, directed, and disseminated the challenged conduct from Illinois. The ICFA extends to conduct with a sufficient connection to Illinois, and courts apply a flexible, fact-intensive test to determine whether that nexus exists. *Avery v. State Farm Mut. Auto. Ins. Co.*, 835 N.E.2d 801, 854 (Ill. 2005) ("no single formula or bright-line test" governs the inquiry; "each case must be decided on its own facts").

Jump reads its cited ICFA-nexus cases as imposing a transaction-situs rule. (Mot. at 38-39.) But courts have sustained ICFA claims with analogous nexus allegations even where the plaintiff resides outside Illinois, so long as the deceptive conduct itself is rooted in the state. *See Al Maha Trading & Contracting Holding Co. v. W.S. Darley & Co.*, No. 12 C 1920, 2014 WL 2459674, at *10 (N.D. Ill. June 2, 2014) (allowing a nonresident plaintiff's ICFA claim to proceed where an Illinois-headquartered defendant prepared deceptive documents, contracts, and payment flows in Illinois). The Complaint alleges that Jump Trading is "Illinois-founded," "headquartered, managed, based, and operates in Illinois," that the scheme "was conceived, formulated, and disseminated from Illinois," and that Jump's trading and communications originated from Illinois. (Compl. ¶¶ 17–21, 185–187.) That is enough.

**C. Plaintiff Alleges Actionable Misconduct, Intent to Induce Reliance, and Proximate Causation**

The ICFA requires a deceptive or unfair act, an intent that the plaintiff rely on the deception, conduct in trade or commerce, and actual damages proximately caused by the conduct. *Vanzant*, 934 F.3d at 736. Whether the conduct was deceptive and whether it caused injury are fact-intensive inquiries that are not appropriate for resolution on a motion to dismiss.

*Daly v. FitLife Brands, Inc.*, No. 1:22-CV-00762, 2023 WL 6388112, at *7 (N.D. Ill. Sept. 29, 2023) (declining to resolve at the pleading stage whether the defendant's conduct was deceptive and whether it caused the plaintiff's injury); *Siegal v. GEICO Cas. Co.*, 523 F. Supp. 3d 1032, 1044–45 (N.D. Ill. 2021) (denying dismissal where the complaint alleged pre-purchase deceptive statements; proximate cause was best left to the trier of fact). Reliance is not a separate element of an ICFA claim. *Turek v. Revolution Glob., LLC*, No. 25-CV-01842, 2026 WL 710946, at *6 (N.D. Ill. Mar. 13, 2026) (holding that "reliance is not a required element" of an ICFA consumer-fraud claim).

The Complaint satisfies ICFA's causation requirement at the pleading stage. Defendants cannot tenably argue that it was not a "deceptive act" to conceal the algorithm's failure, conceal their role in inflating UST for Jump's own benefit, and issue coordinated public misstatements about UST's stability. Further, Plaintiff sufficiently alleges that these deceptive acts proximately caused his purchase decisions and resulting losses. (Compl. ¶¶ 70–84, 88–111, 207–209, 215.) Concealment by silence can supply proximate causation where, as here, the undisclosed facts would have been material to the plaintiff's decision. *Doherty v. Fed. Deposit Ins. Corp.*, No. 18-CV-0703, 2022 WL 888937, at *7 (N.D. Ill. Mar. 25, 2022) (recognizing that concealment by silence can supply proximate causation in the ICFA context). Moreover, Jump's half-truths are actionable under ICFA. *See Fleury v. GM LLC*, No. 22 C 03862, 2023 WL 3792411, at *8 (N.D. Ill. June 2, 2023) ("[A] duty to disclose may arise under Illinois law if the defendant makes an affirmative statement that it passes off as the whole truth while omitting material facts that render the statement a misleading 'half-truth'").

## VI. Plaintiff States a Claim for Unjust Enrichment

Jump unjustly enriched itself by retaining the illicit benefits of its concealed misconduct. To state a claim for unjust enrichment under Illinois law, a plaintiff must allege that the defendant unjustly retained a benefit to the plaintiff's detriment and that the retention

violates the fundamental principles of justice, equity, and good conscience. *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 545 N.E.2d 672, 679 (Ill. 1989). The Complaint alleges that Defendants delivered no value to the UST and LUNA buying public and extracted more than a billion dollars for themselves, which they retain to this day.

Jump's benefit came from Terraform: as a reward for its secret intervention in May 2021, Jump Trading and Jump Crypto received more than 65 million LUNA tokens at a greater-than-99% discount from market price, which Jump later resold for more than $1.28 billion in profit. (Compl. ¶ 223.) Jump also received market-making fees and ongoing monthly LUNA distributions. (Compl. ¶ 223.) Those distributions further incentivized Jump to keep the Terraform ecosystem alive long enough to monetize its position. (Compl. ¶ 82.) Those transfers conferred a direct benefit on Jump. *St. Clair Cnty. v. Trinity Indus.*, No. 14-1320-DRH, 2016 WL 676453, at *4 (S.D. Ill. Feb. 18, 2016) (sustaining unjust enrichment where "plaintiffs allege that they conferred a direct benefit on defendants" through purchases made in reliance on false certifications). Further, Jump's efforts to save Terraform from financial loss constitute an unjustly retained benefit that warrants recovery. *See Allant Grp., Inc. v. Ascendes Corp.*, 231 F. Supp. 2d 772, 775 (N.D. Ill. 2002) ("[S]aving another party from financial loss can constitute a benefit, for purposes of unjust enrichment").[23]

The alleged benefits came at Plaintiff's expense. As to Jump, Plaintiff purchased $80 million in LUNA and UST in reliance on public representations and acts of affirmative concealment by Jump, Kariya, Terraform, and Kwon. (Compl. ¶¶ 208–209, 225.) Jump's profits were not independent of the fraud; they depended on the continued survival of the ecosystem that Jump's concealment preserved. (Compl. ¶¶ 191–192, 224.) *See Tritoncap LLC*

[23]Jump argues that its retained benefits—market-making fees and discounted LUNA—originated in 2019 and 2020 agreements that predated the alleged fraud. Mot. at 45. But the benefit Plaintiff traces is Jump's profit from selling LUNA, which postdated Jump's fraudulent conduct and depended on it. (Compl. ¶¶ 68-69, 121-122.)

*v. Nat'l Bank Holdings*, No. 23 CV 16661, 2024 WL 7002996, at *1 (N.D. Ill. Oct. 22, 2024) (finding allegations that the defendant unjustly reaped a benefit sufficient).

It is against all justice and law for Jump to retain the benefits of its unlawful scheme at the expense of the financial ruin it inflicted on its victims. The Complaint alleges that Jump procured and retained the discounted LUNA, market-making fees, and Bitcoin through the secret rescue, market manipulation, concealment, and continuing public deception. (Compl. ¶¶ 68–84, 104–111, 121–122, 189–197, 223–226.) *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 519 (7th Cir. 2011) (retention may be unjust when revenue is obtained by deceiving plaintiffs).

## VII. Any Perceived Deficiencies in the Complaint Can Be Cured By Amendment

Even if the Court were to conclude that any aspect of the Complaint falls short, dismissal with prejudice would be inappropriate. Federal district courts grant leave to amend a complaint "freely … when justice so requires." Fed. R. Civ. P. 15(a)(2). The Seventh Circuit has construed this directive to require, in most cases, that a plaintiff whose complaint has been dismissed under Fed. R. Civ. P. 12(b)(6) be given at least one opportunity to amend. *See Runnion ex rel. Runnion v. Girl Scouts of Greater Chi. & Nw. Ind.*, 786 F.3d 510, 519 (7th Cir. 2015) (collecting cases and stating that "giving leave to amend freely is especially advisable when such permission is sought after the dismissal of the first complaint"). Plaintiff has not previously amended the Complaint in this action, and the case remains at an early stage with no discovery yet taken and one defendant, the president of Jump Crypto, fighting service. Any perceived deficiency in the specificity of particular allegations is the type of gap that targeted amendment could cure. The Court should therefore deny the Motions outright or, in the alternative, grant Plaintiff leave to amend.

## CONCLUSION

For these reasons, Plaintiff respectfully requests that the Court deny the Motions in their entirety.

Dated: September 25, 2026

Respectfully submitted,

**MCDERMOTT WILL & SCHULTE LLP**

*/s/ Daniel-Charles V. Wolf*

Daniel-Charles V. Wolf
444 W Lake St.
Chicago, IL 60606
Telephone: (312) 372-2000
dcwolf@mcdermottlaw.com

-and-

Joseph B. Evans (admitted *pro hac vice*)
M. Elias Berman (admitted *pro hac vice*)
Christopher Vaughan (admitted *pro hac vice*)
Daniel H. Kaltman (admitted *pro hac vice*)
One Vanderbilt Avenue
New York, NY 10017
Telephone: (212) 547-5400
jbevans@mcdermottlaw.com
eberman@mcdermottlaw.com
cvaughan@mcdermottlaw.com
dkaltman@mcdermottlaw.com

*Attorneys for Plaintiff*